**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| BROAD-BUSSEL FAMILY LIMITED PARTNERSHIP, MARIE LOUISE MICHELSOHN, MICHELLE MICHELSOHN and HERBERT BLAINE LAWSON, JR., Individually and on Behalf of All Other Persons and Entities Similarly Situated, | : : : : : : : : |
|           **Plaintiffs** | : **CIVIL ACTION NO.** : : |
| **vs.** | : **CLASS ACTION COMPLAINT** : |
| BAYOU GROUP LLC, BAYOU MANAGEMENT LLC, BAYOU FUND, LLC BAYOU SUPER FUND, LLC, BAYOU NO LEVERAGE FUND LLC, BAYOU AFFILIATES FUNDS, LLC BAYOU ACCREDITED FUND, LLC BAYOU OFFSHORE FUND, LLC BAYOU PARTNERS LLC, BAYOU SECURITIES LLC, BAYOU SECURITIES, LTD, BAYOU ADVISORS, LLC, BAYOU EQUITIES, LLC, IM PARTNERS, IMG, LLC, SAMUEL ISRAEL, III, DANIEL E. MARINO, RICHMOND-FAIRFIELD ASSOCIATES, CPA, PLLC, JAMES G. MARQUEZ, JEFFREY D. FOTTA, EQYTY RESEARCH AND MANAGEMENT, LLC, EQYTY RESEARCH AND MANAGEMENT LTD, CITIBANK N.A., HENNESSEE GROUP LLC, ELIZABETH LEE HENNESSEE, CHARLES J. GRADANTE, and STERLING STAMOS CAPITAL MANAGEMENT, L.P., | : : : : : **JURY TRIAL DEMANDED** : : : : : : : : : : : : : : : : : : : : : **November 17, 2005** : |
|           **Defendants.** | : : |

Plaintiffs Broad-Bussel Family Limited Partnership, Marie-Louise Michelsohn, Michelle Michelsohn and Herbert Blaine Lawson, Jr. (collectively, "Plaintiffs"), individually and on behalf of all other persons and entities similarly situated, as and for their Complaint against defendants ("Defendants"), allege as follows:

## **NATURE OF ACTION**

1.      During the period between at least December 31, 1996 and August 25, 2005 (the "Class Period"), defendants Bayou Super Fund, LLC, Bayou No Leverage Fund, LLC, Bayou Affiliates Fund, LLC, Bayou Accredited Fund, LLC, Bayou Offshore Fund, LLC, and Bayou Fund, LLC (collectively, the "Bayou Hedge Funds")[1] and defendants Bayou Group LLC, Bayou Management LLC, Bayou Securities LLC, Bayou Securities, LTD, Bayou Partners LLC, Bayou Advisors, LLC, Bayou Equities, LLC, IM Partners, IMG, LLC, Samuel Israel, III and Daniel E. Marino (collectively, with the Bayou Hedge Funds, the "Bayou Defendants" or "Bayou") solicited, sold, operated and/or participated in the operations of the Bayou Hedge Funds. Plaintiffs and other similarly situated investors purchased investment interests in one or more of the Bayou Hedge Funds during the Class Period and were damaged thereby (the "Class").  In total, Plaintiffs and members of the Class invested more than $450 million in the Bayou Hedge Funds during the Class Period.

2.      Almost since their inception, the Bayou Hedge Funds have essentially operated as a massive financial sham and Ponzi scheme orchestrated by the Bayou Defendants, with the

---

[1]      The Bayou Hedge Funds also include the following Bayou entities that are not named as defendants because they are in bankruptcy and an injunction has been issued precluding any such lawsuits, as explained more fully below:  Bayou Offshore Fund A, LTD; Bayou Offshore Fund B, LTD; Bayou Offshore Fund C, LTD; Bayou Offshore Fund D, LTD; Bayou Offshore Fund E, LTD; Bayou Offshore Fund F, LTD; and Bayou Offshore Master Fund, LTD.

assistance and participation of Bayou's banker, Citibank, N.A. ("Citibank"), and the hedge fund

advisory firms which recommended that Class members invest in the Bayou Hedge Funds. In

sum, the Bayou Defendants fraudulently lured investors to invest and maintain hundreds of

millions of dollars in the Bayou Hedge Funds during the Class Period, through a scheme of

improper acts and continuing misrepresentations and omissions regarding the business practices

and financial results, operations and condition of Bayou and the Bayou Hedge Funds. The Bayou

Defendants then unlawfully pilfered and squandered hundreds of millions of dollars that

Plaintiffs and the Class had entrusted to them as financial investments.

3.    The financial fraud and other misconduct of the Bayou Defendants was aided and

abetted by defendants James G. Marquez ("Marquez"), Richmond-Fairfield Associates, CPA,

PLLC ("Richmond-Fairfield"), Jeffrey D. Fotta ("Fotta"), Eqyty Research and Management,

LLC, Eqyty Research and Management, LTD and Citibank (collectively, the "Aider/Abettor

Defendants"). In particular, defendants Marquez, Richmond-Fairfield, Fotta, Eqyty Research and

Management, LLC and Eqyty Research and Management, LTD were close associates of Bayou

and Bayou's principals, defendants Samuel Israel, III ("Israel") and Daniel E. Marino ("Marino");

were directly or indirectly involved in planning, orchestrating and/or executing the alleged fraud;

and directly or indirectly received compensation improperly misappropriated from Class member

investors. In addition, defendant Citibank, serving as the Bayou Defendants' lead banker,

processed millions of dollars in securities and cash transactions relating to Class member

investments; knew that the Bayou funds it had on deposit were beneficially owned by Class

member investors; and directly facilitated and participated in the fraud by allowing defendants

Israel and Marino wrongfully to convert and pilfer millions of dollars in Class member assets

3

invested in the Bayou Hedge Funds, by directing such funds to individual accounts in the name of, and wholly and personally controlled by, defendant Israel.

4. In addition, defendants Hennessee Group LLC (the "Hennessee Group"), Elizabeth Lee Hennessee ("Lee Hennessee"), Charles J. Gradante ("Gradante") and Sterling Stamos Capital Management, L.P. ("Sterling Stamos") (collectively, the "Consultant Defendants") facilitated the fraud by failing to conduct proper due diligence of Bayou and the Bayou Hedge Funds prior to recommending those investments to Plaintiffs and other investors, and then by failing to monitor properly those investments, and are thus liable to those Bayou investors to whom they marketed the Bayou Hedge Funds. Plaintiffs and other investors retained the Consultant Defendants for the express purpose of properly conducting such due diligence. However, despite the presence of numerous red flags regarding Bayou's finances, operations and principals as set forth more fully below, the Consulting Defendants failed to uncover and advise Plaintiffs and other investors of a fraud that had been occurring for years. The principals of defendant Hennessee Group, defendants Lee Hennessee and Gradante, are liable because they were the alter egos and controlled the acts of defendant Hennessee Group; personally solicited and recommended Bayou investments to Plaintiffs and other investors; personally failed to investigate properly Bayou and Bayou's principals; and received direct or indirect compensation and were unjustly enriched thereby.

5. As the fraud began to unravel in July 2005, defendant Israel sent a letter to Bayou investors informing them that Bayou was closing its businesses and assuring those investors that all of their invested funds would be distributed to them once the necessary liquidation audit was complete.

6.     On August 25, 2005 -- the proposed end of the Class Period -- *The New York Times* first alerted investors to "the possible collapse" of Bayou and the Bayou Hedge Funds. By August 29, 2005, *The Wall Street Journal* reported that a self-titled "suicide note and confession", written by Bayou's CFO Dan Marino (who did not commit suicide), had been found at Bayou's abandoned headquarters in Stamford, CT.  That six-page note directly implicated Marino, Israel and others in a massive fraud on investors of the Bayou Hedge Funds dating back to 1996.  Recent media and other reports indicate that the Bayou Hedge Funds are wholly or substantially insolvent, and that hundreds of millions of dollars of Class member investments are missing and unaccounted for.  At least seven Bayou entities have already commenced bankruptcy proceedings as of the date hereof (see footnote 1, *supra*, and ¶ 41, *infra*).

7.     Since Bayou's shocking collapse, numerous investigations have been commenced by state, federal and regulatory agencies, several lawsuits have been filed, and Bayou's two principals, defendants Israel and Marino, have pleaded guilty to multiple criminal counts.  In addition, some $101 million in suspected Bayou investor funds have been seized by the Arizona Attorney General from several Wachovia Bank accounts in Flemington, New Jersey; those monies are the subject of forfeiture and other litigations.  In addition to money damages, Plaintiffs, on behalf of themselves individually and other members of the Class, seek the imposition of a constructive trust over such proceeds and further that such proceeds be equitably distributed to members of the Class in accordance with their respective losses.  Since the Bayou Defendants' announcement in July 2005 that the Bayou Hedge Funds were being closed and liquidated, none of the Bayou Hedge Fund investments has been returned to the Plaintiffs and other members of the Class.

