# ATTACHMENT

1                    UNITED STATES COURT OF APPEALS

2                        FOR THE SECOND CIRCUIT

3                          August Term, 2005

4    (Argued: April 26, 2006              Decided: August 8, 2006)

5                          Docket No. 05-5106-cv

6           ---------------------------------------

7    ISAAC LERNER, ELI LERNER, BALLYWARD INVESTMENT COMPANY, LTD.,
8    JAIME SOHACHESKI, GASTON LIMITED, HOTEL INVESTORS, INC., PERKY
9        LIMITED, ABRAHAM RAPPAPORT, ESTHER RAPPAPORT, MOSHE COHN,
10   ESTABLISSEMENT SOMER, JOSEF KOHN, CHANCERY ENTERPRISES, LTD.,
11     ROSDEV DEVELOPMENTS, INC., MICHAEL ROSENBERG, BRUCE BAYROFF,
12   JOSHUA GOLDSTEIN, LAND TECH MANALAPAN LLC, THEODORE BRODIE, MEYER
13     ROSENBAUM, MR ASSOCIATES LLC, ILANA BLUMKIN, as Trustee, EMDEE
14   TOURS, INC., ALEXANDER HASENFELD, INC., PROFIT SHARING RETIREMENT
15     PLAN, HASENFELD STEIN, INC., PENSION TRUST, AEG AGENCY, INC.,
16       AARON GARFINKEL, RIVKA STEIN, AARON Y. RUBINSON, STEVEN B.
17     ROTHCHILD, P.C., MONEY PURCHASE PLAN, PINCHOS RUBINSON, AKIVA
18     LEIMAN, ESTATE OF BORUCH RUBINSON, CHAIM and RACHEL LEFKOWITZ,
19     NAFTALI and SARAH LIPSHUTZ, MENDEL and FEIGY LIPSCHUTZ, REISEL
20     BERGSTEIN, MICHAEL KONIG, ESTHER WERTENTEIL, AARON WERTENTEIL,
21   TEENA RUBINFELD, MARK WERTENTEIL, MORRIS and SARAH FRIEDMAN, THE
22   REGAL TRADE, S.A., VAVEL CORP., CHADWICK FUNDING CO., L.P., ALLEN
23       SAUSEN and LEONARD SAUSEN, d/b/a ATASSCO, KEREN HACHESED OF
24   MONSEY, INC., GENEVA PROPERTIES, L.L.C., MT. PLEASANT PARTNERS,
25     HERSCHEL KULEFSKY, ALBERT DAVID PEARLS & GEMS, INC., DEFINED
26     BENEFIT PENSION PLAN, CHAI PROPERTIES CORP., ARTHUR KURTZ,
27     CRESTFIELD ASSOCIATES, INC., WEINREB MANAGEMENT, and HOWARD
28                            MERMELSTEIN,

29                       Plaintiffs-Appellants,

30                              - v -

31   FLEET BANK, N.A., STERLING NATIONAL BANK AND TRUST COMPANY OF NEW
32            YORK, and REPUBLIC NATIONAL BANK OF NEW YORK,

33                       Defendants-Appellees.

34          ---------------------------------------

35   Before:     WALKER, Chief Judge, KEARSE and SACK, Circuit Judges.

36               Appeal from a judgment of the United States District

37   Court for the Eastern District of New York (Frederic Block,

1    <u>Judge</u>) dismissing the plaintiffs' complaint on the defendants'

2    Rule 12(b)(6) motion because of the plaintiffs' inadequate

3    pleading of proximate causation with respect to their state-law

4    claims.  We vacate the judgment insofar as it dismissed

5    individual plaintiffs' claims for negligence and aiding and

6    abetting breach of fiduciary duty against the banks in which

7    those plaintiffs' funds were deposited and insofar as it

8    dismissed plaintiff Regal Trade's claim for fraud against

9    defendant Sterling Bank.  We affirm the district court's

10   dismissal of the plaintiffs' remaining claims.

11              Affirmed in part, vacated in part, and remanded.

12                             EDWARD S. RUDOFSKY, Zane and Rudofsky
13                             (James B. Zane, Eric S. Horowitz, <u>of</u>
14                             <u>counsel</u>), New York, NY, <u>for</u> <u>Plaintiffs-</u>
15                             <u>Appellants</u>.
16
17                             THOMAS J. MOLONEY, Cleary Gottlieb Steen
18                             & Hamilton LLP (David Rush, <u>of counsel</u>),
19                             New York, NY, <u>for</u> <u>Defendant-Appellee</u>
20                             Fleet Bank, N.A.

21                             ALLEN C. WASSERMAN, Lord, Bissell &
22                             Brook LLP ®. James DeRose III, <u>of</u>
23                             <u>counsel</u>), New York, NY, <u>for</u> <u>Defendant-</u>
24                             <u>Appellee</u> Sterling National Bank.

25                             CELIA GOLDWAG BARENHOLTZ, Kronish Lieb
26                             Weiner & Hellman LLP (Chaya F. Weinberg-
27                             Brodt, <u>of counsel</u>), New York, NY, <u>for</u>
28                             <u>Defendant-Appellee</u> Republic National
29                             Bank of New York.

30   SACK, <u>Circuit Judge</u>:

31              The plaintiffs are investors who were defrauded by

32   lawyer David Schick in the early 1990s as part of his multi-

1    million-dollar Ponzi scheme.  Many of Schick's victims have tried

2    with varying degrees of success to recover some of their lost

3    investments from Schick's estate in bankruptcy, <u>see, e.g.</u>, <u>In re</u>

4    <u>Venture Mortgage Fund, L.P.</u>, 282 F.3d 185 (2d Cir. 2002), and

5    from various banks that allegedly either abetted or failed to

6    detect Schick's activities, <u>see, e.g.</u>, <u>Schmidt v. Fleet Bank</u>, 16

7    F. Supp. 2d 340 (S.D.N.Y. 1998).

8         This is the second time we have considered these

9    investors' claims against these defendants.  The plaintiffs

10   allege that the defendant banks assisted Schick by failing to

11   report his overdrafts on attorney fiduciary accounts to the state

12   bar for disciplinary action and by evading their reporting duties

13   by misleadingly marking some checks drawn against accounts with

14   insufficient funds as "Refer to Maker."  The district court

15   (Frederic Block, <u>Judge</u>) previously dismissed the plaintiffs'

16   attempt to bring these allegations as a claim under the Racketeer

17   Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.

18   § 1962, and declined to exercise supplemental jurisdiction over

19   their state-law claims.  <u>See</u> <u>Lerner v. Fleet Bank, N.A.</u>, 146 F.

20   Supp. 2d 224 (E.D.N.Y. 2001).  We affirmed the court's dismissal

21   of the RICO claim because the plaintiffs had failed to plead

22   sufficient facts to show proximate causation under the RICO

23   statute.  <u>See</u> <u>Lerner v. Fleet Bank, N.A.</u> (<u>Lerner I</u>), 318 F.3d 113

24   (2d Cir.), <u>cert. denied</u>, 540 U.S. 1012 (2003).  But because we

25   concluded that there was an adequate basis for diversity

3

1    jurisdiction and supplemental jurisdiction over non-diverse

2    parties, we remanded with instructions for the court to decide

3    the plaintiffs' state-law claims.

4         On remand, the district court again granted the

5    defendants' Rule 12(b)(6) motion to dismiss, concluding that

6    because all of the plaintiffs' state-law claims include an

7    allegation on the element of proximate causation, the dismissal

8    of the plaintiffs' RICO claim for lack of proximate cause

9    required that the state-law claims be dismissed on the same

10   grounds.  We disagree. A plaintiff must make a different showing

11   of proximate cause -- one that is often more difficult to make --

12   when bringing suit under the RICO statute than when bringing a

13   common-law cause of action.  Our finding of a failure of the

14   allegations of proximate cause under RICO does not, therefore,

15   necessarily imply a similar finding for the plaintiffs' state-law

16   claims.

17        We conclude that each plaintiff who actually had funds

18   on deposit with the defendants Fleet Bank, N.A. ("Fleet"),

19   Sterling National Bank and Trust Company of New York

20   ("Sterling"), or Republic National Bank of New York ("Republic")

21   has stated a claim against that bank or those banks for

22   negligence and for aiding and abetting breach of fiduciary duty

23   under New York law.  We therefore vacate the judgment of the

24   district court insofar as it dismissed those claims.  We affirm

25   the district court's dismissal of each of the plaintiffs' claims

1    against any such defendant in which the plaintiff did not have

2    funds on deposit.  We also affirm (with one exception) the

3    dismissal of the plaintiffs' claims for fraud and commercial bad

4    faith.

5                          **BACKGROUND**

6            We outlined the substance of David Schick's fraudulent

7    scheme in Lerner I:

8            Schick convinced investors that he had
9            devised a no-risk scheme for generating a
10           high return on their investments.  Schick
11           would bid on distressed mortgage pools at
12           auctions by the Resolution Trust Company, the
13           Federal Deposit Insurance Company ("FDIC"),
14           and other banking institutions.  Upon being
15           awarded the bid, he would immediately try to
16           re-sell the mortgage pool to another buyer
17           for a quick profit.  The acceptance of his
18           bid was subject to a ninety-day due diligence
19           period, so Schick assured his investors that
20           if he was unable to find a buyer within the
21           ninety-day time period, he would be able to
22           rescind his original purchase without
23           incurring any penalty.  Schick's plan was
24           apparently foolproof -- except, he explained
25           to the investors, in order to make this
26           scheme work, Schick had to prove to the FDIC
27           that he could complete the purchase.  He
28           would therefore be required to deposit
29           substantial sums of cash as evidence of his
30           good faith.  This is where Schick's potential
31           investors came in.