5

8.     Defendants' misconduct has caused Plaintiffs and the Class to suffer hundreds of millions of dollars in damages.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because the matter in controversy is in excess of $5 million, exclusive of interest and costs; the matter is a class action in which at least one member of the Class is a citizen of a State different from any Defendant; and the aggregate size of the proposed Class is believed to be greater than 100 members.

10.     This action is not preempted under the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb ("SLUSA"), because, among other reasons, this case does involve "covered securities" as defined by SLUSA, 15 U.S.C. § 78bb(f)(5)(E).

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). Many of the acts and transactions giving rise to the alleged violations of law occurred in this District. In addition, numerous of the Defendants maintain their principal executive offices or residence within this District, or did so during the time of the alleged wrongdoing. Moreover, each of the Defendants resides in the State of Connecticut, and/or transacts business in the State of Connecticut, and has certain minimum contacts with State of Connecticut, and/or engaged in tortious conduct in the State of Connecticut, such that maintenance of this action does not offend traditional notions of fair play and substantial justice.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce including the mail, the Internet and telephone communications.

## THE PARTIES

### The Plaintiffs

13. Plaintiff Broad-Bussel Family Limited Partnership ("Broad-Bussel Family") is a limited partnership organized under the laws of North Carolina with registered offices located in Chapel Hill, North Carolina. During the Class Period, the Broad-Bussel Family invested in the Bayou Hedge Funds and was damaged as a result of Defendants' misconduct.

14. Plaintiffs Marie-Louise Michelsohn, Michelle Michelsohn and Herbert Blaine Lawson, Jr. (collectively, the "Michelsohn Plaintiffs") are citizens of New York. During the Class Period, the Michelsohn Plaintiffs invested in the Bayou Hedge Funds and were damaged as a result of Defendants' misconduct.

### The Bayou Defendants

15. Defendant Bayou Group LLC ("Bayou Group") is a limited liability company organized under the laws of Connecticut and has principal offices located at 40 Signal Road, Stamford, CT. Corporate records list defendants Israel and Fotta as being Principals and Members of Bayou Group. The Bayou Group is a family of companies and individuals that created, operate and control the Bayou Hedge Funds.

16. The Bayou Hedge Funds include the following funds:

a. Defendant Bayou Fund, LLC ("Bayou Fund"), which is a limited liability company organized under the laws of New York and has principal offices at 40 Signal Road, Stamford, CT;

7

      b.     Defendant Bayou Super Fund, LLC ("Bayou Super Fund"), which is a limited liability company organized under the laws of Delaware and has principal offices at 40 Signal Road, Stamford, CT;

      c.     Defendant Bayou No Leverage Fund, LLC ("Bayou No Leverage Fund"), which is a limited liability company organized under the laws of Delaware and has principal offices at 40 Signal Road, Stamford, CT;

      d.     Defendant Bayou Affiliates Fund, LLC ("Bayou Affiliates Fund"), which is a limited liability company organized under the laws of Delaware and has principal offices at 40 Signal Road, Stamford, CT;

      e.     Defendant Bayou Accredited Fund, LLC ("Bayou Accredited Fund"), which is a limited liability company organized under the laws of Delaware and has principal offices at 40 Signal Road, Stamford, CT; and

      f.     Defendant Bayou Offshore Fund, LLC, which is a company incorporated under the laws of the Delaware.

     17.    Defendant Bayou Management LLC ("Bayou Management") is a limited liability company organized under the laws of New York and has principal offices at the law firm of Faust Rabbach & Oppenheim LLP, 488 Madison Avenue, New York, NY -- Bayou's outside law firm ("Faust Rabbach & Oppenheim") -- and at 40 Signal Road, Stamford, CT. Bayou Management served as the investment advisor to, and manager of, the Bayou Hedge Funds. Bayou Management maintained primary bank accounts at defendant Citibank and additional accounts at Wachovia Bank.

18. Defendant Bayou Partners LLC ("Bayou Partners") is a company with principal offices at both 40 Signal Road, Stamford, CT and 27 Beaver Place, Boston, MA -- the home residence of defendant Fotta. Defendant Bayou Partners was involved in soliciting investment funds from members of the Class and other prospective Bayou investors, including at investor conferences held in Miami, FL in October 2000 and in Monte Carlo, Monaco in September 2000. According to its own investment literature, Bayou Partners purported to provide "advisory services to managers and investors in the alternative sector" and "specializes in identifying emerging managers ($25-500 Mill.) and positioning them in institutional investment portfolios, either through structuring multi-manager product or direct allocation."

19. Defendant Bayou Advisors, LLC ("Bayou Advisors") is a Delaware limited liability company with principal offices at Faust Rabbach & Oppenheim, and a mailing address at 40 Signal Road, Stamford, CT. Bayou Advisors was formed in or about January 2001 and is a member of the Bayou Group.

20. Defendant Bayou Equities, LLC ("Bayou Equities") is a Delaware limited liability company with principal offices at Faust Rabbach & Oppenheim, and a mailing address at 40 Signal Road, Stamford, CT. Bayou Equities was formed in or about January 2001 and is a member of the Bayou Group.

21. Defendants Bayou Securities LLC and Bayou Securities, LTD are collectively referred to as defendant Bayou Securities.

    a. Bayou Securities LLC is a limited liability company organized under the laws of New York in or about May 1997 and has principal offices located at 40 Signal Road, Stamford, CT. Bayou Securities LLC is a broker-dealer registered with the National Association

of Securities Dealers ("NASD") and the Securities and Exchange Commission ("SEC"), and, upon information and belief, is the successor-in-interest to Bayou Securities, LTD, a Delaware corporation. Bayou Securities, LTD was formed in or about January 1996 with principal offices located at 31 Buckout Road, West Harrison, NY.

b.      Bayou Securities performed securities brokerage and trading services for the Bayou Hedge Funds. Defendant Israel is the President and sole owner of Bayou Securities. During the Class Period, defendants Israel and Marquez oversaw the operations of Bayou Securities and directed the securities trades for the Bayou Hedge Funds, engaging in a "strategy" that involved buying and selling tens of millions of dollars of securities on a nearly daily basis, akin to day trading. While these securities trades generally resulted in significant losses, those trades yielded enormous commissions for Bayou Securities, from which Israel, Marino and Marquez paid themselves substantial annual salaries and profit distributions. Moreover, even occasionally profitable trades resulted in net losses because of the high commissions charged by Bayou Securities. For example, in 2003 alone, the Bayou Hedge Funds *suffered losses of some $49 million*; however, Bayou Securities *earned approximately $29 million in commissions*.

22.     Defendant IM Partners ("IM Partners") is a general partnership organized under the laws of Connecticut with principal offices at 40 Signal Road, Stamford, CT. During the Class Period, defendants Israel and Marino created IM Partners to directly participate in converting and laundering Class member investor funds. Israel and Marino then used IM Partners to, among other things, invest those wrongfully converted funds in private companies located in Europe, the United States and possibly elsewhere, including reportedly a $10 million

10

investment in Kycos Ltd. in or about 2003, and a $2 million investment in Debit Direct Ltd. beginning in or about November 2003.

23.     Defendant IMG LLC ("IMG") is a limited liability company organized under the laws of Connecticut with principal offices at 40 Signal Road, Stamford, CT. Defendants Israel and Marino created IMG in or about November 2002. According to state regulatory filings, Marino is listed as a Principal and Member of IMG. Like IM Partners, Israel and Marino created IMG to participate in their scheme to unlawfully convert Class member investor funds from the Bayou Hedge Funds.

24.     Defendant Israel is and was, at all times relevant, a founder and principal of the Bayou Group, Bayou Management, Bayou Securities, Bayou Partners, Bayou Advisors, Bayou Equities and the Bayou Hedge Funds. He is the sole owner of Bayou Management and Bayou Securities. He is also the Chief Executive Officer and Chief Investment Officer of Bayou Management, and as such, was responsible for the investment management and operations of Bayou. Defendant Israel is a citizen of New York and resides at 52 Oregon Road, Mt. Kisco, NY.

25.     Defendant Marino is and was, at all times relevant, the Chief Financial Officer and Chief Operating Officer of Bayou, including Bayou Group and Bayou Management, and was a fund manager for the Bayou Hedge Funds. Marino is also the owner and registrant for defendant Richmond-Fairfield. Defendant Marino is a citizen of Connecticut and resides at 261 Bayberry Lane, Westport, CT. He is a Certified Public Accountant, having received his license in 1990 in the State of New York. Prior to his involvement with Bayou, Marino worked at

11

several securities brokers, as well as in the audit departments at two accounting firms, Coopers & Lybrand LLP and Spicer & Oppenheim.

26.     As a result of their positions and roles as principals and officers of the various Bayou entities, defendants Israel and Marino controlled the financial operations, business practices and assets of Bayou and the Bayou Hedge Funds.