32           To convince wary investors that their
33           money would be secure, Schick agreed to
34           deposit the entrusted funds in escrow
35           accounts covered by restrictive provisions.
36           Lerner v. Fleet Bank, N.A., 146 F. Supp. 2d
37           224, 225-27 (E.D.N.Y. 2001).  He also entered
38           into escrow agreements with the investors
39           that stated:  "Escrow Agent are attorneys
40           [sic] admitted to practice in the State of
41           New York and shall act as fiduciary in
42           accordance with the relevant provisions of

5

```
 1                  the Judiciary Law and all other ethical or
 2                  legal standards for attorneys admitted to
 3                  practice in the State of New York and
 4                  expressly agrees that the only person who
 5                  shall be entitled to, or have any right or
 6                  interest in the Escrow Deposit shall be the
 7                  Depositor."  Armed with these guarantees, and
 8                  relying on the fact that Schick was an
 9                  attorney in good standing with the New York
10                  bar, the investors turned their money over to
11                  Schick for deposit in the defendant banks.
12                  Ultimately, however, these escrow agreements
13                  provided little protection against Schick's
14                  unscrupulous conduct.  Before the investors
15                  discovered his fraud, Schick had raided the
16                  accounts repeatedly and managed to steal
17                  approximately $82 million.
```

18   Id. at 117-18 (brackets in original).

19        The plaintiffs based their RICO claims primarily on the

20   banks' failure to report Schick's overdrafts on his attorney

21   fiduciary accounts to the Lawyers' Fund for Client Protection of

22   the State of New York, as required by New York law.  New York's

23   Disciplinary Code requires that "[a] lawyer who is in possession

24   of funds belonging to another person incident to the lawyer's

25   practice of law, shall maintain such funds in a banking

26   institution within the State of New York which agrees to provide

27   dishonored check reports" to the Lawyers' Fund.  See N.Y. Comp.

28   Codes R. & Regs. tit. 22, § 1200.46(b)(1).  Each of the

29   defendants had entered into one or more agreements with the

30   Lawyers' Fund, in which they agreed to report all checks drawn by

31   attorneys on "special," "trust," "escrow," or "IOLA"[1] accounts

---

[1] IOLA stands for "Interest On Lawyers Account."

        An IOLA is a creation of New York State
        statute, and is defined as "an unsegregated

1    that were dishonored for insufficient funds.  See id. at §

2    1300.1.

---

> interest-bearing deposit account . . . for
> the deposit by an attorney of qualified
> funds."  N.Y. Jud. Law § 497(1) (McKinney
> Supp. 1991).  In turn, "qualified funds" are
> statutorily defined as,
>
> > monies received by an attorney in a
> > fiduciary capacity from a client or
> > beneficial owner and which, in the
> > judgment of the attorney, are too
> > small in amount or are reasonably
> > expected to be held for too short
> > time to generate sufficient
> > interest to justify the expense of
> > administering a segregated account
> > for the benefit of the client or
> > beneficial owner.
>
> Id. at § 497(2). The interest earned by an
> IOLA is remitted directly to the state IOLA
> fund, and is used by New York to pay for
> legal assistance for the poor, and to improve
> the administration of justice generally.  See
> id. at § 497(6)(c)(i).

Peoples Westchester Sav. Bank v. FDIC, 961 F.2d 327, 329 (2d Cir.
1992).

    Some states refer to the accounts as IOLTA, for "Interest
On Lawyers Trust Account."

> Every State in the Nation and the District of
> Columbia have followed Florida's lead and
> adopted an IOLTA program, either through
> their legislatures or their highest courts.
> The result is that, whereas before 1980 the
> banks retained the value of the use of the
> money deposited in non-interest-bearing
> client trust accounts, today, because of the
> adoption of IOLTA programs, that value is
> transferred to charitable entities providing
> legal services for the poor.  The aggregate
> value of those contributions in 2001
> apparently exceeded $200 million.

Brown v. Legal Found., 538 U.S. 216, 221-22 (2003) (footnotes
omitted).

1          The Lawyers' Fund uses these reports of checks

2     dishonored for insufficient funds, known colloquially as

3     "bounced" checks, to initiate disciplinary proceedings against

4     lawyers who mishandle client funds.  A check on a client account

5     that is dishonored for insufficient funds is often evidence that

6     a lawyer has improperly commingled client funds, in violation of

7     his or her fiduciary duties.  See generally ABA Model Rules for

8     Trust Account Overdraft Notification, R.2, available at

9     http://www.abanet.org/cpr/clientpro/orule2.html (last visited

10    June 24, 2006).

11          In support of their RICO claim, the plaintiffs alleged

12    primarily that the banks engaged in a conspiracy to corrupt the

13    Lawyers' Fund.  After we affirmed dismissal of that claim and

14    remanded to the district court for its consideration of the

15    plaintiffs' state-law claims, the court instructed the plaintiffs

16    to submit an amended complaint that pared down their many state-

17    law claims.  The plaintiffs' second amended complaint replaced

18    the portion of the original complaint addressing the state-law

19    causes of action.  But the first 147 pages of the earlier

20    complaint, which described the factual background of the

21    allegations, remained substantially unchanged.  See Oral Arg. Tr.

22    of April 26, 2006 at 44 ("[T]his was not an exercise in

23    realleging the facts of the case.  And if you compare the first

24    amended complaint to the second amended complaint, you will see

25    that the hundreds and hundreds of allegations of facts[,] . . .

1    that they're all the same.  We didn't redo that part of the

2    complaint.  All we did was cut down the state-law

3    claims . . . .").

4          Our recitation of the remainder of the facts focuses on

5    those allegations that are most relevant to the plaintiffs'

6    remaining state-law claims.  In stating the facts for purposes of

7    considering this appeal, we take all of the plaintiffs'

8    allegations to be true "and draw all reasonable inferences in the

9    plaintiffs' favor."  Pena v. Deprisco, 432 F.3d 98, 102 (2d Cir.

10   2005) (internal quotation marks, citation, and alteration

11   omitted).  "The narrative that we are about to repeat therefore

12   paints various defendants in 'decidedly unflattering colors,'

13   which may or may not be borne out by the facts."  Id. at 102-03

14   (quoting Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir.

15   2001)).

16         According to the second amended complaint, although

17   Schick told his clients that the accounts were "escrow deposits,"

18   he never executed escrow agreements with the banks.  Escrow

19   accounts are classified as "special deposits," which must be

20   segregated from the bank's other assets.  Instead, Schick

21   deposited their funds in attorney trust accounts and IOLA

22   accounts, which are classified as "general deposits" that become

23   part of the bank's general assets.  See Peoples Westchester Sav.

24   Bank v. FDIC, 961 F.2d 327, 330 (2d Cir. 1992).  Although Schick

25   told the investors that the funds could not be withdrawn without

9

1    their permission, Schick had full access to the accounts and was

2    free to withdraw from them without the clients' knowledge or

3    consent.[2]

4         According to the second amended complaint, Schick had a

5    close business relationship with Leonard Patnoi, then the branch

6    manager of Fleet's Broad Street branch.  Patnoi served as

7    Schick's accounts officer at Fleet from 1985 to 1992.  Around

8    1992 or 1993, Patnoi was terminated as branch manager at Fleet's

9    Broad Street Branch, then rehired as branch manager at Fleet's

10   Hewlett Branch and subsequently promoted to Vice President of the

11   bank.  When Patnoi moved to the Hewlett Branch, Schick either

12   transferred his existing accounts to the Hewlett Branch or opened

---

[2] Fleet and Republic argue that Schick's relevant accounts
at their banks were not properly designated as attorney fiduciary
accounts.  Instead, the accounts were labeled simply "Attorney at
Law," and were, therefore, exempt from the Lawyers' Fund
reporting requirements.  But according to the plaintiffs'
complaint, whether or not the accounts were titled as IOLA
accounts, the banks had actual knowledge that they were intended
to be trust accounts for client funds.  According to the
complaint,

> [t]he Banks knew this, *inter alia*, because of
> (a) written "escrow" agreements provided to
> the Banks, (b) references to "escrow"
> agreements in wire transfer requests and/or
> confirmations, and (c) numerous occasions on
> which there were insufficient funds in order
> to honor checks drawn by Schick on such
> accounts and Schick expressly remarked to
> bank officers, in words or substance, that
> outstanding checks drawn on such accounts
> "had" to be covered because the funds
> involved were the property of others.

Second Am. Compl. ¶ 114.  Drawing all inferences in plaintiffs'
favor on a Rule 12(b)(6) motion to dismiss, we assume that these
accounts were trust accounts as alleged.

1   new accounts there.  Patnoi again served as the Fleet account

2   officer of Schick's accounts.  Between 1993 and 1996, Schick-

3   controlled deposits at the Hewlett Branch totaled approximately

4   $1 billion.  Schick was the single largest source of deposits at

5   the Hewlett branch, averaging $60-80 million per month.  The

6   plaintiffs allege that in light of enormous amount of business

7   the bank was doing with Schick, Fleet was willing to bend the

8   rules for him.