27.     As a result of their positions and roles as principals and officers of the various Bayou entities, defendants Israel and Marino owed fiduciary and other duties to the Plaintiffs and the members of the Class.  Among other things, those duties required defendants Israel and Marino to safeguard and protect the Class' investments in the Bayou Hedge Funds, to properly manage Class member investor funds as faithful fiduciaries, and to be truthful and deal honestly and fairly with the Plaintiffs and the Class.

28.     The Bayou Defendants were also bound to act in good faith by the contracts that were entered into with members of the Class governing Class member investments in the Bayou Hedge Funds.  These agreements, which typically were called Operating Agreements and Subscription Agreements, had uniform terms governing the parties' relationship.  For example, these agreements uniformly obligated the Bayou Defendants to ensure the accuracy of the Net Asset Valuations and other reports the Bayou Hedge Funds distributed to the Class.  Defendants Israel and Marino controlled each of the Bayou entities and thus had the ability and opportunity to prevent the issuance of such reports if such reports were inaccurate or to promptly correct same.  In addition, defendants Israel and Marino had unfettered access to the true financial results, operations and condition of the Bayou Hedge Funds.  Nevertheless, defendants Israel and Marino directed the Bayou Defendants' wrongdoing alleged here and knowingly disseminated

12

false and material statements and omissions regarding the financial results, operations and condition of the Bayou Hedge Funds.

**The Aider/Abettor Defendants**

29.     Defendant Marquez was, at times relevant, a principal and co-founder of Bayou Securities and the Bayou Hedge Funds with defendant Israel.  In addition, Marquez oversaw the operations of Bayou Securities.  Reportedly, defendant Marquez left Bayou in 2004 as it was plunging into insolvency.

a.     According to media reports, Marquez had long been a mentor to Israel, and Israel became a protege of Marquez.  Defendants Marquez and Israel began their relationship in the mid-1980s at F.J. Graber & Co., a small stock-trading firm.  At the time, defendant Israel was a young clerk on the trading desk, fresh from Tulane University, and the grandson of legendary commodities trader, Samuel Israel, Jr.  By contrast, Marquez was a well-known former arbitrage trader who had managed money for hedge fund managers George Soros and Michael Steinhardt.

b.     In 1990, Marquez founded a hedge fund called JGM Management ("JGM").  In 1991, Marquez hired Israel to trade stocks for JGM; Marino was hired as the fund's controller.  According to a March 1993 *Wall Street Journal* article, the JGM fund was down 40% in 1992; JGM never recouped its losses and was shut down in 1993.

c.     Defendants Marino, Israel and Marquez have also previously worked together at another hedge fund called HMR Investors, Limited Partnership (a/k/a Highly Motivated Research) ("HMR Investors").  HMR Investors is a Delaware limited partnership with

principal offices at 405 Park Ave., New York, NY; defendant Marquez and his wife, Mariella, are the General Partners of HMR Investors.

30.    Defendant Richmond-Fairfield (a/k/a Richmond-Fairfield CPA Services, PLLC) was, at times relevant, the purported outside accountant and auditor for Bayou and the Bayou Hedge Funds.

a.    Richmond-Fairfield is a limited liability company organized under the laws of New York. The Bayou Defendants falsely portrayed Richmond-Fairfield as being a legitimate public accounting firm with offices located at 575 Madison Avenue, Suite 1006, New York, NY that performed independent financial audits of Bayou.

b.    In actuality, Richmond-Fairfield was a sham company set up by defendant Marino on or about October 10, 2000 as part of the Bayou Defendants' fraudulent scheme to misappropriate Class member assets. Corporate records for Richmond-Fairfield list defendant Marino as the sole owner and report registered offices located at 111 John Street, #1720, New York, NY.

31.    Defendant Fotta was, at times relevant, a Principal and Member of the Bayou Group, according to the Connecticut Secretary of State's Commercial Recording Division. Defendant Fotta is also a principal or agent for Bayou Partners and Bayou Securities. On or about October 11, 2005, a so-called Interim Notice was filed with the Connecticut Secretary of State, by or on behalf of defendant Fotta, to remove Fotta's name as a Principal and Member of the Bayou Group -- in an attempt to conceal his involvement and relationship with Bayou.

a.    Defendant Fotta is a citizen of Massachusetts and resides at 73 Mount Vernon St., Boston, MA. Defendant Fotta also has or had a residence at 27 Beaver Place,

Boston, MA. In addition, Fotta maintains telephone listings at the 27 Beaver Place residence for

Bayou Partners and Bayou Securities, as well as for Ernst Research and Management, LLC (n/k/a

Eqyty Research and Management, LLC).

       b.     Defendant Fotta is also a co-founder and Managing Partner of defendant

Eqyty Research and Management, LLC and is a principal of defendant Eqyty Research and

Management, LTD (collectively, "Eqyty Research"). From 2003 to 2005, Eqyty Research

received at least $700,000 from Bayou Securities. According to a September 17, 2005 article in

*The New York Times*, Fotta claimed that "the payments were for research on stocks" for Bayou

through May 2005. However and in fact, the Bayou Defendants halted all stock trades and

liquidated the Bayou Hedge Funds in or about April 2004. Indeed, the $700,000 payment to

Eqyty Research was one of the means pursuant to which defendant Fotta participated in, and

personally benefitted from, the Bayou Defendants' misappropriation of Class member investor

assets.

      32.     Defendants Eqyty Research and Management, LLC and defendant Eqyty Research

and Management, LTD are collectively referred to as defendant Eqyty Research.

       a.     Defendant Eqyty Research and Management, LLC is a limited liability

company organized under the laws of Massachusetts and has principal offices located at 27

Beaver Place, Boston, MA. According to state regulatory records, Eqyty Research was formerly

known as Ernst Institutional Research; that name change occurred on July 16, 2003. Prior to that

time, Eqyty Research was known as Ernst Research and Management, LLC.

       b.     Defendant Eqyty Research and Management, LTD is a corporation with

principal offices located in Tortola, British Virgin Islands and a mailing address of 27 Beaver

Place, Boston, MA. Eqyty Research and Management, LTD is registered as an Investment Advisor with the NASD and the SEC.

c. According to a February 15, 2000 media report on *SmartMoney.com*, defendant Fotta and Eqyty Research are touted experts in the field of fundamental analysis of equities securities and supposedly pioneered a novel approach to analyzing companies based on cash flow, known as a "dual cash flow" screen. This analytical approach supposedly "has a proven record as an early warning system for companies whose earnings may be about to change." Morever, that analytical approach allegedly allows "investors [to] spot companies with real potential" by focusing on "the sustainability of earnings growth by getting a handle on how much cash flow is actually generated by paying customers and how much is being contrived by balance-sheet manipulations."

33. Defendant Citibank is a nationally chartered bank with its principal place of business at 399 Park Avenue, New York, NY. Citibank is a subsidiary of Citigroup, Inc., a Delaware corporation with principal offices located at 399 Park Ave, New York, NY.

a. Defendant Citibank served as a principal banker for Israel and the Bayou Hedge Funds. Among other things, Citibank held several of Bayou's bank accounts during the Class Period; received millions of dollars in deposits from Class member investors; transferred millions of dollars in Class member investments for securities trading and other transactions; and knew that the proceeds it had on deposit in Bayou accounts were fiduciary proceeds beneficially owned by Class members. Citibank specifically held bank accounts in the name of, among others, defendants Bayou Super Fund, Bayou No Leverage Fund, Bayou Affiliates Fund, Bayou Accredited Fund and Bayou Management.

16

b.       During the Class Period, defendant Citibank received deposits directly from members of the Class that were specifically designated as being investments in the Bayou Hedge Funds. Citibank also participated in transferring and receiving Class member funds from or relating to the securities trading activities directed by defendants Israel, Marino and Marquez. For example, defendant Citibank transferred investor funds to, and received funds from, Spear, Leeds & Kellogg, L.P., which served as Bayou's lead securities trading and clearing firm, as described more fully below.

c.       Defendant Citibank knew that the Bayou accounts it held consisted of fiduciary funds representing Class member investments in the Bayou Hedge Funds. Nevertheless, and at the request of defendant Israel, in or about July 2004 Citibank allowed defendant Israel to withdraw some $161 million from the five Bayou bank accounts that were held at Citibank in New York -- thereby completely draining those accounts -- and transferred some or all of such proceeds directly to Israel care of one or more bank accounts solely in Israel's own name maintained at Deutsche Postbank in Hamburg, Germany.

**The Consultant Defendants**

34.      Defendant Hennessee Group (d/b/a Hennessee Hedge Fund Advisory Group) is a limited liability company organized under the laws of New York which was formed in or about March 1997. Hennessee Group has principal offices at 500 Fifth Avenue, 47th Floor, New York, NY.

a.       Hennessee Group is a Registered Investment Adviser that consults hedge fund investors on asset allocation, manager selection, ongoing monitoring of hedge fund managers and asset reallocation. In its role as a hedge fund consultant, Hennessee Group

17

funneled tens of millions of dollars to Bayou by advising its clients to invest in the Bayou Hedge Funds and by facilitating those investments.

b.    The Hennessee Group charged plaintiff Broad-Bussel Family and other similarly situated investors advisory and other fees for its services.