9          The plaintiffs further allege that beginning in 1993,

10  Schick began writing checks on attorney fiduciary accounts at

11  Fleet that had insufficient funds to cover them.  Fleet would

12  honor these checks despite the insufficient funds by extending

13  automatic loans to cover the overdrafts.  The bank allowed these

14  overdrafts even though it knew that Schick was under a duty as an

15  attorney-fiduciary not to commingle his clients' funds.  By

16  allowing the overdrafts to continue, the plaintiffs allege,

17  "Fleet intentionally and knowingly permitted Schick to violate

18  the . . . implied and written agreements[] governing account

19  documents and restrictions, knowing and/or recklessly indifferent

20  to the fact that such conduct was in violation of plaintiffs'

21  rights as intended beneficiaries under said contracts and would

22  cause each of them injury."  Second Am. Compl. ¶ 158.

23         Sometime in 1993, Fleet's district manager with

24  responsibility for the Hewlett Branch confronted Patnoi about the

25  overdrafts.  Patnoi then told Schick that Fleet could no longer

1    cover his overdrafts and that the bank would begin dishonoring

2    Schick's checks drawn against insufficient funds.  Schick

3    allegedly responded that if Fleet bounced his checks, the bank

4    would be required by law to report Schick to the Lawyers' Fund

5    and that if Schick were disbarred, Schick could no longer bring

6    business to the bank.  Fleet would then bear the loss associated

7    with all of Schick's then-current overdrafts.  Patnoi agreed not

8    to report the bounced checks to the Lawyers' Fund and to respond

9    to any inquiries about them by vouching that there were double-

10   digit million-dollar balances in the accounts.  Patnoi also

11   promised Schick that the other employees at the Hewlett Branch

12   would tell the "same 'story.'"   Id. at ¶ 165.  The plaintiffs

13   allege that this plan was approved by officers at the highest

14   levels of the bank.  The plaintiffs do not, however, allege any

15   specific instance of a bank officer actually telling such a

16   "story."

17           At some point in 1994 or 1995, Schick told Patnoi that

18   he was having trouble explaining the bounced checks to investors.

19   Patnoi met with his superiors, and they devised a plan to return

20   the checks to the payees marked as "Refer to Maker," without

21   indicating that they were being returned for insufficient funds.

22   The plaintiffs assert that Fleet adopted this strategy with the

23   intent of misleading those payees.  One plaintiff, Crestfield

24   Associates, received a "Refer to Maker" check on January 8, 1996

12

1    -- approximately six weeks after it made its one and only

2    investment with Schick.

3           A similar pattern of behavior emerged involving Schick

4    and Sterling.  Around March 1994, according to the plaintiffs,

5    Schick began bouncing checks drawn on his attorney-fiduciary

6    accounts there.  The plaintiffs allege that Sterling, like Fleet,

7    "with at least reckless disregard of the consequences to the

8    plaintiffs and all other victims of Schick's scheme,

9    intentionally failed and wrongfully omitted to report those

10   bounced checks to the Lawyers' Fund solely so as to protect

11   Sterling's valuable business relationship with Schick."  Id. at

12   ¶ 200.

13          In 1995, Sterling began auditing Schick's accounts.

14   Sterling Executive Vice President Leonard Rudolph told Schick

15   that the bank was worried about the overdrafts and that it was

16   required to report dishonored checks to the Lawyers' Fund.

17   According to the plaintiffs, Schick told Rudolph "'how Fleet is

18   handling the problem'" and suggested that Sterling return problem

19   checks to the payees marked "Refer to Maker."  Id. at ¶ 203.  At

20   about this time, Rudolph also advised Schick to use an account

21   entitled "attorney-at-law" without any more descriptive words

22   such as "special," "escrow," or "trust" in the title in order to

23   avoid the Lawyers' Fund reporting requirements.  Schick had

24   subsequent meetings with other Sterling executives in which they

25   discussed Schick's business in depth and agreed to mark bounced

1   checks as "Refer to Maker" and not to report the insufficient
2   funds to the Lawyers' Fund.

3       The second amended complaint further asserts that after
4   learning that a check issued on a Sterling account had been
5   returned marked "Refer to Maker," a representative of
6   plaintiff/payee The Regal Trade, S.A., telephoned Rudolph and
7   asked him why the check had been returned.  Rudolph told the
8   representative that "there were 'back office problems,' which had
9   nothing to do with Schick, but as a result of which the check was
10  returned and he should call Schick and arrange to get replacement
11  checks."  Id. at ¶ 209.  The Regal representative asked Rudolph
12  directly whether there were sufficient funds in Schick's account
13  to cover the check.  Rudolph confirmed that there were.

14      In late 1995, Schick began to do business with
15  Republic.  In February, March, and April of 1996, Republic
16  returned a series of checks drawn on Schick's fiduciary accounts
17  for insufficient funds without reporting the transactions to the
18  Lawyers' Fund.  Republic also returned at least two checks marked
19  "Refer to Maker" on a separate Schick account.  None of the
20  plaintiffs had funds in this account or received one of these
21  returned checks.

22      Based on the foregoing facts, the plaintiffs' second
23  amended complaint alleged four state-law claims:  fraud and
24  aiding and abetting fraud, breach of fiduciary duty and aiding
25  and abetting breach of fiduciary duty, negligence, and commercial

14

1    bad faith.  The district court granted the defendants' Rule

2    12(b)(6) motion to dismiss these claims, reasoning that because

3    the plaintiffs had failed to allege facts sufficient to support a

4    finding of proximate cause for their RICO claim, they similarly

5    failed to do so for their state-law claims:

6                    There is no principled distinction between
7               the basis for dismissing the RICO claims on
8               proximate-causation grounds and the basis for
9               similarly dismissing the state claims
10              requiring proximate causation.  The
11              plaintiffs do not argue that they have
12              established proximate causation; rather, they
13              contend that there is a causal connection
14              between the defendants' conduct and their
15              injuries.  A causal connection, however, only
16              establishes that "but for" defendants'
17              actions the plaintiffs would not have been
18              incurred their injuries; by contrast,
19              proximate causation requires an additional
20              step -- that defendants' actions were a
21              substantial factor in plaintiff's injuries
22              and that those injuries were reasonably
23              foreseeable to the defendants; thus, even if
24              plaintiffs could establish but-for causation,
25              that is not sufficient to establish proximate
26              causation.

27   Lerner v. Fleet Bank, N.A., No. 98-7778, 2005 WL 2064088, at *6,

28   2005 U.S. Dist. LEXIS 18209, at *19 (E.D.N.Y. Aug. 6, 2005).

29              The plaintiffs appeal.

30                              **DISCUSSION**

31              I.   Standard of review.

32              We review de novo the district court's interpretation

33   of state law, Colavito v. N.Y. Organ Donor Network, Inc., 438

34   F.3d 214, 220 (2d Cir. 2006), and its grant of a Rule 12(b)(6)

35   motion to dismiss for failure to state a claim, Allaire Corp. v.

36   Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006).

                                   15

1        II.   RICO Proximate Cause v. Common Law Proximate Cause

2        RICO provides a private right of action for "[a]ny

3    person injured in his business or property by reason of a

4    violation of section 1962 of this chapter."   18 U.S.C. § 1964(c).

5    "In order to bring suit under § 1964(c), a plaintiff must plead

6    (1) the defendant's violation of [18 U.S.C] § 1962, (2) an injury

7    to the plaintiff's business or property, and (3) causation of the

8    injury by the defendant's violation."   Commercial Cleaning

9    Servs., L.L.C. v. Colin Serv. Sys., Inc., 271 F.3d 374, 380 (2d

10   Cir. 2001).   "RICO's use of the clause 'by reason of' has been

11   held to limit standing to those plaintiffs who allege that the

12   asserted RICO violation was the legal, or proximate, cause of

13   their injury, as well as a logical, or 'but for,' cause."   Id.

14       There is no little confusion in the case law about the

15   meaning and proper use of the term "proximate causation" in the

16   RICO context.[3]   When a plaintiff brings suit under RICO -- as

17   with any "suit on a statute" -- he or she "must show both that he

18   [or she] is within the class the statute sought to protect and

19   that the harm done was one that the statute was meant to

20   prevent."   Abrahams v. Young & Rubicam Inc., 79 F.3d 234, 237 (2d

21   Cir.), cert. denied, 519 U.S. 816 (1996); see also Anza v. Ideal

22   Steel Supply Corp., --- U.S. ---, ---, 126 S. Ct. 1991, 1997

23   (2006) (finding no proximate cause to support the plaintiff's

---

[3] See Baisch v. Gallina, 346 F.3d 366, 373 (2d Cir. 2003)
(explaining that our test for proximate cause under RICO
incorporates concepts of statutory standing and zones of
interest).