35.    Defendant Lee Hennessee was, at times relevant, a Managing Principal of the Hennessee Group. Lee Hennessee is a citizen of New York and resides at 45 Sutton Place in New York City.

a.    In her role with the Hennessee Group, defendant Lee Hennessee touted, among other things, that she "focuses on manager selection and client services development, sharing overall management with Mr. Gradante."

b.    Lee Hennessee co-founded the Hennessee Group with defendant Gradante in 1997. Lee Hennessee directed a division of E.F. Hutton and worked for Shearson Lehman, Republic National Bank and Weiss, Peck and Greer from 1987 to 1997. Prior to that time, she worked for Thomson McKinnon Securities where she performed institutional and retail sales from 1976 to 1987. Defendant Lee Hennessee claims that she has been "Series 3 and 7 registered since 1976 and also holds Series 24, Series 65 and Series 63 registrations."

36.    Defendant Gradante was, at times relevant, a Managing Principal of the Hennessee Group. Gradante is a citizen of New York and resides at 45 Sutton Place in New York City.

a.    In his role with the Hennessee Group, defendant Gradante claimed that he "focuses on research, market analysis, risk management and portfolio design" and specifically

18

boasts that he "brings 'hands-on' experience in risk management, portfolio analysis, trading and venture capital."

    b.  Prior to co-founding the Hennessee Group in 1997, defendant Gradante had a twenty-five year financial industry career, during which he held executive positions in the banking and securities industries, including as President and CEO of Union Chelsea National Bank, Group Marketing Manager at Citibank and Chair of the Risk Management Committee of Drexel Burnham Lambert, where he was responsible for Trading Administration. Defendant Gradante claims to hold a Series 65 registration.

   37.  Defendant Hennessee Group and defendants Lee Hennessee and Gradante are collectively referred to as the Hennessee Defendants.

   38.  As a result of their positions and roles as principals and officers of the Hennessee Group, defendants Lee Hennessee and Gradante controlled the business operations and practices of the Hennessee Group.

   39.  Defendant Sterling Stamos (f/k/a Stamos Partners Capital Management, L.P.) is a limited partnership organized under the laws of Delaware and has principal offices at 450 Park Avenue, New York, NY.

    a.  Sterling Stamos is a Registered Investment Adviser, purportedly operating with "the core investment objective of producing consistent absolute returns regardless of market conditions, while protecting the principal of investors." In its role as a hedge fund consultant, Sterling Stamos funneled millions of dollars to Bayou by advising its clients to invest in the Bayou Hedge Funds and by facilitating those investments. In or about February 2005, Sterling Stamos, which itself had been invested in the Bayou Hedge Funds, withdrew its investments;

however, Sterling Stamos did not notify its own clients who invested in Bayou of these withdrawals.

        b.    Sterling Stamos provided the Michelsohn Plaintiffs and other investors with information and advice regarding various investments including Bayou.

    40.    The Consultant Defendants had fiduciary and other duties and obligations to be truthful and deal honestly and fairly with Plaintiffs and their other client investors who retained the Consultant Defendants to render financial advisory services. Among other things, those duties required the Consultant Defendants to conduct proper due diligence and monitoring of the investments they recommended to Plaintiffs and their other similarly situated client investors. Indeed, Plaintiffs and other such investors specifically relied upon the Consultant Defendants to perform properly such investigation and monitoring. However, the Consultant Defendants failed to perform their obligations, ignoring or failing to uncover numerous red flags with regard to the Bayou Hedge Funds which should have been properly investigated and timely reported to Plaintiffs and the Consulting Defendants' other client investors, all as described more fully below.

## CERTAIN OTHER RELEVANT PERSONS

    41.    Bayou Offshore Entities: The following seven Bayou entities (the "Bayou Offshore Entities") are part of the Bayou family of funds, directly participated in the wrongdoing alleged, and would have been named as defendants in this litigation but for an Order of the United States Bankruptcy Court for the District of Connecticut enjoining lawsuits against the Bayou Offshore Entities:

a.     Bayou Offshore Fund A, LTD ("Bayou Offshore Fund A"), which is a

company incorporated under the laws of the Cayman Islands;

b.     Bayou Offshore Fund B, LTD ("Bayou Offshore Fund B"), which is a

company incorporated under the laws of the Cayman Islands;

c.     Bayou Offshore Fund C, LTD ("Bayou Offshore Fund C"), which is a

company incorporated under the laws of the Cayman Islands;

d.     Bayou Offshore Fund D, LTD ("Bayou Offshore Fund D"), which is a

company incorporated under the laws of the Cayman Islands;

e.     Bayou Offshore Fund E, LTD ("Bayou Offshore Fund E"), which is a

company incorporated under the laws of the Cayman Islands;

f.     Bayou Offshore Fund F, LTD ("Bayou Offshore Fund F"), which is a

company incorporated under the laws of the Cayman Islands; and

g.     Bayou Offshore Master Fund, LTD ("Bayou Offshore Master Fund"),

which is a company incorporated under the laws of the Cayman Islands.[2]

42.     Goldman Sachs Execution and Clearing, L.P.: Goldman Sachs Execution and

Clearing, L.P. (f/k/a Spear, Leeds & Kellogg, L.P.) ("Spear Leeds") is a New York limited

partnership with principal offices located at One New York Plaza, New York, NY.

---

[2]     See Order for Preliminary Injunction and Granting of Petitions under Section 304, In re Petitions of Gordon I. Macrae and G. James Cleaver, Case Nos. 05-51154 to 60 (Bankr. Conn. Oct. 5, 2005) (Shiff, J.) (ordering "that a Preliminary Injunction is hereby issued ... enjoining all persons and entities from ... commencing or continuing any action or other legal proceeding against the [Bayou Offshore Entities], or any of their property in the United States, and seeking discovery of any nature ... against the [Bayou Offshore Entities] without first seeking and receiving permission by the Grand Court in the [Cayman Islands]").

a.      Spear Leeds is registered as a U.S. broker-dealer and futures commission merchant and provides a wide range of brokerage and investment services, including, among other things:  floor-based and electronic market making as a specialist on U.S. equities exchanges; facilitating and financing transactions with a diverse group of corporations, financial institutions, government and individuals; and executing and clearing customer transactions on major stock, options and futures exchanges worldwide.  Spear Leeds held itself out as being a reputable, honest and experienced broker-dealer.

b.      Spear Leeds served as a securities trading agent for Bayou Management, Bayou Securities and the Bayou Hedge Funds.  In that capacity, Spear Leeds maintained one or more capital trading accounts for Bayou, processed securities trading instructions from Bayou's principals, including defendants Israel, Marino and Marquez, and engaged in actual securities trading for Bayou.

c.      Spear Leeds also acted as the clearing firm for Bayou's securities transactions and transferred securities and cash proceeds to and from Bayou accounts including at Citibank in connection therewith.  Spear Leeds' clearing responsibilities include, among other things:  receiving and delivering funds from or to the customer; maintaining records that reflect the transaction; and safeguarding the funds in the customer's account.

43.     Kenneth E. Stocker:  Kenneth Stocker was, at relevant times, a principal and Managing Director of Bayou Management and a Partner of Bayou Partners.  In addition, Mr. Stocker was part of the hedge fund advisory team, along with Kathleen McLaren Williams, which advised Bayou Management and the Bayou Hedge Funds.  Mr. Stocker was also a direct marketer of the Bayou Hedge Funds.  Among other things, Mr. Stocker acted as intermediary

22

between Bayou and the institutional investor community. For example, Mr. Stocker acted as the Bayou representative for investor conferences held in Scottsdale, Arizona in January 2001; Miami, FL in October 2000; and Monte Carlo, Monaco in September 2000 -- a conference that was personally attended by defendant Fotta. Mr. Stocker reportedly left Bayou in or about June 2002 to become a Managing Director of Northeast Alternative Strategies in New York City, a then newly-created division of Northeast Securities, Inc. which serves institutional hedge funds.

44.     Kathleen McLaren Williams:  Kathleen McLaren Williams was, at relevant times, part of the hedge fund advisory team, along with Kenneth Stocker, which advised Bayou Management and the Bayou Hedge Funds. Ms. Williams reportedly left Bayou with Kenneth Stocker in or about June 2002 to become a Managing Director of Northeast Alternative Strategies in Boston, MA.

45.     Chris D'Amore:  Beginning in or about June 2002, Chris D'Amore became a direct marketer for the Bayou Hedge Funds, and thereby participated in directly soliciting members of the Class and other prospective Bayou investors to invest in the Bayou Hedge Funds. Mr. D'Amore replaced Kenneth Stocker who had previously acted as one of Bayou's direct marketers. Prior to working for Bayou, Mr. D'Amore was a marketer for the San Francisco-based hedge fund RS Investment Management.