16

1    RICO suit because "[t]he cause of [the plaintiff's] asserted

2    harms . . . is a set of actions (offering lower prices) entirely

3    distinct from the alleged RICO violation (defrauding the

4    State)").  When used in this context, the term "proximate

5    causation" thus takes on a meaning that is different from its

6    ordinary meaning at common law:

7              At common law, so long as the plaintiff
8         category is foreseeable, there is no
9         requirement that the risk of injury to the
10        plaintiff, and the risk of the harm that
11        actually occurred, were what made the
12        defendant's actions wrongful in the first
13        place.  With statutory claims, the issue is,
14        instead, one of statutory intent: was the
15        plaintiff (even though foreseeably injured)
16        in the category the statute meant to protect,
17        and was the harm that occurred (again, even
18        if foreseeable), the "mischief" the statute
19        sought to avoid.  See Gorris v. Scott, L.R. 9
20        Ex. 125 (1874) (preamble of statute made
21        clear that the "mischief" the statute sought
22        to prevent was only disease and did not
23        encompass the risk of losing sheep off the
24        side of a ship).

25   Abrahams, 79 F.3d at 237 (footnote omitted).  As we explained in

26   Abrahams, the "use of 'no proximate cause' language as the ground

27   for dismissal in statutory cases frequently leads to confusion

28   when the issue of proximate cause is raised in related common law

29   claims" because the phrase "proximate cause" may cover a greater

30   or lesser swath of injuries and victims when used in the

31   statutory context.  Id. at 237 n.3.[4]

_____

    [4] For these reasons, the Abrahams Court suggested abandoning
the "proximate cause" phrasing all together.  See id.  While the
substance of the analysis in Abrahams has never been doubted, we
subsequently resolved to adhere to the "proximate causation"
terminology employed by the Supreme Court in Holmes v. Securities

1        Our conclusion in Lerner I that the plaintiffs had not

2   pleaded facts sufficient to support a finding of proximate cause

3   in the RICO action, therefore, does not necessarily mean that

4   their injuries were, under the facts alleged, not proximately

5   caused by the banks' actions for purposes of the plaintiffs'

6   claims under the common law.  In Abrahams, for example, we

7   concluded that the plaintiff could not bring a RICO suit because

8   he "was neither an intended target of the scheme nor an intended

9   beneficiary of the laws prohibiting it."  Abrahams, 79 F.3d at

10  238.  But we also concluded that "the RICO ruling is not

11  dispositive of [the plaintiffs'] negligence claim."  Id. at 239.

12  "[T]he duty to act with reasonable care establishes a general

13  standard of conduct and is not limited to protecting certain

14  classes of person from particular kinds of harms."  Id. at 239-

15  40.[5]

---

Investor Protection Corp., 503 U.S. 258 (1992).  See Lerner I,
318 F.3d at 121 n.6 (explaining that in Abrahams, "we merely
sought to apply the same standing test endorsed by the Holmes
Court under a more precise terminology"); see also Laborers Local
17 Health & Benefit Fund v. Phillip Morris, Inc., 191 F.3d 229,
234 n.3 (2d Cir. 1999).

[5] There may be other important differences between assessing
proximate causation for RICO claims and for common-law torts:

> In practice, our cases have held RICO
> plaintiffs to a more stringent showing of
> proximate cause than would be required at
> common law.  Thus, at common law, the element
> of foreseeability is generally satisfied by a
> showing that the plaintiff was in a
> foreseeable category of persons who might be
> harmed.  And this is so in some common law
> cases even when the type of harm may be
> unforeseeable.  But RICO cases, in order to

1         Even when stemming from the same fact pattern, then,

2    proximate causation may be present or absent depending on the

3    cause of action under which the plaintiff brings suit.[6]  In

4    Lerner I, we concluded that the plaintiffs' injuries were not

5    proximately caused by the defendants' racketeering activity, not

6    that their injuries were not proximately caused by the

7    defendants' conduct.  Indeed, we have subsequently interpreted

8    our decision in Lerner I to stand for the proposition that "a

9    plaintiff does not have standing if he suffered an injury that

10   was indirectly (and hence not proximately) caused by the

11   racketeering activity or RICO predicate acts, even though the

---

              combat the specific mischiefs that the RICO
              statute was designed to address, seem to
              require that the kind of harm the victim
              suffered be foreseeable as well.  Similarly,
              it is usually easier for intervenors to break
              the chain of causation in RICO than it is at
              common law.

Moore v. Painewebber, Inc., 189 F.3d 165, 179 (2d Cir. 1999)
(Calabresi, J., concurring) (citations omitted).

     [6] In Laborers Local 17 we declared that "analogous
principles to those that doomed plaintiffs' RICO causes of action
also bar plaintiffs' common law fraud and special duty actions."
Laborers Local 17, 191 F.3d at 243.  But in that case, we
concluded that there was no "direct" link between any of the
defendants' actions and any of the plaintiffs' injuries, i.e.,
that the plaintiff had been injured by a third party, not by the
defendant.  See id. at 239 ("Being purely contingent on harm to
third parties, these injuries are indirect.").  Because proximate
cause under RICO and under New York common law each requires a
showing of "direct injury," our conclusion that such injury was
lacking was equally applicable to both the federal and state
causes of action.  See also Anza, --- U.S. at ---, 126 S. Ct. at
1998 ("When a court evaluates a RICO claim for proximate
causation, the central question it must ask is whether the
alleged violation led directly to the plaintiff's injuries.").

                              19

1    <u>injury was proximately caused by some non-RICO violations</u>

2    <u>committed by the defendants</u>."  <u>Baisch v. Gallina</u>, 346 F.3d 366,

3    373 (2d Cir. 2003) (emphasis added).  RICO and common-law claims

4    will often depend on different chains of causation stemming from

5    the same underlying conduct.  Accordingly, even though we

6    concluded in <u>Lerner I</u> that there was no proximate causal

7    connection between the plaintiffs' injuries and RICO violations

8    under the facts as alleged, the district court erred in failing

9    to determine whether the plaintiffs had nonetheless alleged a

10   proximate causal connection between the plaintiffs' injuries and

11   the defendants' common-law tortious conduct.

12        The district court's error is understandable in light

13   of the plaintiffs' failure to revise the bulk of their complaint

14   on remand or to display alternate theories of causation with any

15   prominence.  The plaintiffs instead emphasized before the

16   district court the same theory of causation that they had

17   previously argued in support of their RICO claim:  that the

18   plaintiffs' losses resulted from the banks' conspiracy to corrupt

19   the Lawyers' Fund.  It is not altogether impossible that the same

20   chain of causation may, in some circumstances, fail to establish

21   proximate cause under RICO and still support proximate cause for

22   a common-law claim.  <u>See Moore</u>, 189 F.3d at 179 (Calabresi, J.,

23   concurring) ("[I]t is usually easier for intervenors to break the

24   chain of causation in RICO than it is at common law.").  But this

25   particular theory of liability, whether marshaled in support of a

1    RICO claim or a common-law negligence claim, rests on assumptions

2    that are "inherently speculative," Lerner I, 318 F.3d at 124.

3    See, e.g., Part III.A., below (finding this theory insufficient

4    to establish proximate cause for negligence claim against banks

5    in which plaintiffs' funds were not deposited); cf. Laborers

6    Local 17, 191 F.3d at 243 (concluding that, under both RICO and

7    common-law fraud, plaintiffs' injuries were too indirect because

8    the defendant allegedly harmed a third party, not the plaintiff

9    bringing the instant suit).

10        The plaintiffs have lately come to the view that they

11   were mistaken in focusing on the alleged conspiracy to corrupt

12   the Lawyers' Fund in pursuing their common-law claims. See Oral

13   Arg. Tr. of April 26, 2006, at 46 ("If you want to tell me that

14   it could have been argued better or it shouldn't have been -- the

15   emphasis shouldn't have been on the [L]awyers['] [F]und, given

16   the nature of the case and the Second Circuit's ruling in the

17   prior appeal -- you know, if I have to, I'll say sure, okay.").

18   But we disagree with the defendants' assertion that the

19   plaintiffs have waived all alternative theories of causation.

20   The complaint separately alleges other such theories for each of

21   the four state-law claims. See Second Am. Compl. ¶¶ 294-96, 304-

22   06, 320-22, 328-30.

23        We now consider each of the plaintiffs' theories as to

24   each state-law claim in turn.

25             III.  Negligence

1          To establish a prima facie case of negligence under New

2    York law, "a plaintiff must demonstrate (1) a duty owed by the

3    defendant to the plaintiff, (2) a breach thereof, and (3) injury

4    proximately resulting therefrom."  <u>Solomon ex rel. Solomon v.</u>

5    <u>City of New York</u>, 66 N.Y.2d 1026, 1027, 489 N.E.2d 1294, 1294,

6    499 N.Y.S.2d 392, 392 (1985); <u>see also</u> <u>King v. Crossland Sav.</u>

7    <u>Bank</u>, 111 F.3d 251, 259 (2d Cir. 1997).

8    <u>A. Joint and Several Liability to All Plaintiffs</u>

9          Each plaintiff appears to assert a negligence claim

10   against each defendant bank, whether or not Schick ever deposited

11   that particular plaintiff's funds with that particular bank.  We

12   do not think any of the plaintiffs has stated a claim for

13   negligence against banks in which their funds were not deposited.

14         As a general matter, "[b]anks do not owe non-customers

15   a duty to protect them from the intentional torts of their

16   customers."  <u>In re Terrorist Attacks on Sept. 11, 2001</u>, 349 F.