46.     Steven D. Oppenheim:  Steven D. Oppenheim and his firm, Faust Rabbach & Oppenheim, served as counsel for Bayou during all or some of the Class Period. In addition, defendants Bayou Management, Bayou Advisors and Bayou Equities maintain a principal place of business at Mr. Oppenheim's law firm. Mr. Oppenheim is both an attorney and a Certified

23

Public Accountant, having received his CPA license in 1965 in the State of New York. In April 2005, Mr. Oppenheim was elected to serve as a Governor of the American Stock Exchange.

    a.    Prior to his law practice as a named partner of Faust Rabbach & Oppenheim, Mr. Oppenheim was the managing partner of Spicer & Oppenheim, an eight-office, 100-partner accounting firm that disbanded in or about December 1990; at that time, Spicer & Oppenheim was the nation's 15th largest accounting firm. According to media reports, the securities industry accounted for about 40% of Spicer & Oppenheim's business, which was crippled in 1987 by the Black Monday crash of the stock market.

    b.    Following the dissolution of Spicer & Oppenheim, Mr. Oppenheim and most of his New York office joined the accounting firm of Grant Thornton, which later served as Bayou's auditor up until in or about late 1998. Bayou, however, continued to falsely tell investors as late as 2002 that Grant Thornton audited Bayou's books.

    c.    In late 1991, Mr. Oppenheim left Grant Thornton to join Faust, Rabbach & Stranger as a tax lawyer. After leaving Grant Thornton, Mr. Oppenheim continued a personal business relationship with that firm. According to a September 23, 1991 article in Accounting Today, Mr. Oppenheim said at the time that "he and his family would retain Grant Thornton as accountant for certain entities, which he would not identify, that they control."

### CLASS ACTION ALLEGATIONS

47.    Plaintiffs bring this action on behalf of themselves and a Class of persons who, during the Class Period December 31, 1996 through August 25, 2005, invested funds or maintained investments in the Bayou Hedge Funds, and suffered damages thereby. Plaintiffs also bring this action on behalf of the following two subclasses: all members of the Class who,

24

during the Class Period December 31, 1996 through August 25, 2005, were advised to invest in

the Bayou Hedge Funds pursuant an investment advisory relationship with the Hennessee Group

and suffered damages thereby (the "Hennessee Subclass"); and all members of the Class who,

during the Class Period December 31, 1996 through August 25, 2005, were advised to invest in

the Bayou Hedge Funds pursuant an investment advisory relationship with Sterling Stamos and

suffered damages thereby (the "Sterling Stamos Subclass").[3]  Excluded from the Class and the

Consultant Subclasses are:  the Defendants; the principals, officers and directors of the

Defendants; the members of the immediate families of any of the foregoing persons; any entity in

which any Defendant has a controlling interest; other persons and entities presently unknown to

Plaintiffs who directly or indirectly participated in the wrongdoing alleged; and the legal

affiliates, representatives, heirs, controlling persons, successors and predecessors in interest and

assigns of any such excluded person or entity.

48.     This action is properly maintainable as a class action on behalf of the Class under

Rules 23(a), (b)(1)(B) and (b)(3) of the Federal Rules of Civil Procedure (the "Federal Rules")

because:

(a)     During the Class Period, numerous investors dispersed throughout the

United States invested hundreds of millions of dollars in the Bayou Hedge Funds, and

accordingly, those investors are so numerous that joinder of all such Class members is

impracticable.

---

[3]      The Hennessee Subclass and the Sterling Stamos Subclass are collectively referred to as
the "Consultant Subclasses".

(b)     Plaintiffs' claims are typical of the claims of the other members of the

Class.  Plaintiffs and all members of the Class similarly acquired interests in one or more of the

Bayou Hedge Funds.  Plaintiffs and all members of the Class similarly relied on the veracity of

Defendants' acts and practices and were similarly damaged by Defendants' misconduct.

(c)     Plaintiffs are representative parties who will fairly and adequately protect

the interests of the members of the Class.  Plaintiffs have retained counsel competent and

experienced in class action litigation.

(d)     A class action is superior to other available methods for the fair and

efficient adjudication of the Class' claims, because joinder of all members is impracticable.

Furthermore, although the damages suffered by Plaintiffs and other individual Class members

may be substantial, the expense and burden of individual litigation render class treatment far

superior to individual litigation in the circumstances here.  Moreover, the likelihood of all of the

individual Class members prosecuting separate claims is remote, would result in increased

litigation costs, and would be an inefficient use of judicial resources in any event.

(e)     Plaintiffs anticipate no unusual difficulties in the management of this

action as a class action.

(f)     Common questions of law and fact predominate over any questions

affecting any individual members of the Class.  The questions of law and fact which are common

to Plaintiffs and the Class include, among others:

(i)     Whether the Defendants' acts and omissions violated the law as

alleged;

26

(ii)     Whether the Bayou Defendants defrauded Plaintiffs and the Class through several sham hedge funds that they orchestrated and operated;

(iii)    Whether the Bayou Defendants misappropriated property of the Plaintiffs and the Class;

(iv)    Whether the Bayou Defendants engaged in fiduciary and other breaches of obligations owed to Plaintiffs and the Class;

(v)     Whether the Aider/Abettor Defendants aided and abetted the Bayou Defendants' misconduct as alleged;

(vi)    Whether the reports and other statements disseminated by the Bayou Defendants to the Plaintiffs and the Class misrepresented or omitted material facts about the financial results, operations and condition of the Bayou Hedge Funds;

(vii)   Whether Class members should be entitled to share ratably in accordance with their damages in any remaining proceeds of the Bayou Defendants and other Bayou Hedge Fund proceeds; and

(viii)  Whether the Plaintiffs and the Class have sustained damages and, if so, the extent of such damages.

(g)     Adjudications with respect to individual members of the Class would as a practical matter be dispositive of the interests of other members of the Class or would substantially impair or impede Class members' ability to protect their interests, particularly with respect to the $101 million Bayou Hedge Fund proceeds reportedly seized by the Arizona Attorney General which are beneficially owned by, and should be distributed ratably to, Class member investors in accordance with their respective damages, as well as all other assets which

27

are still held or maintained by the Bayou Defendants. In addition, certification of the Class under

Federal Rule 23(b)(1)(B) is also particularly appropriate here because the Bayou Defendants --

and particularly defendants Israel and Marino -- are expressly alleged to have misappropriated

and squandered many millions of dollars of Class member investments in the Bayou Hedge

Funds, and the Bayou Defendants may have insufficient assets to satisfy all Class member

claims.

      49.    This action is properly maintainable as a Class action on behalf of the respective

members of the Hennessee Subclass and the Sterling Stamos Subclass under Rules 23(a) and

(b)(3) because:

      (a)    During the relevant period, numerous investors dispersed throughout the

United States retained the Hennessee Defendants and Sterling Stamos to render financial

advisory services and, based on such advice, invested millions of dollars in the Bayou Hedge

Funds. Accordingly, the respective members of the Hennessee Subclass and the Sterling Stamos

Subclass are so numerous that joinder of all such subclass members is impracticable.

      (b)    Plaintiff Broad-Bussel Family's claims are typical of the claims of the

other members of the Hennessee Subclass, and the Michelsohn Plaintiffs' claims are typical of

the claims of the other members of the Sterling Stamos Subclass. Plaintiff Broad-Bussel Family,

the Michelsohn Plaintiffs and all members of their respective Consultant Subclasses similarly

retained the Hennessee Defendants and defendant Sterling Stamos to render financial advisory

services and made investments in one or more of the Bayou Hedge Funds as a result of such

financial advice. Plaintiff Broad-Bussel Family, the Michelsohn Plaintiffs and all members of

their respective Consultant Subclasses similarly relied on the veracity of the Consultant

Defendants' acts and practices in properly investigating the Bayou Hedge Funds, and were similarly damaged as a result.

      (c)    Plaintiff Broad-Bussel Family is a representative party who will fairly and adequately protect the interests of the members of the Hennessee Subclass, and the Michelsohn Plaintiffs are representative parties who will fairly and adequately protect the interests of the members of the Sterling Stamos Subclass. Plaintiff Broad-Bussel Family and the Michelsohn Plaintiffs have retained counsel competent and experienced in class action litigation.

      (d)    A class action is superior to other available methods for the fair and efficient adjudication of the claims of the Consultant Subclasses, because joinder of all members of the Consultant Subclasses is impracticable. Furthermore, although the damages suffered by Plaintiffs and other individual members of the Consultant Subclasses may be substantial, the expense and burden of individual litigation render class treatment far superior to individual litigation in the circumstances here. Moreover, the likelihood of all of the individual members of the Consultant Subclasses prosecuting separate claims is remote, would result in increased litigation costs, and would be an inefficient use of judicial resources in any event.

      (e)    Plaintiffs anticipate no unusual difficulties in the management of the Consultant Subclasses in this action.