17   Supp. 2d 765, 830 (S.D.N.Y. 2005); <u>see also</u> <u>Renner v. Chase</u>

18   <u>Manhattan Bank</u> (<u>Renner I</u>), No. 98-926, 1999 WL 47239, at *13-*14,

19   1999 U.S. Dist. LEXIS 978, at *40 (S.D.N.Y. Feb. 3, 1999);

20   <u>Century Bus. Credit Corp. v. N. Fork Bank</u>, 246 A.D.2d 395, 396,

21   668 N.Y.S.2d 18, 19 (1st Dep't 1998) ("[T]o hold that banks owe a

22   duty to their depositors' creditors to monitor the depositors'

23   financial activities so as to assure the creditors' collection of

24   the depositors' debts would be to unreasonably expand banks'

25   orbit of duty.").  As a New York trial court concluded in another

1    Schick-related case, "a bank has no duty to customers of other

2    banks.  With billions of banking transactions occurring in New

3    York alone, this would be the equivalent of making New York banks

4    liable to the world's banking public."  Eschel v. Fleet Bank,

5    Index No. 600809/98, slip op. at 6-7 (N.Y. Sup. Ct. 2003)

6    (footnote omitted).

7           Even if the banks did owe them a duty of care, the

8    plaintiffs' allegations could not establish proximate cause with

9    respect to banks that did not hold their funds.  The plaintiffs

10   argue that if any of the banks had reported Schick's

11   misappropriation of funds, the bar disciplinary committee would

12   have intervened sooner and prevented Schick from defrauding his

13   future clients.  But as discussed in Part II, above, we think

14   that, whether alleged as a RICO claim or not, the banks' failure

15   to report Schick's overdrafts is too far removed from the damages

16   Schick subsequently caused to persons who never deposited funds

17   with the bank and who participated in future transactions to

18   which the bank was not a party.  To find proximate causation in

19   this context would, in effect, require a bank that failed to

20   report an attorney's overdrafts on fiduciary account to be an

21   insurer for any damages that lawyer subsequently causes to any of

22   his or her future clients.  By the plaintiffs' reasoning, the

23   banks could also be liable for any hypothetical malpractice

24   action against Schick based on poor performance at trial or bad

25   legal advice in unrelated cases.  Liability for negligence does

23

1    not extend that far.  "Life is too short to pursue every human
2    act to its most remote consequences; 'for want of a nail, a
3    kingdom was lost' is a commentary on fate, not the statement of a
4    major cause of action against a blacksmith."  Holmes v. Sec.
5    Investor Prot. Corp., 503 U.S. 258, 287 (1992) (Scalia, J.,
6    concurring in judgment).

7         We therefore affirm the judgment of the district court
8    dismissing the second amended complaint to the extent that the
9    plaintiffs seek to recover from banks in which their funds were
10   never deposited on a theory of negligence.

11   B. Each Bank's Liability to Plaintiffs with Funds Deposited at
12   that Bank

13        Several plaintiffs also allege that Schick deposited
14   their funds in fiduciary accounts with one or more of the three
15   defendant banks.  The analysis of negligence in these
16   circumstances is different.

17        As a general matter, "a depositary bank has no duty to
18   monitor fiduciary accounts maintained at its branches in order to
19   safeguard funds in those accounts from fiduciary
20   misappropriation."  Norwest Mortgage, Inc. v. Dime Sav. Bank of
21   N.Y., 280 A.D.2d 653, 654, 721 N.Y.S.2d 94, 95 (2d Dep't 2001);
22   see also Grace ex rel. Fox v. Corn Exch. Bank Trust Co., 287 N.Y.
23   94, 102, 38 N.E.2d 449, 452 (1941).  "The bank has the right to
24   presume that the fiduciary will apply the funds to their proper
25   purposes under the trust."  Bischoff ex rel. Schneider v.
26   Yorkville Bank, 218 N.Y. 106, 111, 112 N.E. 759, 760 (1916); see

24

1    also Clarke v. Pub. Nat'l Bank & Trust Co. of N.Y., 259 N.Y. 285,

2    290, 181 N.E. 574, 576 (1932).  As noted, we have held that this

3    general principle applies to Attorney Trust and IOLA accounts.

4    See People's Westchester Sav. Bank, 961 F.2d at 332 ("In

5    maintaining an IOLA account, the lawyer, not the bank, is charged

6    with a fiduciary duty to the client.").

7           Nevertheless, "a bank may be liable for participation

8    in [such a] diversion, either by itself acquiring a benefit, or

9    by notice or knowledge that a diversion is intended or being

10   executed."  In re Knox, 64 N.Y.2d 434, 438, 477 N.E.2d 448, 451,

11   488 N.Y.S.2d 146, 149 (1985).  "Adequate notice may come from

12   circumstances which reasonably support the sole inference that a

13   misappropriation is intended, as well as directly."  Bischoff,

14   218 N.Y. at 113, 112 N.E.2d at 761.  "Having such knowledge, [the

15   bank is] under the duty to make reasonable inquiry and endeavor

16   to prevent a diversion."  Id. at 114, 112 N.E.2d at 761; see also

17   Norwest Mortgage, 280 A.D.2d at 654, 721 N.Y.S.2d at 95 ("Facts

18   sufficient to cause a reasonably prudent person to suspect that

19   trust funds are being misappropriated will trigger [such] a duty

20   of inquiry on the part of a depositary bank, and the bank's

21   failure to conduct a reasonable inquiry when the obligation

22   arises will result in the bank being charged with such knowledge

23   as inquiry would have disclosed.").  Although "[s]mall overdrafts

24   are generally insufficient to trigger a duty of inquiry," id.;

25   see also Grace, 287 N.Y. at 104-05, 38 N.E.2d at 453, the bank's

1    duty may be triggered by "chronic insufficiency of funds,"

2    Norwest Mortgage, 280 A.D.2d at 654, 721 N.Y.S.2d at 95; see also

3    Zaz-Huff Inc. v. Chase Manhattan Bank, N.A., 277 A.D.2d 59, 61,

4    717 N.Y.S.2d 11, 12 (1st Dep't 2000) (stating that "evidence of

5    overdrafts against these accounts, or of any other suspicious

6    activity in such accounts . . . would have put Chase on notice of

7    possible impropriety").

8            Although they invoke this line of cases generally, the

9    plaintiffs rely primarily on Home Savings of America, FSB v.

10   Amoros, 233 A.D.2d 35, 661 N.Y.S.2d 635 (1st Dep't 1997). There,

11   the First Department concluded that "[t]here is, at the very

12   least, a factual issue as to whether the chronic and extremely

13   serious insufficiency of funds in the mortgage trust account in

14   early October 1994, combined with the contemporaneous and roughly

15   commensurate sapping of that account into other [of the bank's]

16   accounts plainly being utilized by the account fiduciary . . .

17   for nontrust purposes was sufficient to place [the bank] on

18   notice of the misappropriation."  Id. at 40-41, 661 N.Y.S.2d at

19   638.  "[A]mong the various indicia of fiduciary misappropriation,

20   surely account insufficiency must rank very highly, revealing as

21   it does a telling disparity between entrusted funds and fiduciary

22   expenditures which, in turn, may be, and often is, indicative of

23   trust withdrawals for nontrust purposes."  Id. at 41, 661

24   N.Y.S.2d at 638.

1          The <u>Home Savings</u> court also emphasized that a bank's

2     duty to report bounced checks on IOLA accounts reflects the fact

3     that overdrafts are particularly probative in signaling

4     misappropriation:

5                    "Disciplinary counsel nationwide know from
6                    experience that a 'bounced check' on a
7                    lawyer's trust account is an obvious signal
8                    that law clients' money may be in jeopardy"
9                    (Alter, Outside Counsel, <u>Coming Jan. 1: The</u>
10                   <u>Dishonored Check Notice Rule</u>, NYLJ, Nov. 19,
11                   1992, at 1, col 1, at 4, col 4). Indeed, it
12                   is precisely because trust account
13                   insufficiency is considered such a reliable
14                   sign of fiduciary misappropriation that
15                   depositary banks maintaining attorney trust
16                   accounts must make a dishonored check report
17                   to the Lawyers' Fund for Client Protection
18                   "whenever a properly payable instrument is
19                   presented against an attorney special, trust
20                   or escrow account which contains insufficient
21                   available funds, and the banking institution
22                   dishonors the instrument for that reason" (22
23                   NYCRR 1300.1 [c]).

24    <u>Id.</u>, 661 N.Y.S.2d at 638-39. The First Department concluded

25    that, "[a]lthough we are not of the view that the bank's evident

26    default in the performance of its regulatory obligation to make a

27    report of check dishonor suffices to establish its liability for

28    the loss occasioned by [the defrauder's] misappropriation, we do

29    think such default may be adduced as some evidence of the bank's

30    negligence." <u>Id.</u> at 41-42, 661 N.Y.S.2d at 639.

31          Fleet and Republic argue that Schick's relevant

32    accounts at their banks were not properly designated as attorney

33    fiduciary accounts -- rather they were labeled simply "Attorney

34    at Law" -- and that the banks therefore had no duty to

1    investigate under Home Savings.  But according to the plaintiffs'

2    complaint, whether or not the accounts were titled IOLA accounts,

3    the banks had actual knowledge that the accounts were intended to

4    be trust accounts for client funds.  For purposes of this Rule

5    12(b)(6) motion, of course, we assume that allegation to be true.