      (f)    Common questions of law and fact predominate over any questions affecting any individual members of the Consultant Subclasses. The questions of law and fact which are common to Plaintiffs and the members of the Consultant Subclasses include, among others:

29

(i)     Whether the acts and omissions of the Hennessee Defendants and defendant Sterling Stamos violated the law as alleged;

(ii)     Whether the Hennessee Defendants and defendant Sterling Stamos engaged in fiduciary and other breaches of obligations owed, respectively, to Plaintiffs and to the members of the Hennessee Subclass and the Sterling Stamos Subclass;

(iii)     Whether the Hennessee Defendants and defendant Sterling Stamos failed to properly investigate Bayou and the Bayou Hedge Funds prior to recommending investments in the Bayou Hedge Funds;

(iv)     Whether the Hennessee Defendants and defendant Sterling Stamos failed to properly monitor the Consultant Subclasses' investments in Bayou and the Bayou Hedge Funds; and

(v)     Whether the Plaintiffs and the other members of the Consultant Subclasses have sustained damages and, if so, the extent of such damages.

## ADDITIONAL SUBSTANTIVE ALLEGATIONS

### The Class Invests in the Bayou Hedge Funds

50.     In seeking to attract investors to the Bayou Hedge Funds, the Bayou Defendants provided prospective investors, including Plaintiffs and members of the Class, with the Bayou Hedge Funds' offering memoranda, subscription agreements, operating agreements and other general marketing materials.

51.     Investments in the Bayou Hedge Funds by Class members were typically contracted for pursuant to a so-called Subscription Agreement with Bayou Management (the "Subscription Agreement"). The Subscription Agreement provided for the Class member's

initial purchase of an interest in one or more of the Bayou Hedge Funds. In addition, Class

members and Bayou Management entered into a separate agreement known as the Operating

Agreement (the "Operating Agreement").

52.    The material terms of the Bayou Operating Agreements were uniform, although

each Operating Agreement was also specific to the particular Bayou fund the Class member

invested in. For example, Bayou's standard form Operating Agreement specifically obligated

Bayou Management in its role as the manager of the Bayou Hedge Funds, among other things:

a.    to keep "[p]roper and complete records and books of
account";

b.    to account "fully and accurately [for] all transactions and
other matters";

c.    to compute all "profits and losses of the [Bayou Hedge
Fund] ... in accordance with Generally Accepted
Accounting Principles applied on a consistent basis using
mark-to-market method of accounting";[4]

d.    to maintain sufficient "procedures and internal controls
reasonably designed to prevent the use of the Fund for
money laundering purposes"; and

e.    to perform its managerial duties "in good faith, in a manner
it reasonably believes to be in the best interests of the
Company [*i.e.*, the Bayou Hedge Fund], and with such care
as an ordinary prudent person in a like position would use
under similar circumstances.

---

[4]    GAAP are those principles recognized by the accounting profession as the conventions,
rules and procedures that define accepted accounting practice at a particular time. GAAP includes,
among other things: FASB (Financial Accounting Standards Board) Statements of Financial Accounting
Standards ("FAS"); FASB Interpretations ("FIN"); Accounting Principles Board Opinions ("APB");
American Institute of Certified Public Accountants ("AICPA") Accounting Research Bulletins ("ARB");
AICPA Statements of Position ("SOP"); Consensus Positions of FASB Emerging Issues Task Force
("EITF"); and FASB Concept Statements ("CON").

53.     The Operating Agreements also provided for a uniform choice of law (Delaware) and similarly purported to disclaim liability for loss or damage unless such was the result of "fraud, deceit, gross negligence, willful misconduct, or a wrongful taking by [Bayou Management]."

54.     The terms of Bayou's Subscription Agreements were similarly uniform for the Bayou Hedge Fund Class member investors.  For example, Bayou's Subscription Agreements also provided that the Subscription Agreement shall be governed by a uniform choice of law (Connecticut).

55.     For example, plaintiff Broad-Bussel Family entered into a Subscription Agreement with Bayou on December 21, 2003.  Broad-Bussel Family's Subscription Agreement provided for, among other things, the Broad-Bussel Family's initial investment of $1,000,000 in the Bayou Super Fund.  In accordance with its obligations thereunder, on January 5, 2004, the Broad-Bussel Family made a $500,000 wire transfer to Citibank, credited as the Broad-Bussel Family's initial investment in the Bayou Super Fund.  On January 8, 2004, the Broad-Bussel Family made a second $500,000 wire transfer to Citibank; that transfer was also credited as the Broad-Bussel Family's investment in the Bayou Super Fund.

56.     After Citibank received monies from plaintiff Broad-Bussel Family and other Class members as investments in the Bayou Hedge Funds, defendant Bayou Management sent such investors a certificate that acknowledged the Class member's investment in the respective Bayou Hedge Fund.

57.     During the Class Period, the Bayou Defendants sent members of the Class, including Plaintiffs, on a monthly basis Net Asset Valuations that purported to accurately reflect

32

Class members' contributions, withdrawals, and profits and losses for their investments in the

Bayou Hedge Funds. However, all such Net Asset Valuation statements were false and

misleading because they did not reflect Class members' true financial interests in the Bayou

Hedge Funds and did not accurately portray the Bayou Hedge Funds' true financial position and

results. Moreover, such Net Asset Valuation statements were also false because they omitted to

disclose, among other things, the massive trading losses that were being incurred by the Bayou

Hedge Funds, the true asset valuation of the Bayou Hedge Funds, and the fact that the Bayou

Defendants were unlawfully and secretly converting and otherwise dissipating -- indeed, outright

stealing -- millions of dollars of Class member funds.

58.     In disseminating the false monthly asset valuations, the Bayou Defendants' *modus*

*operandi* was to similarly mislead all Class member investors into believing that their investment

funds were being properly maintained and invested when, in fact, the opposite was true.

Moreover, and throughout the Class Period, the Bayou Defendants also communicated financial

and other information about Bayou and the Bayou Hedge Funds to the Class via weekly

newsletters, monthly reports, quarterly reports, annual reports and investor conference calls, all

of which similarly omitted material adverse information about Bayou and the Bayou Hedge

Funds in order to mislead Class member investors into believing the Bayou Hedge Funds were

being operated properly and in accordance with the law.

59.     During the Class Period, the Bayou Defendants represented to the Class that

independent financial audits of Bayou and the Bayou Hedge Funds were properly and timely

being conducted. In certain instances, the Bayou Defendants even requested Class members to

assist in those so-called independent audits.

33

60.     For example, on or about February 14, 2004, defendant Israel sent plaintiff Broad-Bussel Family a confirmation letter stating that Bayou's auditors were engaged in an examination of Bayou's financial statements and thus wanted to confirm material information covering investor capital accounts. The confirmation letter reflected the $1,000,000 investment that the Broad-Bussel Family made in January 2004. The letter requested that the Broad-Bussel Family confirm the contribution information directly to Bayou's auditor, defendant Richmond-Fairfield.

61.     However, contrary to the Bayou Defendants' representations, the Bayou Hedge Funds were not being independently audited during the Class Period. The Bayou Defendants omitted to disclose that no audits of the Bayou Hedge Funds were being performed and that Richmond-Fairfield, the purported auditor, was not independent but was simply a sham company set up by defendant Marino.

62.     On or about July 27, 2005, defendant Israel sent Class member investors, including Plaintiffs, a letter that abruptly announced that the Bayou Hedge Funds would be closed at the end of July 2005. In that letter, Israel made false assurances that, among other things, "[u]pon completion of the final audit, all investors will receive a 100% payout of their investments", and that Bayou would "send updates to the investors while the audit is in progress indicating an anticipated date of final payments." Israel also falsely praised Bayou's financial and fiduciary performance for its investors, stating specifically that "I feel we have done an admirable job in the stewardship of the funds with which we have been entrusted and hope that you agree."

63.     On or about July 29, 2005, defendant Israel sent Class member investors, including Plaintiffs, a letter stating that the process of liquidating the Bayou Hedge Funds

34

requires an auditing and closing process that could take four months or even longer. However, the letter stated that at least partial distributions of Class members' investments could begin by mid-August 2005. That letter also falsely assured investors that "the final results [and resulting distribution] will not be materially different from the information furnished to you in your June [2005] statement."

64.    In or about August 2005, Bayou Management sent Class member investors, including Plaintiffs, a final Net Asset Valuation statement for their investments in the Bayou Hedge Funds.

65.    On or about August 2, 2005, defendant Israel sent members of the Class, including Plaintiffs, a letter dated that same day falsely stating that "[t]he auditors are now conducting the final audit of the Bayou Family of Funds." Those letters also included investment information regarding Class members' Bayou investments and requested that Class members confirm the investment information using a self-addressed enclosed envelope. That envelope was addressed to "Richmond-Fairfield Associates, 575 Madison Avenue, Suite 1006, New York, NY 10022-2511".