6    Cf. Eschel v. Fleet Bank, Index No. 600891/98, slip. op. at 7

7    (N.Y. Sup. Ct. 2003) (declaring, in another Schick-related case,

8    that "[i]n the complaint, plaintiffs conclusorily allege deposits

9    into 'de facto' attorney escrow accounts . . . . Eventually,

10   plaintiffs must establish that their funds were deposited in such

11   accounts.  However, at the pleading stage, all that is necessary

12   is that defendants have notice of plaintiffs' claim. They do.").

13        Sterling concedes that its accounts were labeled as

14   IOLA accounts, but instead argues that under New York Judiciary

15   Law § 90, it was required to report only those overdrafts that

16   were dishonored due to insufficient funds and that, under New

17   York law, if the bank chooses to honor the overdraft, it need not

18   report the attorney's overdraft to the Lawyers' Fund.  Sterling

19   notes that the ABA Model Rules -- unlike New York law -- suggest

20   that financial institutions report all overdrafts, see Model

21   Rules for Client Protection (American Bar Association Center for

22   Professional Responsibility 1995); Model Rules for Trust Account

23   Overdraft Notification, R. 2 (1995).  Sterling therefore argues

24   that New York's notification law represents a considered policy

25   choice to depart from a stricter reporting requirement suggested

28

1    by the ABA.  But whether or not Sterling violated New York

2    Judiciary Law § 90 by failing to report the overdrafts that it

3    honored, still, the fact that Schick was overdrawing his

4    fiduciary accounts constituted strong evidence that he was, at

5    the very least, mishandling his clients' funds.[7]  The fact that a

6    tortfeasor complies with relevant laws and regulations does not

7    insulate it from liability if it fails to act objectively

8    reasonably.  See Restatement (Second) of Torts § 288C (1965)

9    ("Compliance with a legislative enactment or an administrative

10   regulation does not prevent a finding of negligence where a

11   reasonable man would take additional precautions."); Tufariello

12   v. Long Island R.R. Co.,    --- F.3d. ---, 2006 WL 2068296, *8,

13   2006 U.S. App. LEXIS 18267, *28-29 (2d Cir. 2006) (2d Cir. July

14   20, 2006) (citing 288C in the context of negligence under the

15   Federal Employers' Liability Act); Charter Oak Fire Ins. Co. v.

16   Nat'l Wholesale Liquidators, 279 F. Supp. 2d 358, 361 n.3

17   (S.D.N.Y. 2003) (citing section 288C); Royal Ins. Co. of Am. v.

18   Ru-Val Elec. Corp., 918 F. Supp. 647, 658 (E.D.N.Y. 1996) (same).

19            Once Schick began repeatedly to overdraw on his

20   attorney trust accounts at a defendant bank, that bank had a duty

21   under Home Savings to make reasonable inquiries and to safeguard

---

[7] Similarly, whether or not Schick's accounts at Fleet and
Republic were actually subject to the reporting requirements of
N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.46, the banks are
alleged to have had actual knowledge that client funds were
deposited there.  This knowledge triggers a duty under Home
Savings regardless of whether the banks were obligated to report
the bounced checks to the Lawyers' Fund.

1    attorney trust funds from Schick's misappropriation.  The court

2    in Home Savings noted that a breach of duty had been properly

3    alleged when "not one but 11 checks in very substantial amounts

4    were dishonored in a context of long-pending account

5    insufficiency."  Home Savings, 233 A.D.2d at 42, 661 N.Y.S.2d at

6    639.  The scale and scope of Schick's pattern of dishonored

7    checks easily exceeds those in Home Savings.

8        Home Savings also makes clear that the banks' alleged

9    breaches of their duty to investigate and, if necessary,

10   safeguard the funds in its trust account, would qualify as a

11   proximate cause of the clients' losses.  See id.  ("[T]here can

12   be little doubt in light of the results of the . . . audit [in

13   question] or the bank's own internal investigation performed

14   [during the following month,] that a reasonable investigation by

15   the bank initiated at an earlier date would have uncovered [the]

16   embezzlement.").

17       Republic argues that plaintiffs who deposited funds in

18   Republic accounts cannot show causation because Schick did not

19   begin overdrawing on those accounts until early 1996, and,

20   therefore, even if the banks had reported those checks dishonored

21   for insufficient funds to the Lawyers Fund, Schick would still

22   not have been disciplined before his scheme collapsed in April.

23   But whether or not the disciplinary authorities would have

24   disbarred Schick in time to protect the clients' funds, Republic

25   could have acted immediately to protect the funds as soon as it

1    discovered Schick's misappropriation.  By ignoring evidence of

2    Schick's misconduct and allowing him to continue to use Republic

3    accounts, Republic allegedly allowed itself to become a conduit

4    for Schick's activities.  Like the defendant held liable in

5    Bischoff, "by supinely paying, under the facts here, . . . the

6    subsequent checks of [the trustee], it became privy to the

7    misapplication."  Bischoff, 218 N.Y. at 114, 112 N.E.2d at 762;

8    see also Grace, 287 N.Y. at 107, 38 N.E.2d at 454 ("By ignoring

9    these facts and their necessary implications, the bank became a

10   guilty participant in the trustee's embezzlement of trust funds

11   deposited in the trust account in the bank and from that date it

12   became liable as a joint wrongdoer for all moneys which the

13   trustee embezzled."); Bassman v. Blackstone Assocs., Index No.

14   600891/98, slip op. at 8 (N.Y. Sup. Ct. 1999) (concluding, in

15   another Schick-related action, that "[m]uch like the court in . .

16   . Home Savings, this Court is constrained to find that at the

17   very least these fact[s] sufficiently plead a cause of action for

18   negligence").

19           Accordingly, we vacate the judgment of the district

20   court to the extent that it dismissed the plaintiffs' claims for

21   negligence against a defendant bank in which his, her, or its

22   funds were deposited.

23           III.  Fraud

24           Federal Rule of Civil Procedure 9(b) sets forth a

25   heightened pleading standard for allegations of fraud:  "In all

31

1    averments of fraud or mistake, the circumstances constituting

2    fraud or mistake shall be stated with particularity."  We have

3    explained that in order to comply with Rule 9(b), "the complaint

4    must: (1) specify the statements that the plaintiff contends were

5    fraudulent, (2) identify the speaker, (3) state where and when

6    the statements were made, and (4) explain why the statements were

7    fraudulent."  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175

8    (2d Cir. 1993).

9            Under Rule 9(b), "[m]alice, intent, knowledge, and

10   other condition of mind of a person may be averred generally."

11   Fed. R. Civ. P. 9(b).  But because "we must not mistake the

12   relaxation of Rule 9(b)'s specificity requirement regarding

13   condition of mind for a license to base claims of fraud on

14   speculation and conclusory allegations[,] . . . plaintiffs must

15   allege facts that give rise to a strong inference of fraudulent

16   intent."  Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.

17   1995) (internal quotation marks and citation omitted).  "The

18   requisite 'strong inference' of fraud may be established either

19   (a) by alleging facts to show that defendants had both motive and

20   opportunity to commit fraud, or (b) by alleging facts that

21   constitute strong circumstantial evidence of conscious

22   misbehavior or recklessness."  Shields v. Citytrust Bancorp,

23   Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

24   A. Fraudulent Misrepresentation

32

1           Under New York law, "[t]o state a cause of action for

2   fraud, a plaintiff must allege a representation of material fact,

3   the falsity of the representation, knowledge by the party making

4   the representation that it was false when made, justifiable

5   reliance by the plaintiff and resulting injury."  Kaufman v.

6   Cohen, 307 A.D.2d 113, 119, 760 N.Y.S.2d 157, 165 (1st Dep't

7   2003).[8]

8           Only one plaintiff, Regal Trade, has alleged an

9   affirmative representation that it relied upon to its detriment.

10  According to the complaint:

11                  [U]pon receipt of the Notice of Dishonor from
12                  Holm & Drath's bank, accompanying the return
13                  of Schick's checks unpaid, marked "Refer to
14                  Maker", as aforesaid, Mark Karasick [Regal
15                  Trade's representative], telephoned
16                  Sterling's main office in New York, from New
17                  Jersey, spoke with Rudolph, and asked why
18                  Schick's checks were returned.  Rudolph
19                  falsely and fraudulently responded that there
20                  were "back office problems", which had
21                  nothing to do with Schick, but as a result of
22                  which the check was returned and he should

---

[8] We have at times recited a slightly different formulation.
See, e.g., Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d
91, 98 (2d Cir. 1997) ("Under New York law, for a plaintiff to
prevail on a claim of fraud, he must prove five elements by clear
and convincing evidence: (1) a material misrepresentation or
omission of fact, (2) made with knowledge of its falsity, (3)
with an intent to defraud, and (4) reasonable reliance on the
part of the plaintiff, (5) that causes damage to the plaintiff."
(emphasis added)).  We need not resolve at this time whether that
formulation is consistent with the First Department's.  Cf.,
e.g., Houbigant, Inc. v. Deloitte & Touche, LLP, 303 A.D.2d 92,
100, 753 N.Y.S.2d 493, 499 (1st Dep't 2003) ("[T]he plaintiff
must only allege facts from which it may be inferred that the
defendant was aware that its misrepresentations would be
reasonably relied upon by the plaintiff, not that the defendant
intended to induce the particular acts of detrimental reliance
ultimately undertaken by the plaintiff.").

```
 1                    call Schick and arrange to get replacement
 2                    checks.  Mr. Karasick directly asked Rudolph
 3                    on that occasion whether there were
 4                    sufficient funds to cover the returned check,
 5                    to which Rudolph falsely and fraudulently
 6                    affirmatively responded that there were
 7                    sufficient funds to deposit.
```

 8    Second Am. Compl. ¶ 209.  The complaint further states that in

 9    reliance on the defendant's fraudulent misrepresentations, Regal

10    Trade continued to entrust its funds to Schick.  Id. at ¶ 289.

11    These allegations are sufficient to state a claim for fraud by

12    Regal against Sterling.

13             None of the other plaintiffs, however, points to any

14    misrepresentation from a defendant bank on which it relied.