66.    On or about August 11, 2005, defendant Israel sent members of the Class, including Plaintiffs, a letter stating that it planned to distribute 90% of the proceeds from the liquidation to investors beginning on August 17, 2005. As with the other prior specific communications set forth above, this letter was materially false and misleading because, among other things, Bayou had no intention of properly making such distributions.

## The Truth Begins to be Revealed

67.     On August 25, 2005 -- the close of the Class Period -- *The New York Times* shocked Class members and other investors by reporting that "[s]tate and federal officials in Connecticut are investigating the possible collapse of the Bayou Group, a hedge fund and brokerage firm in Stamford that managed an estimated $400 million for its investors". The article reported that "[c]lients of the Bayou Group apparently grew concerned about the firm's status in recent days, when refund checks it had sent to customers could not be drawn upon for lack of funds".

68.     On August 27, 2005, *The New York Post* reported that federal agents had seized boxes of records and other material from Bayou's offices in Stamford, Connecticut, amid fears that up to $500 million of its investors' money has "disappeared". Reportedly, witnesses said that those Bayou offices had employed some 15 to 20 people; however, by the time of the raid, the offices had been stripped bare of their contents and had actually been vacant for weeks. The article also reported that "[n]early everyone involved with Bayou Securities LLC has vanished - including its founder, Samuel Israel III ... [a]nd those who could be found aren't talking."

69.     On August 29, 2005, *The Wall Street Journal* reported that a "suicide note and confession" had been found at offices of defendant Bayou Management. That suicide note/confession was supposedly written by defendant Marino, directly implicated defendants Marino, Israel and Marquez, and consisted of a six-page account of some of the details of financial fraud that had been conducted by the Bayou Defendants beginning in 1996 (the "Marino Confession"). It was reported that Eric Dillon, a money manager for Silver Creek Capital LLC in Seattle, Washington, had found the Marino Confession on August 16, 2005 and that federal and

36

local authorities had commenced investigations regarding the Bayou fraud based in part on the Marino Confession.

70. As reported in *The Wall Street Journal* on the August 29, 2005, the Marino Confession begins with the statement, "This is my suicide note and confession", and went on to make numerous shocking revelations including, among others:

     a. On the last trading day in December 1998, defendant Israel held a frantic meeting with defendants Marino and Marquez. Marino recalled that all three men knew Bayou's situation was dire -- in that the Bayou Hedge Funds' losses had vastly overwhelmed their gains for at least more than two years. In addition, Marino recalled that just three months earlier, another hedge fund known as Long-Term Capital Management had collapsed, causing widespread disruption in the financial world. Marino summed up the situation in plain words: "Something had to be done, and fast."

     b. According to Marino, the solution, devised by Israel and Marquez, was simple: produce a fake audit of the funds' performance, and try to make up the losses the following year. The plan to recoup Bayou's past trading losses, as outlined by Marino, involved two steps. First, Israel would raise fresh funds from investors and trade his way to outsized gains on that money. Second, at least part of the commissions generated by the Bayou Hedge Funds' trades -- which were executed by Israel's own brokerage firm, defendant Bayou Securities -- would be credited back to the Bayou Hedge Funds to help offset and hide the losses. Those commissions were substantial given defendant Israel's daily "rapid-fire trading" activity. However, in order to engage in such a blatant fraud, the defendants determined that the existing

37

outside auditor, Grant Thornton LLP, would need to be replaced by a newly-created bogus

accounting firm -- defendant Richmond-Fairfield.

      c.     Defendants Israel, Marino and Marquez then quickly implemented their

fraudulent plan. With that plan in place, Bayou falsely reported its 1998 performance to

investors as representing a gain of 17.55%, with December 1998 being touted as an especially

good month, showing a profit of 3.14%.

     71.     For a period of time, the Bayou Defendants' Ponzi scheme provided significant

cash flow from Bayou's new investors. Defendants Israel and Marino used significant amounts

of that cash flow to fund their own extravagant life styles. For example, by 2003, defendant

Marino, who had previously been driving a used Maxima and living at his mother's house in

Staten Island, began driving Bentley and Ferrari automobiles and moved to a six-bedroom home

in Westport, Connecticut acquired for some $2.9 million -- which he paid for in large part with

Class member investors' cash. Similarly, that same year, defendant Israel, who was then in the

midst of a marital divorce, moved into a luxury estate that had originally been built for ketchup

magnate H.J. Heinz -- at a cost of $32,000 per month, again subsidized or largely paid by Class

member investors' cash.

     72.     During the Class Period, defendants Israel and Marino created entities that were

used to unlawfully receive Class members' Bayou investor funds, and thereafter either converted

those funds personally to their own use or invested those funds in other investments for their own

personal interests. For example, Israel and Marino wrongfully funneled some $40 million to

defendant IM Partners during the period in or about 2003 to 2004. In addition, defendants Israel

and Marino converted significant portions of those proceeds for their own personal use, and

38

invested other such proceeds for their own personal benefit in several other companies, including

Kycos Ltd., Debit Direct Ltd., Adam Aircraft, GS Capital and Vectrix, despite knowing that

these funds were beneficially owned by Class member investors. Similarly, Israel and Marino

funneled other Bayou investor monies to defendant IMG which were likewise wrongfully

converted and used to make additional private investments for the personal benefit of Israel and

Marino. In fact, defendants Israel and Marino reportedly created defendants IM Partners and

IMG for the express purpose of helping conceal and lauder the assets they stole from Class

members, and in fact used defendants IM Partners and IMG expressly for such purposes.

     73.    Over time, the Bayou Defendants' scheme began to unravel as new investments

were outpaced by investment withdrawals, expenses, losses and unlawful conversions. In or

about April 2004, the Bayou Defendants made a last-ditch effort to keep their scheme afloat.

Without informing Plaintiffs or other Bayou investors, the Bayou Defendants then secretly

stopped all securities trading and liquidated the Bayou Hedge Funds. At or about that same time,

the Bayou Defendants then transferred the remaining proceeds of the Bayou Hedge Funds

directly to defendant Israel, with the substantial assistance and direct participation of defendant

Citibank.

## Citibank Wrongfully Distributes Bayou Hedge Funds

     74.    Citibank wrongfully participated in the Bayou Defendants' fraud and other

misconduct by wrongfully distributing to defendant Israel *personally* some $161 million of the

Class member investments in circumstances where Citibank knew and disregarded that such

proceeds were fiduciary funds beneficially owned by Class member investors.

39

75.     In or about April 2004 -- following the Bayou Defendants' liquidation of the
Bayou Hedge Funds -- defendants Israel and Marino instructed Citibank to transfer $150 million
from the Bayou bank accounts held at the Citibank branch in Bronxville, NY.  Israel and Marino
wired those funds to a trading account at Barclay's Bank in London.  Thereafter, Israel and
Marino reportedly transferred the $150 million back to Bayou's Citibank accounts in Bronxville.

76.     Following those initial transfers, Citibank then permitted defendant Israel to
personally withdraw many millions of dollars of Class member investor funds, and transferred
such funds to bank accounts individually owned by, and under the sole control of, defendant
Israel.  Indeed, according to a September 1, 2005 article in *The Wall Street Journal*, the Bayou
Defendants emptied five Bayou accounts held by Citibank over the course of six days,
withdrawing some $161 million.  Four of those accounts held money for -- and, very
significantly, ***explicitly and directly in the name of*** -- four specific Bayou Hedge Funds (Bayou
Super Fund, Bayou No Leverage Fund, Bayou Affiliates Fund and Bayou Accredited Fund), and
the fifth account held money directly in the name of Bayou Management.

77.     Despite the fact that Citibank knew those monies were Bayou Class member
investor funds, Citibank nevertheless permitted defendant Israel to personally withdraw and
transfer those funds to accounts he himself alone owned and controlled.  Specifically, on or about
July 8, 2004, Citibank directly wired $120 million from Bayou's Citibank accounts in New York
to one or more bank accounts in defendant Israel's name personally that were maintained by
Deutsche Postbank in Hamburg, Germany.  Other transfers of Class member investor funds from
the Citibank accounts, including an additional $32 million wire transfer reportedly somewhere
within the United States, are unaccounted for.

78.    Citibank knew or disregarded that it was holding the Bayou fund proceeds for the benefit of the Bayou Class member investors.  In fact, Citibank knew as of the time the Bayou Defendants established these accounts that such accounts included Class member investment dollars.  Moreover, that Citibank understood clearly that it was holding proceeds beneficially owned by Class member investors is further confirmed by the fact that many Class members originally invested in the Bayou Hedge Funds by making *wire transfers and other deposits directly to Citibank*.  Indeed, according to the Wire Transfer Instructions supplied by Citibank in connection with Bayou Hedge Fund investments, such funds were to be held and maintained in the names of the Bayou Hedge Funds.  For example, the Wire Transfer Instructions supplied by Citibank for plaintiff Broad-Bussel Family directed that Broad-Bussel Family wire transfer its investment for the Bayou Super Fund directly to Citibank NA, 95 Pondfield Road Br 165, Bronxville, New York  10708.  Those wiring instructions also provided the specific ABA number and bank account number for the Citibank account; the account name specified by Citibank was "Bayou Management, L.L.C. Special Account as agent for Bayou Superfund LLC"; and the wire transfer to Citibank included "Reference:  Broad-Bussel Family L.P.".