15    Besides Regal Trade's phone call to Sterling, the only other

16    possible misrepresentations alleged in the second amended

17    complaint are the "Refer to Maker" stamps placed on Schick's

18    dishonored checks.  Only one of the plaintiffs -- Crestfield

19    Associates -- asserts that it received a "Refer to Maker" check.

20    But Crestfield cannot show any reliance on this statement because

21    it had already made its one and only investment with Schick six

22    weeks earlier.

23             With the exception of Regal Trade's claim against

24    Sterling, therefore, we affirm the judgment of the district court

25    insofar as it dismissed the plaintiffs' claims for fraud.

26    B. Fraudulent Concealment

27             "[I]nstead of an affirmative misrepresentation, a fraud

28    cause of action may be predicated on acts of concealment where

1   the defendant had a duty to disclose material information."

2   Kaufman, 307 A.D.2d at 119-20, 760 N.Y.S.2d at 165.  We have

3   explained that "[d]uring the course of negotiations surrounding a

4   business transaction, a duty to disclose may arise in two

5   situations:  first, where the parties enjoy a fiduciary

6   relationship, and second, where one party possesses superior

7   knowledge, not readily available to the other, and knows that the

8   other is acting on the basis of mistaken knowledge."  Aaron Ferer

9   & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d

10  Cir. 1984) (citations omitted).  As several district courts have

11  suggested, such a duty "usually arises . . . in the context of

12  business negotiations where parties are entering a contract."

13  Ray Larsen Assocs. v. Nikko Am., Inc., No. 89-2809, 1996 WL

14  442799, at *5, 1996 U.S. Dist. LEXIS 11163, at *14 (S.D.N.Y. Aug.

15  6, 1996); see also Ryan v. Hunton & Williams, No. 99-5938, 2000

16  WL 1375265, at *5, 2000 U.S. Dist. LEXIS 13756, at *16 (E.D.N.Y.

17  Sept. 20, 2000); Renner v. Chase Manhattan Bank (Renner II), No.

18  98-926, 2000 WL 781081, at *9 n.5, 2000 U.S. Dist. LEXIS 158552,

19  at *28 n.5 (S.D.N.Y. June 16, 2000); Williams v. Bank Leumi Trust

20  Co., No. 96-6695, 1998 WL 397887, at *8, 1998 U.S. Dist. LEXIS

21  10636, at *22 (S.D.N.Y. July 15, 1998).

22          Even if the withholding of information could constitute

23  fraudulent concealment in the absence of business negotiations,

24  the plaintiffs would still be required to show that they relied

25  on the banks' fraudulent failure to disclose.  No plaintiff has

35

1    alleged any such reliance.  Instead, they claim reliance on "(i)

2    the fact that Schick was an attorney admitted to the practice of

3    law in the State of New York in good standing, and (ii) the

4    integrity of 'The New York State Attorney Disciplinary System.'"

5    Second Am. Compl. ¶ 234.  None of them alleges that he or she

6    contacted the Appellate Division to determine whether there had

7    been previous disciplinary actions taken against Schick.  In the

8    absence of an allegation that the plaintiffs actually relied on

9    the banks' omissions, they have not stated a claim for fraudulent

10   concealment.

11                   C. Aiding and Abetting Fraud

12             To establish liability for aiding and abetting fraud,

13   the plaintiffs must show "(1) the existence of a fraud; (2) [the]

14   defendant's knowledge of the fraud; and (3) that the defendant

15   provided substantial assistance to advance the fraud's

16   commission." JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d

17   247, 252 (S.D.N.Y. 2005) (internal quotation marks and citations

18   omitted); see also Franco v. English, 210 A.D.2d 630, 633, 620

19   N.Y.S.2d 156, 159 (3d Dep't 1994) (requiring "nexus between the

20   primary fraud, [defendant's] knowledge of the fraud and what it

21   did with the intention of advancing the fraud's commission").

22             The leading opinion interpreting New York law in this

23   respect is Kolbeck v. LIT America, Inc., 939 F. Supp. 240

24   (S.D.N.Y. 1996), in which Judge Mukasey concluded that

25   "[t]ogether, H2O Swimwear[, Ltd. v. Lomas, 164 A.D.2d 804, 560

1    N.Y.S.2d 19 (1st Dep't 1990),] and AA Tube Testing[ Co. v. Sohne,

2    20 A.D.2d 639, 246 N.Y.S.2d 247 (2d Dep't 1964),] demonstrate

3    that actual knowledge is required to impose liability on an aider

4    and abettor under New York law." Id. at 246; see also JP Morgan

5    Chase Bank, 406 F. Supp. 2d at 252 n.4 ("[T]he weight of the case

6    law . . . defines knowledge in the context of an aiding and

7    abetting claim as actual knowledge.").

8         We think the plaintiffs in this case have failed to

9    allege actual knowledge of fraud with the particularity necessary

10    to survive the heightened pleading requirements of Federal Rule

11    of Civil Procedure 9(b). See Armstrong v. McAlpin, 699 F.2d 79,

12    92-93 (2d Cir. 1983) (applying Rule 9(b) for claim for aiding and

13    abetting fraud).

14         Although the plaintiffs conclusorily allege that the

15    banks had actual knowledge, we think that they failed to plead

16    facts with the requisite particularity to support that claim.

17    The plaintiffs allege in detail that the banks knew that Schick

18    engaged in improper conduct that would warrant discipline by the

19    Appellate Division, but those alleged facts do not give rise to

20    the "strong inference," required by Federal Rule of Civil

21    Procedure 9(b), of actual knowledge of his outright looting of

22    client funds. See, e.g., Ryan, 2000 WL 1375265, at * 9, 2000

23    U.S. Dist. LEXIS 13756, at *15 ("Allegations that Chemical

24    suspected fraudulent activity . . . do not raise an inference of

25    actual knowledge of Wolas's fraud."); Renner II, 2000 WL 781081,

1    at *12, 2000 U.S. Dist. LEXIS 158552, at *36 (stating that

2    although bank had previously "rejected the transactions on the

3    basis that they were potential vehicles for fraud, there is no

4    factual basis for the assertion that Chase officials actually

5    knew that the fraud was, in fact, occurring."). We therefore

6    affirm the judgment of the district court insofar as it dismissed

7    the plaintiffs' claims for aiding and abetting fraud.

8            IV.   Commercial Bad Faith

9            The New York Court of Appeals fashioned the doctrine of

10   "commercial bad faith" as an exception to the general rule that a

11   bank is absolved of liability for a check made out to a

12   fictitious payee when the maker knows that the payee is

13   fictitious.  See N.Y. U.C.C. Law § 3-405.  The doctrine provides

14   that a bank may be held liable if it in fact knows of the fraud

15   and participates in it.  See Prudential-Bache Sec., Inc. v.

16   Citibank, N.A., 73 N.Y.2d 263, 274-75, 536 N.E.2d 1118, 1124, 539

17   N.Y.S.2d 699, 705 (1989); Getty Petroleum Corp. v. Am. Exp.

18   Travel Related Servs. Co., 90 N.Y.2d 322, 331, 683 N.E.2d 311,

19   316, 660 N.Y.S.2d 689, 694-95 (1997).  We have considerable doubt

20   whether the doctrine has any applicability to these plaintiffs'

21   claims, which do not allege fraud in the making and cashing of

22   checks.  Compare Peck v. Chase Manhattan Bank, N.A., 190 A.D.2d

23   547, 548-49, 593 N.Y.S.2d 509, 510-11 (1st Dep't 1993).

24           Even if a claim for commercial bad faith were available

25   in this context, however, the plaintiffs' claims would fail for

38

1    the same reason as do their claims for aiding and abetting fraud.

2    Claims of commercial bad faith, like claims of fraud, are

3    governed by the heightened pleading requirements of Federal Rule

4    of Civil Procedure 9(b).  See Wight v. BankAmerica Corp., 219

5    F.3d 79, 91-92 (2d Cir. 2000).  A claim of commercial bad faith

6    requires that the bank have "actual knowledge of facts and

7    circumstances that amount to bad faith, thus itself becoming a

8    participant in a fraudulent scheme."  Prudential-Bache, 73 N.Y.2d

9    at 275, 536 N.E.2d at 1124-25, 539 N.Y.S.2d at 706.  "[A]

10   transferee's lapse of wary vigilance, disregard of suspicious

11   circumstances which might have well induced a prudent banker to

12   investigate and other permutations of negligence are not relevant

13   considerations."  Getty Petroleum, 90 N.Y.2d at 331, 683 N.E.2d

14   at 316, 660 N.Y.S.2d at 694-95.  Because the plaintiffs fail to

15   plead facts giving rise to the "strong inference" of actual

16   knowledge of fraud required by Federal Rule of Civil Procedure

17   9(b), we affirm the district court's dismissal of their claim for

18   commercial bad faith.  Cf. Nigerian Nat'l Petroleum Corp. v.