79.    In wrongfully allowing defendant Israel in or about July 2004 to personally misappropriate Class member investor funds from the Bayou accounts Class members beneficially owned, Citibank also knew, among other things, that:

a.    defendant Israel and the other Bayou Defendants were essentially making an abrupt and wholesale withdrawal of Bayou Class member investor funds held by Citibank;

41

b.    the funds being withdrawn were funds held by Citibank as a fiduciary for the benefit of Plaintiffs and the members of the Class who invested in the Bayou Hedge Funds; and

c.    the fiduciary funds being withdrawn were being transferred to a foreign bank account and were being deposited, not in the name of the Bayou Hedge Funds, Bayou or even any Bayou-related entity, but in fact wrongfully into one or more of defendant Israel's own individual accounts.

80.    At a very minimum, Citibank negligently permitted Israel to personally withdraw proceeds it knew or disregarded were beneficially owned by Class member investors. Moreover, defendant Citibank's acts in transferring at least $120 million directly to accounts wholly owned by, and personally in the name of, defendant Israel were particularly inexcusable in the circumstances here given that Citibank knew or disregarded that such proceeds were fiduciary funds beneficially owned by Class member investors.

### Laundering of Converted Proceeds

81.    After draining the Bayou bank accounts, Israel and Marino began a series of additional covert transactions aimed at laundering the $161 million by transferring those monies through bank accounts in financial institutions around the world, including New York, London, Germany, Hong Kong, Pennsylvania and New Jersey. Ostensibly, the transactions were purported to relate to legitimate private placement programs, which were to produce "above average returns -- and in some cases, 100% per week". In reality, however, the funds being transferred by Israel and Marino were part of an elaborate scheme to unlawfully launder the

remaining assets of the Bayou Hedge Funds through several financial institutions in connection with their illegal conversion of those monies.

82.     In May 2005, the Arizona Attorney General seized $101 million from several Wachovia Bank accounts in Flemington, New Jersey. In an August 30, 2005 press release, the Arizona Attorney General stated that the assets had been seized "after an investigation indicated the funds might be involved in a complex financial fraud". Since the seizure of the $101 million from Wachovia by the Arizona Attorney General in May 2005, defendants Israel and Bayou Management have filed claims for those monies with the Arizona Superior Court.

83.     On September 29, 2005, defendants Israel and Marino both pleaded guilty to felony criminal charges that they "defrauded investors in the recently collapsed Bayou group of hedge funds of more than $450 million." In pleading guilty to the multiple-count felony informations filed by the United States Attorney in Manhattan:

        a.      Defendant Israel admitted "that he conspired with MARINO, the 45-year-old Chief Financial Officer and Chief Operating Officer of Bayou, to defraud investors by creating false financial statements that were distributed to investors", and that "between 1996, when the funds were set up, and 2005, when the funds collapsed, the funds sustained consistent losses, but, at his direction, investors were regularly told that the funds were reaping substantial gains."

        b.      Defendant Marino admitted "that he and ISRAEL, along with another former employee and co-founder of the Bayou Funds, hatched the scheme after the funds began sustaining losses. At the time, the three agreed that MARINO, a Certified Public Accountant, would form a sham certified public accounting firm named Richmond-Fairfield Associates, to

sign off on the false financial statements showing fake profits that were used to lure future and current investors."

        c.      Defendant Israel pleaded guilty to criminal conspiracy, mail fraud and investment advisor fraud. Defendant Marino pleaded guilty to conspiracy, mail fraud, wire fraud and investment advisor fraud. As a result, each defendant faces a possible sentence of 30 years in prison. In addition, both defendants also face fines on each count of $250,000 or twice the gain or loss resulting from the crime; an order of restitution; and forfeiture of the proceeds of their admitted fraudulent scheme.

<h3 align="center"><u>Bayou Defendants' Material Misrepresentations and Omissions</u></h3>

      84.      During the Class Period, the Bayou Defendants made numerous material misrepresentations and omissions regarding the financial results, operations and conditions and the business practices of the Bayou Hedge Funds (the "Misrepresentations and Omissions"). The Bayou Defendants' Misrepresentations and Omissions were made as part of a consistent, uniform scheme to all members of the Class. The Bayou Defendants' Misrepresentations and Omissions include, among others, the following:

        a.      The Bayou Defendants reported fictitious rates of return for the Bayou Hedge Funds in quarterly reports and mailed those reports to members of the Class.

        b.      The Bayou Defendants reported fictitious rates of return for the Bayou Hedge Funds in weekly newsletters and e-mailed or faxed those newsletters to members of the Class.

        c.      The Bayou Defendants reported individual investors' inflated accumulated profits in monthly reports and mailed those reports to members of the Class.

44

d.      The Bayou Defendants mailed annual financial statements to members of the Class that contained, among other misrepresentations:  (i) inflated rates of return on trading; (ii) inflated net asset values, and (iii) false certifications that Bayou had been independently audited by a certified public accounting firm, defendant Richmond-Fairfield.

e.      The Bayou Defendants falsely told investors that the Bayou Hedge Funds were properly audited.  In fact, beginning in or about early 1999, the Bayou Defendants created the phony accounting firm Richmond-Fairfield Associates and, contrary to the Bayou Defendants' representations, neither Richmond-Fairfield nor anyone else conducted independent audits of the Bayou Hedge Funds during the Class Period.

f.      The Bayou Defendants omitted to disclose the true financial results and conditions of the Bayou Hedge Funds and the true net asset valuations for Class members' investments in the Bayou Hedge Funds, as well as the facts that the Bayou Hedge Funds were not being independently audited, that Richmond-Fairfield was a sham company, and that the reported results of the Bayou Hedge Funds were wholly fictitious.

g.      The Bayou Defendants also omitted to disclose that in or about the spring of 2004, the Bayou Defendants ceased all trading for the Bayou Hedge Funds, liquidated all investments in the Bayou Hedge Funds, and withdrew all of the remaining monies from the Bayou Hedge Funds' bank accounts at Citibank, without being authorized to do so and without informing -- but instead affirmatively and fraudulently concealing their scheme from -- the members of the Class.

h.      The Bayou Defendants omitted to disclose that between in or about the fall of 2003 and in or about May 2005, the Bayou Defendants entered and attempted to enter into

45

private financial transactions using money from the Bayou Hedge Funds without authorization and without disclosing to Class member investors the nature of those transactions.

    i.    The Bayou Defendants also omitted to disclose that from in or about July 1996 through in or about August 2005, the Bayou Defendants fraudulently induced members of the Class to contribute in excess of $450 million to the Bayou Hedge Funds and the Bayou Defendants then wrongfully converted significant portions of those monies for their own personal use.

    85.    As an example of the Bayou Defendants' misstatements, the Bayou Defendants told investors that the purported "audited" financial statements of the Bayou Super Fund for the year ended December 31, 2003 reported fund assets of approximately $192 million and a net trading gain of some $27 million. In truth, however, the Bayou Defendants omitted to disclose that the Bayou Super Fund actually had less than $54 million in fund assets -- not even one-third of the falsely reported value -- and had not experienced a trading gain but had suffered a loss of $35 million.

    86.    The reports created and distributed by the Bayou Defendants during the Class Period were materially false and also violated numerous of the most basic tenets of GAAP, including but not limited to the following:

    a.    that revenue can only be recognized if the revenue has been earned and is collectible (CON 5, ¶ 83);

    b.    that financial reporting should provide information that is useful to present and potential investors, creditors, and other users in making rational investment, credit, and similar decisions (CON 1, ¶ 34);

46

c.      that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (CON 1, ¶ 40);

d.      that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it (CON 1, ¶ 50);

e.      that financial reporting should provide information about an enterprise's financial performance during a period (CON 1, ¶ 42);

f.      that financial reporting should be relevant and reliable in that it represents what it purports to represent -- a notion that is central to accounting (CON 2, ¶¶ 58-59); and

g.      that financial reporting should be complete, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON 2, ¶ 79).

## The Consultant Defendants Improperly
## Recommend the Bayou Hedge Funds

87.     The Consultant Defendants held themselves out to Plaintiffs, the Consultant Subclasses and the investing community generally as highly experienced and competent experts, even self-proclaimed "pioneers", in hedge fund consulting.

88.     For example, the Hennessee Group website posted an open letter to investors, signed by defendants Lee Hennessee and Gradante, which states in pertinent part (emphasis altered):

> [W]e are committed to a singular mission:  achieving the investment goals of our clients by applying the expertise, creativity and commitment of our people.

47