19   Citibank, N.A., No. 98-4960, 1999 WL 558141, at *8, 1994 U.S.

20   Dist. LEXIS 11599, *22 (S.D.N.Y. July 30, 1999) (citing Getty and

21   granting Rule 12(b)(6) motion to dismiss claim of commercial bad

22   faith for failure to plead adequately defendant's actual

23   knowledge of fraud).

24            V.   Aiding and Abetting Breach of Fiduciary Duty

1    As already noted, a bank generally has "no duty to
2  monitor fiduciary accounts maintained at its branches in order to
3  safeguard funds in those accounts from fiduciary
4  misappropriation." Norwest Mortgage, 280 A.D.2d at 654, 721
5  N.Y.S.2d at 95. Some of the plaintiffs here have nonetheless
6  stated claims against some of the defendant banks for aiding and
7  abetting Schick's breach of fiduciary duty.

8    "A claim for aiding and abetting a breach of fiduciary
9  duty requires: (1) a breach by a fiduciary of obligations to
10  another, (2) that the defendant knowingly induced or participated
11  in the breach, and (3) that plaintiff suffered damage as a result
12  of the breach." Kaufman, 307 A.D.2d at 125, 760 N.Y.S.2d at 169;
13  accord In re Sharp Int'l Corp., 403 F.3d 43, 49 (2d Cir. 2005);
14  see also Wechsler v. Bowman, 285 N.Y. 284, 291, 34 N.E.2d 322,
15  326 (1941) ("Any one who knowingly participates with a fiduciary
16  in a breach of trust is liable for the full amount of the damage
17  caused thereby to the cestuis que trust."). With respect to the
18  second requirement, "[a]lthough a plaintiff is not required to
19  allege that the aider and abettor had an intent to harm, there
20  must be an allegation that such defendant had actual knowledge of
21  the breach of duty." Kaufman, 307 A.D.2d at 125; 760 N.Y.S.2d at
22  169. And "[a] person knowingly participates in a breach of
23  fiduciary duty only when he or she provides 'substantial
24  assistance' to the primary violator." Id. at 126, 760 N.Y.S.2d
25  at 170.

40

1            The complaint alleges that "each defendant had actual
2   knowledge that Schick and his law firms violated their fiduciary
3   duties to some or all of the plaintiffs, inter alia, by reason of
4   the fact that Schick Attorney Fiduciary Accounts were overdrawn;
5   numerous checks written on Schick Attorney Fiduciary Accounts
6   were dishonored for insufficient funds; and Schick on numerous
7   occasions . . . transferred funds from the Schick Attorney
8   Fiduciary Accounts to his personal account(s)."  Second Am.
9   Compl. ¶ 303.

10           As discussed above, these "red flags," as alleged, were
11  insufficient to establish a claim for aiding and abetting fraud
12  because, although they may have put the banks on notice that some
13  impropriety may have been taking place, those alleged facts do
14  not create a strong inference of actual knowledge of Schick's
15  outright theft of client funds.  But the claim for aiding and
16  abetting a breach of fiduciary duty does not depend on such
17  knowledge of outright theft.  Schick's commingling of funds was
18  not only an indication of a breach of fiduciary duty -- it was,
19  in and of itself, a breach.  See ABA Model Rules for Trust
20  Account Overdraft Notification, R.2, available at
21  http://www.abanet.org/cpr/clientpro/orule2.html (last visited,
22  June 24, 2006) ("In light of the purposes of this rule, and the
23  ethical proscriptions concerning the preservation of client funds
24  and commingling of client and lawyer funds, it would be improper
25  for a lawyer to accept 'overdraft privileges' or any other

1    arrangement for a personal loan on a lawyer trust account.").  We
2    therefore conclude that the bank's actual knowledge of this
3    breach of duty may provide the basis for an aiding and abetting
4    claim.

5        As noted above, to establish the banks' knowing
6    participation, the plaintiffs must also show that the banks gave
7    Schick "substantial assistance" in breaching his fiduciary duty
8    to his clients.  "Substantial assistance occurs when a defendant
9    affirmatively assists, helps conceal or fails to act when
10   required to do so, thereby enabling the breach to occur.
11   However, the mere inaction of an alleged aider and abettor
12   constitutes substantial assistance only if the defendant owes a
13   fiduciary duty directly to the plaintiff."  Kaufman, 307 A.D.2d
14   at 126, 760 N.Y.S.2d at 170; see also Sharp, 403 F.3d at 50-51.

15       The defendants argue that they could not have given
16   "substantial assistance" if they did no more than passively fail
17   to report Schick's bounced checks because they owed no
18   independent fiduciary duty to Schick's clients.  But as discussed
19   above with regard to the plaintiffs' negligence claim, banks do
20   have a duty to safeguard trust funds deposited with them when
21   confronted with clear evidence indicating that those funds are
22   being mishandled.  "Neither a large bank nor a small bank may
23   urge that it is ignorant of facts clearly disclosed in the
24   transactions of its customers with the bank . . . nor may a bank
25   close its eyes to the clear implications of such facts."  Grace,

42

1  287 N.Y. at 107; 38 N.E.2d at 454.  As in _Bischoff_, the

2  plaintiffs here allege that the banks had sufficient information

3  to place them "under the duty to make reasonable inquiry and

4  endeavor to prevent a diversion."  _Bischoff_, 218 N.Y. at 114; 112

5  N.E.2d at 761.

6          The rule that liability for aiding and abetting is

7  limited to those with a duty to disclose is based on the common-

8  law principle that "since there is ordinarily no duty to take

9  affirmative steps to interfere, mere presence at the commission

10  of the wrong . . . is not enough to charge one with

11  responsibility."  W. Page Keeton et al., Prosser & Keeton on the

12  Law of Torts § 46 at 323-24 (5th ed. 1984); _see_ _Kolbeck_, 939 F.

13  Supp. at 247 (incorporating the common-law requirement into the

14  test for aiding and abetting breach of fiduciary duty).  We think

15  that the duty "to prevent a diversion" described in _Bischoff_ and

16  _Home Savings_ -- whether or not it is specifically designated as a

17  "fiduciary" duty -- encompasses such a duty to interfere as that

18  contemplated by the First Department in _Kaufman_.[9]

---

[9] In using the phrase "fiduciary duty," the _Kaufman_ court
borrowed language from the bankruptcy court in _Sharp_
_International Corp. v. State Street Bank & Trust Co. (In re Sharp_
_Int'l Corp.)_, 281 B.R. 506, 516 (Bankr. E.D.N.Y. 2002), which
had, in turn, borrowed language from Judge Mukasey's opinion in
_Kolbeck_.  As explained above, _Kolbeck_ derived the requirement of
a "fiduciary duty owed directly to the plaintiff" from the common
law, as recounted in Prosser & Keeton on the Law of Torts § 46.
We doubt that, in repeating the particular phrasing used in the
_Kolbeck_ opinion, the First Department intended to narrow the
doctrine of aiding and abetting or otherwise alter its common-law
roots.

43

1          Because of their duty to prevent a diversion, the

2     defendant banks in this case stand on very different footing

3     from, for example, the defendants in Sharp, who had "no

4     affirmative duty under New York law to inform [the looted

5     corporation], [its] existing creditors, or [its] prospective

6     creditors of [the] fraud," Sharp, 403 F.3d at 52 n.2., no "duty

7     to consider the interests of anyone else," id. at 52, and no duty

8     "to precipitate its own loss in order to protect lenders that

9     were less diligent," id. at 53.  As discussed in Part III.B.,

10    above, when put on notice of a misappropriation of trust funds,

11    the banks in this case were obligated to take reasonable steps to

12    prevent the misappropriation that an investigation would

13    uncover.[10]

14          VII. Reassignment on Remand

15          Because we have been given no reason whatever to think

16    that the district court will be unable to -- or could reasonably

17    be perceived to be unable to -- faithfully apply the law on

18    remand, see Mackler Prods., Inc. v. Cohen, 225 F.3d 136, 146-47

19    (2d Cir. 2000), we deny the plaintiffs' request for reassignment

20    of this case to a different district court judge on remand.

---

[10] We need not decide whether the plaintiffs have stated a
claim for aiding and abetting breach of fiduciary duty based on
the banks' "inducing" or "encouraging" the fiduciary breach to
occur.  See Sharp v. State Street Bank & Trust Co. (In re Sharp
Int'l Corp), 302 B.R. 760, 774-75 (E.D.N.Y. 2003).

1                          **CONCLUSION**

2           For the foregoing reasons, we vacate the judgment of

3    the district court insofar as it dismissed individual plaintiffs'

4    claims for negligence and for aiding and abetting breach of

5    fiduciary duty against the defendant banks in which those

6    plaintiffs' funds were deposited and insofar as it dismissed

7    plaintiff Regal Trade's claim for fraud against defendant

8    Sterling Bank, and remand.  In all other respects, we affirm the

9    judgment of the district court.