UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

IN RE BAYOU HEDGE FUNDS INVESTMENT :     No. 06 MDL 1755 (CM)
LITIGATION : 

------------------------------------------------------------ X

THIS DOCUMENT RELATES TO:

------------------------------------------------------------ X

BROAD-BUSSEL FAMILY LIMITED :     No. 06 Civ. 3026 (CM)
PARTNERSHIP, ET AL., Individually :
and on Behalf of All Other Persons and Entities :
Similarly Situated, :
               Plaintiffs, :
:
    - against - :
:
BAYOU GROUP LLC, ET AL., :
               Defendants. :

------------------------------------------------------------ X

BROAD-BUSSEL FAMILY LIMITED :     No. 07 Civ. 2026 (CM)
PARTNERSHIP, ET AL., Individually :
and on Behalf of All Other Persons and Entities :
Similarly Situated, :
               Plaintiffs, :
:
    - against - :
:
HENNESSEE GROUP LLC, ET AL., :
               Defendants :     ELECTRONICALLY FILED

------------------------------------------------------------ X

**Declaration of Dr. Robert R. Trout, Ph.D., CFA In Support of the
Broad-Bussel Plaintiffs' Motion for Class Certification**

I, Dr. Robert R. Trout, declare and state as follows:

1.    I have been retained as an expert witness by counsel for plaintiffs Broad-Bussel
Family Limited Partnership, Marie-Louise Michelsohn, Michelle Michelsohn, Herbert Blaine
Lawson, Jr., and Caroline B. Glass (the "Broad-Bussel Plaintiffs") in the above-referenced
matter. I make this declaration in support of the Broad-Bussel Plaintiffs' Motion for Class
Certification. Unless otherwise indicated, the matters attested to herein are based on my direct
and personal knowledge and if called upon as a witness to testify, I could and would,
competently testify thereto.

2.    Specifically, I have been requested by counsel to opine as to the financial and
economic merits supporting certification of a class of investors in this case (the "Class") who,
during the period December 31, 1996 through August 25, 2005 (the "Class Period") were
damaged by investing in the Bayou family of hedge funds (the "Bayou Hedge Funds").
Additionally, I have been requested by counsel to opine as to the financial and economic merits
supporting certification of a subclass of the investor Class who, during the Class Period, invested
in the Bayou Hedge Funds as a result of the advice of the Hennessee Group LLC (the
"Hennessee Subclass").

3.    I have a Bachelor of Science degree in math and economics from the University
of Oregon, and I have an MBA degree in finance and a Ph.D. degree in financial economics from
UCLA. My doctoral work included a minor field of study in applied statistics. Currently, I
perform consulting services through Lit.Econ, LLP and the Michel-Shaked Group, which
provide economic, accounting, financial, and statistical consulting services to attorneys in a wide
variety of litigation cases.

1

4.    I also hold the Chartered Financial Analyst ("CFA") designation. The CFA designation is the premier credential for financial analysts, and is recognized worldwide. In order to receive this credential, applicants must pass a series of three exams covering such topics as equity analysis, financial valuation, business analysis, quantitative estimation methods, investment analysis, portfolio management, risk management, financial accounting, and ethical and professional standards. Attached hereto as Exhibit A is a true and correct copy of my most recent *curriculum vitae*.

5.    The list of documents and other data I considered in performing these analyses is attached as Exhibit B.

6.    As alleged in the Broad-Bussel Plaintiffs' operative complaints in the above captioned matters, throughout the Class Period, numerous investors invested in the Bayou Hedge Funds, and were defrauded and damaged as a result of the misconduct of the persons and entities who managed the Bayou Hedge Funds and by others who aided and abetted the alleged wrongdoings. Additionally, the Hennessee Subclass of investors were also damaged by the alleged misconduct of the Hennessee Group, LLC and its principals, Elizabeth Lee Hennessee and Charles Gradante (collectively, the "Hennessee Defendants"), in recommending and facilitating those investments in the Bayou Hedge Funds. Since the public collapse of the Bayou Hedge Funds in August 2005, three of Bayou's principals (defendants Samuel Israel, III ("Israel"), Daniel Marino ("Marino"), and James Marquez ("Marquez")) have pleaded guilty to criminal charges, and most of the Bayou funds and related entities have filed for protection under the federal bankruptcy laws in this district in proceedings captioned, In re Bayou Group, LLC, et al., Chapter 11, Case No. 06-22306 (ASH) (Bankr. S.D.N.Y.).

2

7.     As early as 1997, the trading activities of the Bayou Hedge Funds produced significant financial losses.  In order to conceal these losses, Bayou's management initially used a deceptive ploy to rebate internally generated "commissions" back to the fund.  Bayou's management used a supposed day trading methodology that resulted in their generating and taking substantial commissions based on the high trading volume that they, themselves, initiated. At first, Bayou's management convinced its auditors of the validity of the commission rebate scheme.  However, over time, additional ploys were necessary to conceal, expand and perpetuate an investment fraud in ways that similarly perpetrated their fraud against investors in the various Bayou Hedge Funds.

8.     Among other things, Bayou's management realized that their fraud could not be sustained against an annual audit by an independent CPA firm.  Thus, in October 2000, Richmond-Fairfield Associates was formed as a sham CPA firm by defendant Marino, who was Bayou's CFO.  From the inception of its creation, Richmond-Fairfield was used in Bayou's issuance of false financial statements to investors in the Bayou Hedge Funds, thereby further facilitating the fraud.  Indeed, throughout the Class Period, defendants Israel, Marino and Marquez regularly issued other such misstatements and omissions about the performance of the Bayou Hedge Funds to members of the Class as part of this fraud.

9.     In February 2003, Bayou's management notified investors by letter signed by defendant Israel that due to "our success and asset/investor expansion to date", Bayou would be reorganizing.[1]  The original Bayou Fund would be terminated and five new funds would be formed.  It was specifically described to the investors that the new funds would have "the same

---

[1] One of the form *letters* that Bayou sent to investors is included as Exh. C in the Compendium of Documents in Support of the Broad-Bussel Plaintiffs' Motion for Class Certification ("Compendium") that is being filed with the Court contemporaneously herewith.

basic structure that is, no administrative costs or fees (% 0 [sic.] management fee) and a twenty

percent (20%) incentive fee." Further, exchange of membership interests from the original

Bayou Fund into one of the new Bayou funds was facilitated so that the investors' "history

(capital contribution, high water mark, and so forth) will be carried over to the new fund for

computational purposes." It was further stated in the February 2003 letter that "this

reorganization of Funds in no way affects the investment policies, practices or future prospects

of the manager." The similarity and continuity found between the original Bayou Fund and the

successor funds established following the February 2003 reorganization further supports the

similarity in structure and operations of all of the Bayou Hedge Funds.

   10. In July 2005, defendant Israel, a Bayou Hedge Funds principal and founder,

notified the Bayou investors with a letter that the Bayou funds would be closing. The letter

ensured investors that their invested funds would be distributed upon completion of a liquidation

audit. However, since that announcement, no funds have been distributed to any of Bayou's

investors, as evidenced by the following statements in the Bayou debtors' Disclosure Statement

dated June 13, 2007 (Compendium Exh. N, at p. 23), filed in the Bayou bankruptcy proceedings:

> In August 2005, the Debtors' [Bayou Hedge Funds] fraudulent
> scheme finally collapsed. In a letter dated July 27, 2005, the
> Debtors abruptly advised their investors that the Bayou Hedge
> Funds were voluntarily liquidating. All investors were promised a
> 100% redemption of their investments, which purportedly had
> grown in value, upon completion of a final audit. In mid-August
> 2005, the Debtors sent another letter promising all investor
> creditors that 90% of the total value of their investments would be
> distributed within one week. Despite their assurance, the Debtors
> did not repay any additional money to investor creditors. Instead,
> all of the funds comprising the Bayou Hedge funds were gone and
> hundreds of investor creditors were left without any repayment of
> their investment principal.

11.    Following the end of the Class Period (August 25, 2005), it became clear that the
Bayou Hedge Funds were a sham, essentially operated as a Ponzi scheme. To date, three of
Bayou's principals have confessed to the fraudulent nature of the funds and have pleaded guilty
to felony criminal acts of fraud and other offenses. Throughout the Class Period, all of the
Bayou investors were subjected to a unitary fraud, as supported by the plea agreements of the
three principals of Bayou Hedge Funds, as well as the self-titled "confession and suicide note"
authored by defendant and Bayou principal Marino, as demonstrated below.

12.    Although there were multiple Bayou funds after the 2003 reorganization, the
fraud was effectively committed across all of the funds with a uniform result. As illustrated in
the Bayou entities' organizational chart (Compendium Exh. A), defendant Israel was at the head
of the Bayou organization. At least three of the related Bayou entities were owned by Israel:
Bayou Management, LLC, Bayou Securities, LLC, and Bayou Group, LLC. Bayou
Management, LLC provided investment advisory and fund management services, and Bayou
Securities, LLC provided securities brokerage and trading for all of the Bayou Hedge Funds.
Bayou Group, LLC was the umbrella entity that owned and/or controlled the individual Bayou
funds. Regardless of which fund of the various Bayou funds any particular investor was
invested, all of the funds were ultimately managed through the same operational infrastructure.

13.    A second organizational chart (Compendium Exh. B) describes the relationships
among Bayou's personnel. Defendant Israel, who has pleaded guilty to criminal acts related to
the fraud at Bayou, was at the head of the organization as Principal and Chief Investment
Officer. Defendant Marino, who has also entered a guilty plea for criminal acts related to the
Bayou fraud, was the Bayou organizations' CFO and the principal of the sham CPA firm,
Richmond-Fairfield, which provided false and misleading "audited" financial reports to the

5

Bayou investors. In other words, the same entities operated all of the Bayou Hedge Funds; the same individuals managed all of the Bayou Hedge Funds; and thus, the same management pervaded throughout the various Bayou entities, and their fraudulent practices affected all Class member investors similarly.

14.    The commonality of the fraudulent operation and management of the Bayou Hedge Funds likewise produced a common result in that all Class members have been similarly defrauded of their Bayou investment principal. In the circumstances here, all investors suffered economic losses resulting from the fraud that are directly related to the size of their original investment in the funds, as the reported profits for each of the Bayou Hedge Funds were fictitious and all such investors have been denied their investment principal since the public collapse of the Bayou Hedge Funds in August 2005.

15.    That there was, in fact, a unified fraudulent scheme committed in the Bayou Hedge Funds is also documented in the "confession and suicide letter" written by Bayou's principal, defendant Marino (he did not later commit suicide) (Compendium Exh. D). That confession was allegedly discovered in August 2005, as the fraud at Bayou was being brought into light. In the letter, Marino states the following (Compendium Exh. D, at pp. 1-2):

> In 1997 it [the Bayou Fund] lost money and I was able to convince the auditors at the time, the concept of rebating commissions to the fund was ok and did not need to be disclosed in detail.
>
>   *  *  *  *
>
> When December [1998] came around, the reality of the situation began to dawn on Jim [Marquez] and Sam [Israel] that they were in trouble again as they continued to have losses. They were lying to their clients all year long. On the last trading day of the year, we all sat down to discuss the issue and both Jimmy and Sam suggested that I do the audit and cover the losses.

\*      \*      \*      \*

> We were successful in passing off the audit and the firm,
> Richmond Fairfield Associates CPA.
>
> I continue [sic.] this for the next six years ending with the 2004
> audit report.
>
> In all years the profit reflected is false. There were no profits as
> Jim and Sam never produced a positive rate of return. The
> commissions were never high enough and the costs of the
> operation keep expanding. This combined with the losses and the
> fraudulent rate of returns, made the problem twice as big to the
> point of no return.

16.    In his criminal guilty plea before Judge George A. Yanthis (Compendium Exh. E,

at p. 24), defendant Israel further illustrated the common scheme behind the fraud throughout the

Class Period:

> I, along with others, caused Bayou to send various kinds of
> documents containing false financial information about Bayou's
> performance to current and prospective clients of Bayou which
> made it appear that Bayou was performing better than it truly was.
> My purpose was to induce these people to invest in Bayou or
> continue to keep their money in Bayou.

17.    Defendant Marquez, who was a Bayou fund portfolio manager, acknowledged the

following in his criminal guilty plea (Compendium Exh. F, at p. 20):

> I acted in the position of a portfolio manager for Bayou Fund
> where I helped formulate the trading strategy for the fund. I had
> general knowledge of the financial status of the fund and became
> aware, after a period of time, that the fund was sustaining losses.
>
> Together with others, I caused documents to be sent via U.S. Mail
> to investors that contained inaccurate financial information about
> the Bayou Fund. Specifically, such mailings contained false
> financial information that made it appear that the fund was more
> successful that it actually was.
>
> I was also aware that Richmond-Fairfield was formed to handle the
> audits for the Fund with the intent that the true financial status of
> the Fund not be disclosed to investors.

7

18.     Defendant Marino's criminal guilty plea (Compendium Exh. G, at p. 27)

acknowledged the following:

> I did participate as chief financial officer of Bayou in a conspiracy
> and a course of conduct along with other individuals to mislead
> investors in the Bayou hedge fund by sending them false
> information regarding the true status of their investment. The
> communication to investors was sent by mail and by wire, intended
> to mislead investors. I did not act alone when I committed these
> offenses. At the end of 1998, we all agreed to set up an accounting
> firm that would give the appearance of an independent auditor to
> further the conspiracy to deceive Bayou investors. I did form
> Richmond Fairfield Associates which certified a false financial
> statement of Bayou as true. The other individuals with whom I
> conspired and acted in concert with included an individual who
> was the chief investment officer throughout the entire period
> responsible for actual trading of securities for Bayou investors, the
> other individual was responsible for which security to trade on
> behalf of the Bayou investors. I also provided certain
> documentation to a lending institution which I knew to be false
> when I did so.

19.     In my opinion, the foregoing confirms not only the existence of the fraud, but also

that the fraud was similarly committed across all of the Bayou Hedge Funds and Class member

investors.

20.     From an economic and financial vantage point, it would be wholly appropriate,

both theoretically and practically, for the investors in the Bayou Hedge Funds to be treated as a

single class. First, the fraud was committed across all funds and all investors equally. Second,

there are many investors who have been similarly damaged by the fraud at Bayou.

21.     In support of the conclusion as to the large number of the investors in the Bayou

Hedge Funds, consider the claims filed against the Bayou bankruptcy estate. I have accessed the

Bayou bankruptcy proofs of claim via Bayou's bankruptcy administrator's website,

<<www.trumbellgroup.com>>, which lists a total of 1,082 distinct claims filed against the

bankruptcy estate -- the majority of which appear to be claims of fund investors, although some

may represent the same claim made against various of the Bayou debtors. Moreover, those

Bayou investor claimants appear to be geographically dispersed throughout the United States.

Indeed, as previously noted, the Bayou debtors' Disclosure Statement also reports that "hundreds

of investor creditors" remain unpaid. Computation of damages for any particular investor would

be a matter of computing the gross investment principal that each Class member invested in the

Bayou Hedge Funds, less any partial redemption received during the Class Period. Regardless of

the timing or the specific Bayou fund in which any investor had participated, the computation of

damages would be subject to the same type of calculation.

22.    Other factors further support the conclusion that the investors have similar claims

against Bayou. The first among these is the similarity of the subscription agreements entered

into by the Bayou investors. Counsel has provided me with Bayou subscription agreements for

the Bayou Hedge Funds ("Subscription Documents") for several investors. These Subscription

Documents specify the party investing as well as the specific fund within Bayou Hedge Funds in

which the investment is to be made. However, regardless of the investor involved or the specific

Bayou Hedge Fund selected, the Subscription Documents executed remain virtually identical in

all substantive respects.

23.    For example, I reviewed the following packets of Subscription Documents

(Compendium Exh. I):

- Subscription Documents 963 for Marie-Louise Michelsohn pertain to her
  investment in the Bayou Superfund, LLC. Signatures in this packet of
  documents are dated October 20, 2004;

- Subscription Documents 856 for H. Blaine Lawson, Jr. pertain to his
  investment in the Bayou Accredited Fund, LLC. Signatures in this packet of
  documents are dated December 2, 2003;

- Subscription Documents 763 for Michelle H. Michelsohn and Marie-Louise
  Michelsohn Joint Tenants pertain to their investment in the Bayou Accredited
  Fund, LLC. Signatures in this packet of documents are dated May 27, 2003;

- Subscription Documents 882 for Broad-Bussel Family L.P. pertain to its investment in the Bayou Superfund, LLC. Signatures in this packet of documents are dated December 21, 2003; and

- Subscription Documents 609 for Caroline B. Glass pertain to her investment in the Bayou Fund. Signatures in this packet of documents are dated December 11, 2002.

24.     Each of the above packets of Subscription Documents is virtually identical. In fact, on page 2 of each packet, the title reads "Documents to be Executed" and lists a series of specific documents required. This list is identical in each of the packets of subscription documents I cited above. Regardless of the named investors or the fund selected, the documentation compiled for subscribing in a Bayou Hedge Fund was consistent.

25.     The Operating Agreements across Bayou's group of funds illustrate similarity as well. I have reviewed the following Operating Agreements (Compendium Exhs. J, K, and L):

- Amended and Restated Operating Agreement of Bayou Accredited Fund, L.L.C.;

- Amended and Restated Operating Agreement of Bayou Superfund, L.L.C.; and

- Amended and Restated Operating Agreement of Bayou Fund, L.L.C.

26.     The last document listed above bears a date stamp of August 1, 2001, a date preceding the reorganization of Bayou into multiple funds. The other documents are all dated subsequent to the reorganization. Regardless of the fund referenced, the Operating Agreements appear to be virtually identical. For example, the following language appears on the same page in all three above referenced documents:

> 3.1 Permitted Buisinesses. The business of the Company shall be:
> (a) to purchase, invest, trade and sell, whether a long or short position, on margin or otherwise, in capital stock, subscriptions, warrants, bonds, notes, debentures, convertible securities, rights, options, puts and calls relating thereto and other securities (both equity and debt) of companies (all such items being herein "Securities").

10

27.    Additional support for the unitary nature of the underlying misconduct claimed

here can be found in the specific language of the Bayou debtors' Disclosure Statement

(Compendium Exh. N, at p. 4, 20), in which the following was stated:

> The [Chapter 11 Reorganization] Plan is predicated on the
> following fundamental principles and assumptions: (1) each of the
> Debtors were operated fraudulently pre-petition, the Bayou Hedge
> Funds were operated as a Ponzi scheme, each of the investors who
> acquired membership interests in the Bayou Hedge Funds was
> fraudulently induced into doing so and redemption from the Bayou
> Hedge funds were knowingly inflated by the Debtors' pre-petition
> management. Thus, all of the investors in the Bayou Hedge Funds
> have restitution claims against the Debtors for return of their
> principal investments; (2) as a result of the Debtors' operation as a
> fraudulent Ponzi scheme, it will be so costly as to consume the
> assets of the Bayou Hedge Funds, and perhaps futile to attempt to
> disentangle the assets of each of the Bayou Hedge Funds on a
> consolidated basis and equalize the recoveries of the investor
> creditors from a common asset pool....
> 
>        *      *      *      *
> 
> The Debtors' present understanding is that the United States plans
> to distribute those forfeited [Bayou] assets on a <u>pro rata</u> basis to the
> investor creditors in the Bayou Hedge Funds and the Bayou Off-
> Shore Hedge Funds, but not to any investor who is not a victim
> with a liquidated, non-contingent claim.
> 
>        *      *      *      *
> 
> The Debtors, including certain off-shore affiliates, are an affiliated
> group of entities that created, operated, comprised, and controlled
> private, pooled investments funds (commonly known as "hedge
> funds"). As more particularly described below, prior to the
> Petition Date, the Debtors operated their hedge funds as a
> fraudulent Ponzi scheme, and engaged in a series of fraudulent
> actions and transactions in furtherance of their criminal scheme.
> 
>        *      *      *      *
> 
> Investors in the Bayou Hedge Funds purchased non-voting,
> redeemable, participating shares in one of the Bayou Hedge Funds
> by executing a Subscription Agreement.

28.    Clearly, as evidenced by the vast number of claims against the Bayou estate and

the Bayou debtors' own admissions, the potential members of the Class are numerous. Further,

11

the virtually identical nature of the Bayou subscription and operating documents as well as the statements presented in the Bayou debtors' Disclosure Statement illustrate the broad similarity of each Class members' interest.

29.     A Hennessee Subclass of the Class is comprised of those investors who were enticed into purchasing and holding interests in the Bayou Hedge Funds through the investment advice and services rendered by the Hennessee Defendants.  The Hennessee Group, LLC formalized its relationship with members of this subclass through its standard investment advisory agreements.  Included among the 29 Hennessee advisory agreements I have reviewed are the following (Compendium Exh. M):

- Investment Advisory Agreement between the Hennessee Group LLC and the Broad-Bussel Family Limited Partnership; and

- Investment Advisory Agreement between the Hennessee Group LLC and Dr. Daniel Glass and Mrs. Caroline Glass.

30.     Each of the above-cited documents, and the other 27 such agreements, are virtually identical in all substantive respects.  In fact, the following language appears in each document:

> Client desires to invest in hedge funds and has retained Hennessee as a non-discretionary Investment Adviser for the sole purpose of providing advice to Client concerning investments in one or more private investment partnerships (each a "Hedge Fund") and collectively, the "Portfolio").  These services include the initial selection of each Hedge Fund and ongoing monitoring of the performance of the Portfolio and are specified in more detail in Section II below.
>
> *       *       *       *
>
> Hennessee agrees to provide the following services:
>
> (a) Structuring and Ongoing Services
> Hennessee will perform search, evaluation, selection, and introduction services (collectively, "Structuring Services") and introduce Client to one or more Hedge Fund(s) that Hennessee reasonably believes would be appropriate investment vehicles for Client to use based upon the investment objectives of Client, as

12

specified by Client orally and in writing. Included in the Structuring Services, Hennessee (at the request of Client) will evaluate any Hedge Fund(s)identified by Client as being of interest. Hennessee will also provide the services below listed ("Ongoing Services").

(i) Hennessee will monitor the performance of the Portfolio selected by Client and provide continuous and ongoing Hedge Fund investment advice.

(ii) Hennessee will also be available to confer with Client periodically to provide investment advice on the Portfolio....

31.     Each of the Hennessee investment advisory agreements cited above indicated the exact same duties to Hennessee's clients. This supports the concept that the Hennessee Subclass, like the Class, is composed of investors with similar interests who were similarly damaged. Further, the Hennessee investment advisory agreements available to date involve investors who appear to be geographically dispersed throughout the United States.

32.     In failing to render proper due diligence and monitoring services as to the Bayou Hedge Funds, the Hennessee Defendants similarly failed to render to each member of the Hennessee Subclass the services they were obligated to perform.

33.     In accordance with recognized professional ethics, my professional fees for this service are not contingent upon the opinions expressed herein. My time on this matter is billed at the rate of $575 per hour. Also, in accordance with recognized professional ethics, I do not have a present or intended financial interest in the outcome of this matter.

34.     Public information, statistical information and data are from sources I deem to be reliable. However, I make no representation as to the accuracy or completeness of such information and data, and have accepted the information and data without further investigation.

13

It should be understood that I have reviewed numerous documents related to this matter and I have not attempted to set forth verbatim every fact that supports my opinions. I reserve the right to supplement or amend this declaration should any additional information become available.

Dated: July 16, 2007                    Respectfully submitted,

                                        Robert R. Trout, Ph.D., CFA

**Exhibit A**

June 2007 (1)

## ROBERT R. TROUT, PH.D., CFA.

120 Birmingham Dr, Suite 200
Cardiff, CA 92007
Tel: (760) 944-9721
Fax: (760) 944-4551
e-mail: ecnxprt@aol.com

## WORK EXPERIENCE

| | |
|---|---|
| 1998-Date | Lit-Econ LLP, San Diego, CA |
| 1996-1998 | Deloitte & Touche, Costa Mesa and San Diego, CA |
| 1992-1996 | Foster Associates, Inc., San Diego, CA. |
| 1982-1992 | Spectrum Economics, Inc. & QED Research, San Diego, Ca.;  Visiting Professor of Finance,  UCLA and UCSD. |
| 1978-1982 | Resource Planning Associates, Inc., San Francisco. |
| 1977-1978 | Assistant Professor, Graduate School of Management, Univ. of California, Irvine, Ca. |
| 1974-1977 | National Economic Research Associates, Inc., New York City. |

## EDUCATION

o PhD in financial economics from the Anderson Graduate School of Management, U.C.L.A. Minor fields in statistics and corporate law.

o MBA in finance from U.C.L.A.

o BS in math and economics from the University of Oregon, Eugene, OR.

## PROFESSIONAL ASSOCIATIONS

o Chartered Financial Analyst (CFA), member of the Financial Analysts Society of San Diego and the CFA Institute;

o Former Director of the National Association of Forensic Economics;

o Senior Editor, Board of Editors for the *Journal of Forensic Economics*;

o Original Managing Editor, *Litigation Economics Digest*; and,

Exhibit A

**Resume of Dr. Robert R. Trout**                                        **Page 2**

> o    Member of the American Finance Association, Financial Management Association, and National Association of Forensic Economics.
>
> o    Member Advisory Board for Forensic Economics Abstracts, Social Science Research Network.

## EXPERT WITNESS

Previously testified in civil courts concerning the following areas:

- o Antitrust economics and damages
- o Breach of contract damages
- o Business interruption losses
- o Eminent domain business goodwill losses
- o Employment discrimination statistics
- o Investment and portfolio theory
- o Patent infringement losses
- o Personal economic losses
- o Reasonable Royalties in patent cases
- o Regulatory economics issues
- o Securities fraud losses
- o Statistical analysis
- o Trademark infringement losses
- o Valuation of businesses, partnerships, financial assets, and securities

## PUBLICATIONS

"Estimating Economic Loss for the Multi-product Business," in Issues in Litigation Economics, Edited by P. Gaughan and R. Thornton (New York, NY: Elesevier Press, 2005).

"Duration of Employment: Updated Analysis," *Journal of Forensic Economics*, Vol 16, No 2, Summer 2003.

"Minimum Marketability Discounts," *Business Valuation Review*, September 2003.

"Valuing Business Goodwill Loss in Eminent Domain Cases" *Appraisal Journal,* April 2000.

"Time Series Analysis of Gasoline Pricing in an Antitrust Claim," *Litigation Economics Digest*, Fall 1999, Vol. IV, No. 2, pp. 62-80.

"Recovering Loss: Valuing Business Goodwill Losses in Condemnation Cases," *Verdict,* 1st Quarter, 1999, pp. 12-15.

Exhibit A

**Resume of Dr. Robert R. Trout**                                    **Page 3**

"Valuing Business Goodwill Loss in Condemnation Cases," *Trial Bar News*, Vol. 21, No. 9, November 1998, pp. 17-18.

Valuing a Closely Held Business, in *Expert Economic Testimony: Reference Guides for Judges and Attorneys,* (Tucson, AZ: Lawyers & Judges Publishing Co., 1998).

"Re Going Concern Value: A Comment," *Journal of Forensic Economics,* Vol 9, No. 1, Spring 1996.

"Wrongful Termination and Length of Employment, *Verdict*, First Quarter, 1996.

"The Role of Economics in Regulatory Takings Cases," *Litigation Economics Digest*, Vol. 1., No. 1, Fall 1995.

"What About Hedonic Damages?" *Verdict*, Second Quarter 1995, pp. 17-28.

"Duration of Employment in Wrongful Termination Cases," *Journal of Forensic Economics*, Vol. 8, No. 2, Summer 1995, pp. 167-177.

"Comment: Re Going Concern Value," *Journal of Forensic Economics*, Vol. 8, No. 2., Spring 1995.

"Hedonic Damages: Not for the Courtroom," *Orange County Lawyer*, August 1994.

"Comment: Intra-Year Discounting Made Easy," *Journal of Forensic Economics*, Vol 7, No. 2, Spring 1994, pp. 223-226.

"Comment: Valuation of Vested Pension Benefits in Divorce and Wrongful Death Actions," *Journal of Legal Economics*, Vol. 4, No. 1, Spring 1994, pp. 83-86.

"Loss Analysis in Commercial Litigation," (with C. B. Foster & P. Gaughan), paper presented at the Western Economic Association Meetings, June 1993, Lake Tahoe, CA. Reprinted in the *Journal of Forensic Economics*. Vol 6, No. 3, Fall 1993, pp. 179-196.

"Estimating the Decedent's Consumption in Wrongful Death Cases," (with C.B. Foster) *Journal of Forensic Economics*, Vol. 6, No. 2, June 1993. Reprinted in *Assessing Family Loss in Wrongful Death Litigation* (Tucson, AZ: Lawyers & Judges Publishing Co., 1999).

"Applications of Logit Analysis in Civil Litigation," (with C.B. Foster & G. McCollister), *Journal of Legal Economics*, Vol. 3, No. 1, March 1993.

"Economic Analysis of Business Interruption Losses," (with C.B. Foster) in Litigation Economics, edited by P. Gaughan and R. Thornton, JAI Press 1993.

**Exhibit A**

**Resume of Dr. Robert R. Trout**                                                    **Page 4**

"Introduction to Business Valuation," in <u>Litigation Economics,</u> edited by P. Gaughan and R. Thornton, JAI Press 1993.

"Minority Discounts and Control Premiums: A Synthesis," *Journal of Legal Economics*, Vol. 2, No. 1, March 1992, pp. 17-24.

"Does Economic Testimony Affect Damage Awards?," *Journal of Legal Economics*, Vol 1., No. 1, March 1991, pp. 43-49.

"Computing Losses in Business Interruption Cases," (with C.B. Foster), *Journal of Forensic Economics*, Vol. 3, No. 1, December 1989, pp. 9-22.

"Valuing Illiquid Pension Benefits," *Journal of Forensic Economics*, Volume 1, No. 2, May 1988, pp. 25-31.

"Valuing Pensions as Illiquid Assets," *Community Property Journal*, Volume 15, No. 1, April 1988, pp. 78-85.

"Present Value of Future Income: A Synthesis," *For The Defense*, August 1987.

"Regulatory Implications for Asset Valuation in Leveraged Buy Outs and Spin-offs." (with C. Pflaum and K. Zumwalt), Proceedings of the Biannual Regulatory Information Conference, NRRI, Columbus, Ohio, September 1986.

"A Market-Based Method of Relicensing Federal Hydroelectric sites," *Public Utilities Fortnightly*, January 16, 1984.

"Utility Company Diversification as a Means of Rate Reduction and Improved Returns to Stockholders," in <u>The Strategic Planning Process for Electric Utilities,</u> ed. James L. Plummer (Washington D.C.: QED Research and Public Utility Reports), 1983.

"Relicensing Federal Hydroelectric Sites: A Market Oriented Approach," in <u>The Strategic Planning Process for Electric Utilities,</u> ed. James L. Plummer (Washington D.C.: QED Research and Public Utilities Reports), 1983.

"Regulatory Behavior and the Effect of Accounting Treatment on the Valuation of Electric Utilities," Proceedings of the Iowa State University Regulatory Conference, May 1983.

"Alternatives for Electric Utility Deregulation," *Public Utilities Fortnightly*, September 16, 1982.

"A Comment on Rate of Return Differentials by Class," *Public Utilities Fortnightly*, January 1981.

**Exhibit A**

**Resume of Dr. Robert R. Trout**                                                                          **Page 5**

Current Practices in Retail Rate Design, American Public Power Association, Washington, D.C., 1980.

"The Regulatory Factor and Electric Utility Common Stock Investment Values", *Public Utilities Fortnightly*, November 22, 1979.

"Comment: Regulatory Procedures, Investment Opportunities and Stock Valuation," *Journal of Business Research*, September 1979.

"A Rationale for Preferring Construction Work in Progress in the Rate Base," *Public Utilities Fortnightly*, May 10, 1979.

"Estimation of the Discount Associated with the Transfer of Restricted Securities," *TAXES - The Tax Magazine*, June 1977. Reprinted in Closely Held Business Manual, American Bankers Association, Trust Division, 1979.

"An Examination of Market-Book Ratios in Utility Regulation," Proceedings of the Iowa State University Regulatory Conference, May 1974.

## REPORTS AND PAPERS

"The Case for Rate Base Treatment of Cable Television Start-Up Losses," (with Ron White), Foster Associates, March 1995.

"Phase I and II Final Reports: Study of Alternatives to Transport Coal from the Black Mesa Mine to the Mojave Power Generating Station," U. S. Department of the Interior, 1993.

Analysis of the Power Contract Between the Southwestern Power Administration and Associated Electric Cooperative, Inc., Resource Planning Associates, Inc., June 1980.

Utility Regulation Under Inflation, Ph.D. dissertation, Anderson Graduate School of Management, U.C.L.A., 1978.

Economic and Demographic Determinants of Telephone Availability, (with Lewis J. Perl) National Economic Research Associates, Inc., 1976.

## PRESENTATIONS:

Financial Management Association meetings, Salt Lake City, UT 2006
Loss Executives Association meetings, Portland, Maine 2003
Financial Management Association meetings, Honolulu, Hawaii 1997
Western Economic Association meetings, San Francisco, CA 1992
Iowa State University Regulatory Conference, 1974 & 1985

Exhibit A

**Resume of Dr. Robert R. Trout**                                    **Page 6**

## SELECTED SECURITIES AND BUSINESS VALUATIONS

Rothenburg v. MLS (New York, NY 2006) Valued a minority interest in MLS owned by an original founder, for an arbitration hearing. Arbitrator generally agreed with our finding as to the economic value of the minority ownership position.

Davis Bacon Materials Handling v. Alameda Corridor (Los Angeles Cty 2005) Valued a business as part of an eminent domain proceeding.

Sanitec Industries  (Los Angeles Cty 2005) Prepared a business valuation for purposes of a private offering of common stock.

United States v. Adams (Washington DC 2005) Prepared a valuation of a Colorado-based energy and resource holding company for purposes of determining an estate tax.

Centurion Investment Company (2005) Valued a Colorado energy-based holding company for the United States Dept. Of Justice in a tax-related case.

CalTrans v. Compucraft (2004) Valued a precision instruments business that lost revenues because of a the construction of a nearby CalTrans highway project.

24 Hour Fitness v. CalTrans (2003) Testified about the value of lost business goodwill to an exercise club in Santee.

Petco v. CalTrans (2003) Testified about the lost business goodwill value of a pet supply store in Santee.

Pillars of Faith v. Alameda Corridor (2003) Determined the value of a church's lost goodwill resulting from a condemnation of its property in Los Angeles County.

LAUSD v. Giant Stores (2003) Determined the value of a retail store's lost business goodwill resulting from a condemnation of its property in Los Angeles County.

City of Bell Gardens v. Cho (2001) Determined the value of lost business goodwill for a dentist who had to move his practice to a new location because of a downtown redevelopment project.

Zwinkles v. CalTrans (2001) Determined the value of lost business goodwill for a flower grower and distributor that lost property to a highway expansion.

Mayer-Johnson Company (2000) Valued the common stock of the company for the purpose of determining the value of a minority block of stock gifted by the father.

Bobit Publishing Company (2000) Valued the common stock of the company for the purpose of determining the value of a minority block of stock gifted by the founder to relatives.

**Exhibit A**

**Resume of Dr. Robert R. Trout**                                                **Page 7**

Re: Hunter Family Trust (2000) Estimated value of potential liability for alleged environmental damages and possible impact on the assets of a family trust.

Re: iCALL, Inc. (2000) Valued certain intangible assets for a transfer of ownership from a US based company to a foreign based company.

Breton v. Apple Plastics (2000) Valued two companies in the plastics business for a shareholder suit over the value of shares purchased from a minority shareholder.

Re: Hunter Family Trust (2000) Determined appropriate marketability and minority discounts for numerous financial assets held by the Trust, including limited partnerships, partnerships and shares in corporations.

ACTA v. Industrial Wire Products (2000) Valued the business goodwill for a wire products manufacturer that lost some of its property to a widening of a major road in Los Angeles.

CRA v. Time Clock Sales & Service Co. (1999) Valued the business goodwill of a service company and seller of time clock instruments business that was condemned for the construction of the Staples Center in Los Angeles.

ACTA v. American Brass & Aluminum Co. (1999) Valued the business goodwill of an aluminum and brass parts and products fabricator following the taking of the company's property and a move to a new location as part of the ACTA project.

County of Los Angeles v. West Coast Liquidators (1999) Valued the business goodwill of a Pick 'N' Save store that lost business as a result of construction activities related to the Alameda Corridor Transportation Authority project.

Los Angeles v. RTR Partnership (1999) Valued the business goodwill of a medical center, laboratory and a pharmacy that all discontinued business following the taking of the property they used for freeway access.

FMP Medical Management (1998) Valued restricted common stock held by the Company's founders, and also valued family limited partnerships created by the Company's founders.

Los Angeles County v. Terry Companies (1998) Valued the business goodwill of a company location that was closed because of the expansion of the Los Angeles MTA subway system.

Turner v. San Diego County (1998) Valued loss of business goodwill resulting from higher expenses incurred by a business that was moved because of a condemnation proceeding.

Preuss Trust (1998) Valued employee stock options for restricted stock that were given by an employee to a trust for gift tax purposes.

**Exhibit A**

**Resume of Dr. Robert R. Trout**                                         **Page 8**

<u>Safeskin, Inc</u>. (1997) Valued certain intangible assets, including copyrights, patents, and production knowledge for transfer of those assets to a foreign subsidiary.

<u>Aircraft Services, Inc.</u> (1997) Valued an aircraft service company located at a regional airport for purposes of a condemnation case.

<u>Quicksilver Enterprises, Inc.</u> (1996) Valued a small airplane manufacturer that suffered damages and loss of business goodwill because of a flood.

<u>Paramount Citrus Corp v. California</u> (1995) Valued a portion of a lemon growing farm and a related processing plant for a condemnation case against the State of California.

<u>Zimmer v. Los Angeles County</u> (1994) Valued a large truck service center for an inverse condemnation case against Los Angeles County.

<u>Bobit v. Bobit</u> (1994) Valued a Los Angeles-based publishing company for purposes of a marital dissolution. Also determined the investment value of a portfolio of securities under the *Pereira v. Pereira* rule, and the proper level of CEO compensation level under the *Van Camp v. Van Camp* rule.

<u>Lyman v. San Diego County</u> (1993) Valued an Escondido based equipment rental company for a condemnation proceeding against the County.

<u>Tanklage v. Tanklage</u> (1993) Valued closely-held preferred stock, and determined a discount for closely-held common stock for a marital dissolution. Determined the proper rate of return for a *Pereira* investment analysis.

<u>Bank of America v. Temple City Comm. Redevelopment Agency</u> (1993) Valued a Bank of America operation that was closed for a redevelopment project, for a condemnation proceeding.

<u>Bakers Square Restaurant</u> (1993) Valued a San Diego outlet of this national restaurant chain for a condemnation case where the restaurant was closed to make way for construction of a freeway interchange.

<u>Cotsen v. Cotsen</u> (1992) Determined the investment value of a portfolio of securities under the *Pereira v. Pereira* rule, and proper CEO compensation level under the *Van Camp v. Van Camp* rule, for a marital dissolution.

<u>Continental Investment Corp.</u> (1992) Valued a resource holding company for purposes of determining estate taxes, on behalf of the IRS.

<u>Energy Fuels Corporation</u> (1991) Valued a coal company for purposes of analyzing a planned tax-free exchange of assets, for the IRS.

Exhibit A

**Resume of Dr. Robert R. Trout**                                                        **Page 9**

Belly Up Tavern (1990) Valued a minority interest in a night club for purposes of a buy-out by the majority partner.

T.B. Penick & Sons, Inc. (1989) Valued a medium-sized construction company for purposes of transferring stock from the founder to his sons. The valuation was accepted by the IRS in a tax audit.

MBE-USA (1989) Valued a mail service company at the time of a corporate restructuring.

Mesa Beverage Co. (1989) Valued covenants not to compete associated with the purchase of a beverage distributing company.

Main-On Foods (1988) Valued a food products producer and distributor in Los Angeles in a business litigation case.

Alamito Electric Co. (1986) Valued the equity of a billion dollar, closely-held, electric power production company in Arizona, as part of a securities fraud case involving a contested management led LBO.

Martin Processing, Inc. (1976) Valued the restricted common stock given to certain relatives of the president of the company; and also a block of stock given to charity.

## SELECTED LITIGATION CONSULTING ASSIGNMENTS

American Interbank v. Bankrate.com (Orange Cty 2006) Estimated economic losses to an internet seller of mortgages in an antitrust case. Testified for plaintiff at trial, and plaintiff was awarded $48 million in damages.

Sharpe v. McDonnell (Orange Cty 2007) Valued a motorcycle production company as part of a business fraud case. Testified at trial for plaintiff, who was awarded damages and other compensation valued at about $4 million.

Pritchard v. Ernst & Young (Dallas, TX 2007) Performed an analysis of the value of Daisytek over time, and the value of one of its subsidiaries, as part of an accounting malpractice case.

Perez v. Wooley (San Diego Cty 2006) Testified about the economic losses related to an alleged breech of contract.

Abramo v. Ingram Micro (Orange Cty 2006) Testified about the economic value of certain employment related stock options in a public company.

TrekEight v. Symantec (San Diego Cty 2006) Testified about the economic losses to a computer software business resulting from an alleged business interference by another party.

American Cal Car v. BMW (San Diego 2005) Prepared a report on the hypothetical royalty and economic losses to a company with several patents regarding the operation of a motor vehicle.

**Exhibit A**

**Resume of Dr. Robert R. Trout**                                                          **Page 10**

Redline Products v. Pro Chem (San Diego Cty 2005) Prepared an economic loss report concerning lost earnings of a company that produces various cleaning products. The company's sales were interfered with by the actions of another market participant.

Pure Bio Science v. NVID et al. (San Diego Cty 2005) Testified about the economic losses to a company that was injured by false claims about one of its patents.

Haywood v. NASSCO (San Diego Cty 2005) Testified about the economic losses of an injured and allegedly terminated employee.

Bacus Labs v. Aperio (San Diego Cty 2005) Prepared a report on a hypothetical royalty rate for a company in the digital microscopic scanning industry.

Pasmoo v. Aroyo Seco (Los Angeles Cty 2005) Estimated business interruption losses to a restaurant affected by construction activity in its building.

Wolf v. DAR (Atlanta, GA 2004) Estimated business losses in an intellectual property litigation case involving the jewel box industry.

Amini Innovations v. Roberts (Los Angeles Cty 2004) Estimated business losses in an intellectual property case involving the furniture industry.

Re: USS POSCO, Inc (Pittsburgh, CA 2002) Estimated economic losses caused by a fire at a steel mill in California for its insurance carrier.

Collaborative Solutions v. ANSYS (Pittsburgh, PA 2001) Testified about the economic losses sustained by a franchisee in the computer software business.

Don De Castro v. Jackson Products (St. Louis, MO 2001) Testified about the economic losses associated with production of certain highway safety products in a patent infringement case.

Cooper v. Chapman University (Orange Cty 2001) Analyzed economic losses concerning ten plaintiff's claims against Chapman's law school.

GE v. Power Systems, Inc. (Dade Cty, FL 2001) Prepared a report on the competition in the market for certain components used in gas turbine generators for an antitrust case.

Rincon Marine v. Chevron (Ventura Cty, 2000) Analyzed the economic losses associated with an alleged breach of contract by an oil company against a marine company.

Re: EPA v. Casmalia Resources (Los Angeles FDC, 2000) Analyzed potential damages associated with a CERCLA case and probably impact on the owner and his estate.

24

**Exhibit A**

**Resume of Dr. Robert R. Trout**                                    **Page 11**

Inland v. CT Produce (San Diego FDC, 2000) Testified about the economic losses to a supplier of boxes used for the shipment of produce from Mexico to the United States.

Engle, et al v. RJR Tobacco, et al (Dade Cty, FL 2000) Provided economic and financial consulting concerning punitive damages for a class-action product liability case.

Helix Technology v. Overland Data (Fed Dist Ct, Boston, MA. 1999) Estimated economic losses associate with an alleged misuse of a trademark.

Lewis v. Tyson Foods (Los Angeles Cty 1999) Testified about the economic losses sustained by an injured commercial fisherman.

Broussard v. San Jose (Santa Clara Cty 1999) Testified about the economic losses claimed by five firefighters in an employment discrimination case.

Speedplay v. BeBop (San Diego Cty 1998) Testified about the economic losses to a bicycle parts manufacturer from an infringement of its patents by another manufacturer.

Louisville Bedding Co. V. Pillowtex Corp (Fed Dist Ct, Louisville, KY. 1998) Prepared economic loss report for defendant in a patent infringement case.

Aguilar et al v. ARCO et al. (San Diego Cty 1997) Testified about pricing issues in an antitrust case, including rebuttal of allegations of cartel pricing and other cartel behavior.

Rated R. Clothing v. California Fair Plan (Los Angeles Cty 1997) Analyzed alleged losses to a business damaged by a flood. Determined value of business prior to the accidental flood, and economic losses from the incident.

Indian Child v. Riverside (Riverside Cty 1996) Testified about the economic losses sustained by ten different plaintiffs that suffered economic losses resulting from a flood.

Brothers v. Washington PSE (Seattle, WA 1995) Testified about the value of an agreement to offer certain insurance policies to union members.

In Re Peabody Coal Co. (Arizona 1991-1994) Project Manager for a multi-discipline study of alternatives to moving coal from Black Mountain, AZ to Laughlin, NV, and to examine the economic feasibility of using an alternative source of water in a coal slurry pipeline from Black Mountain to Laughlin, NV.

Meade v. Bank of America (San Diego Cty 1994) Testified about the economic losses to an estate from actions taken by the executor of the estate in the sale of certain estate assets to pay federal and state taxes.

**Exhibit A**

**Resume of Dr. Robert R. Trout**                                                     **Page 12**

ISK Biotech v. Veterans (Washington DC 1993)   Analyzed costs of meeting EPA test standards, including interest and changes in costs over time, and devised method for allocating costs among product users.

Krikorian Theaters v. Pacific Theaters and AMC (FDC San Diego 1993)  Testified about the economic losses to a movie theater, and the relevant economic product and geographic markets, in a Sherman Act Section 1 antitrust case.

Mattel v. Unique (Los Angeles FDC 1993)  Testified about the business losses resulting from an alleged breach of a contract to purchase products from a manufacturer.

Spring Group v. Jacobs (Maricopa Cty, AZ 1993) Testified about the economic losses resulting from a taking of employees and clients by a former manager of the plaintiff company.

Pioneer Mortgage Litigation (San Diego FDC 1992)  Testified about the economic losses of certain investors in mortgage limited partnerships for a securities fraud case.

Showalter v. General Dynamics (San Diego FDC 1992)   Testified about the statistical probability of age discrimination in an employment case alleging age discrimination by General Dynamics.

FKM v. Konica (Orange Cty 1992) Testified about the economic losses to a terminated office products distributor.

Komes v. Stoker (Los Angeles Cty 1991) Testified about the lack of income and portfolio losses resulting from a personal injury.

Burlington Northern v. Underwriters (Fed. Dist. Ct., Ft. Worth 1991) Prepared an analysis of the value to Burlington Northern from participating in an illegal boycott.

Estate of Adams (Federal Tax Court, 1991)  Prepared an analysis of the value of a large estate consisting of numerous partnerships and companies owning resource properties in several states.

In re Deckard Bankruptcy (Federal Bankruptcy Court, Santa Ana, CA 1991) Testified about the economic value of a real estate investment and management company.

National University v. Square D (San Diego Cty 1990) Testified about the business interruption losses resulting from a fire and damage to a communications line to certain NU campuses.

Grange v. Marin Sanitary Services (Marin Cty 1990) Prepared an analysis of economic losses to a refuse collector in Marin county resulting from alleged predatory conduct of the largest competitor in the area.

**Exhibit A**

**Resume of Dr. Robert R. Trout**                                              **Page 13**

San Marcos WD v. UTC (San Diego Cty 1989) Testified about the level of economic losses in a product liability case, concerning the installation of sewage treatment equipment.

Western Cities Broadcasting, Inc. v. Eldorado Communications (Jefferson Cty, Co 1989) Testified about business losses to a lessor of space on a communications tower resulting from a breach of contract by a lessee.

Boyle v. Hertz-Penske (Alameda Cty 1989) Testified about the lack of statistical proof of age discrimination, and on economic losses incurred by a terminated employee.

Union Pacific v. Underwriters (Fed Dist Ct, Los Angeles 1989) Prepared an analysis on the value of settlement contracts from prior ETSI-Railroad litigation; also investigated antitrust issues included in the prior antitrust litigation.

Crusinbery v. Systematics (Fed Dist Ct, Wichita, KA 1988) Prepared a statistical analysis, using a logistic regression model, that supported a claim of age discrimination.

Peace v. Merle West (Fed Dist Ct, Eugene, OR 1988) Testified about the relevant geographic and product markets for certain ambulance services in Oregon, and competition in the relevant market; and prepared an economic valuation of an ambulance business, in an antitrust case.

Six B v. Bonzi (Stanislaus Cty 1988) Testified about the relevant geographic and product markets for cattle feed in the San Joaquin valley for an antitrust case.

Main-On Foods v. Hoffman (Fed Dist Ct, Long Beach 1988) Prepared report and exhibit on damages to Main-On resulting from a business interruption.

Bank of America v. Litton (Los Angeles Cty 1987) Analyzed plaintiff damage testimony in a case involving alleged breach of fiduciary duty by the defendant.

AmNet, Inc. v. Pacific NW Bell (Fed Dist Ct, Seattle 1987) Prepared economic damage analysis for an antitrust case involving access to certain telephone service markets.

Chemical Bank v. WPPSS and In Re WPPSS Securities Litigation (Fed Dist Ct, Seattle, WA 1984-87) Assisted plaintiff counsel in addressing financial issues and economic damages in multi-billion dollar 10-b(5) securities fraud case.

In re Cass County Warrant Litigation Settlement (Fed Dist Ct, Lincoln, Neb 1986) Testified concerning a procedure for allocating the settlement funds from a proposed settlement to the plaintiff class members in a securities fraud case.

Tri-State Bank v. Dain Bosworth, Inc. (Fed Dist Ct, Omaha 1985) Testified on damages to a class of plaintiffs in a federal securities fraud case.

**Exhibit A**

**Resume of Dr. Robert R. Trout**                                    **Page 14**

Rowe v. Giftchecks (Fed Dist Ct, Sacramento 1984) Testified about defendant's pricing actions and its cost structure in a predatory pricing case involving firms in the coupon distribution industry.

Curry v. Prudential (Contra Costa Cty 1984) Testified about the effect of a termination of an employee on her earnings capacity in a wrongful termination case.

National Convenience Stores v. Town of Los Gatos (Los Gatos Town Council 1984) Testified on the appropriate amortization period for a nonconforming structure (a convenience store) in Los Gatos.

Courville v. Oceanroutes (Santa Clara Cty 1984) Testified on the business reasons, including a decline in the overall market for the firm's services, for terminating an employee in a wrongful termination case.

Wooten Construction Co. v. Featherlite et al. (Fed Dist Ct, New Mexico 1983) Filed an affidavit on the effects of bid rigging in the production and sale of prestressed concrete products in the state of New Mexico.

Schirer v. West Coast Oil et al. (Orange Cty 1983) Testified on the market value of certain promissory notes, and on the appropriate discount to be applied to the sale of restricted common stock of a closely held company.

Re: Merger of Westinghouse Lamp Division with North American Philco (Federal Trade Commission 1983) Conducted an analysis of the competition for lighting products in the United States and Europe for a potential antitrust action.

Baker v. City of Santa Monica (Los Angeles Cty 1981) Testified on the economic merits of the city's rent control law and the rent control regulations.

Gulf Oil Co. v. Exxon (Fed Dist Ct, San Diego 1981) Conducted an analysis of the factors that influenced the market for uranium in the 1970's for an antitrust case.

Associated Electric Power Company v. Southwestern Power Administration (Fed Dist Ct, Tulsa Ok 1980) Prepared testimony on the value and cost of certain services provided by an electric utility cooperative to a government power agency.

Western Waste, Inc. v. Universal Waste Control (Fed Dist Ct, Phoenix 1980) Analyzed competition in the refuse collection market in Phoenix for an antitrust case.

IRS v. Hermes (U.S. Court of Claims 1976) Prepared a valuation of restricted securities for income, gift and estate tax purposes. Case was settled and the valuation accepted by the I.R.S.

Exhibit A

**Resume of Dr. Robert R. Trout**                                                            **Page 15**

## SELECTED TESTIMONIES IN REGULATORY PROCEEDINGS

In Re Continental Cablevision, Inc. (Federal Communications Commission 1994) Filed a joint affidavit concerning the application of traditional rate of return regulation to the cable television industry.

In re Commonwealth Edison Co. (Illinois Commerce Commission. No. 90-, 1990) Testified about inclusion of coal reserves in rate base deferred plant accounting, and off-system sales for Commonwealth Edison Co.

In re Oregon IntraLATA Presubscription (Oregon PUC UT-52, 1987)  Testified about the competitive effects of requiring presubscription for intraLATA toll service in Oregon.

Re: Arizona Public Service Co. (Arizona Corp Comm 1984) Testified on the cost of capital and fair rate of return for Arizona Public Service Co., and the effect of allowing CWIP in the rate base on the utility's cost of equity capital.

Re: Coal Rate Guidelines Nationwide (Interstate Commerce Comm. 1982) Testified before the Interstate Commerce Commission in Ex Parte No. 347 on problems with Ramsey pricing in setting rail commodity rates, and the use of risk-return analysis in railroad rate making.

Re: Potomac Electric Power Company (Dist of Columbia PSC 1981) Testified on the financial effect of the company's proposed capacity expansion program, and cost differences between oil and coal-fired generating plants.

Re: El Paso Electric Company (New Mexico PSC 1979) Testified on the cost of excess capacity to consumers in an electric utility's service territory, and on the results on an investigation into the value of reliability to those customers.

**Exhibit B**

## Documents and Sources Considered

<u>Documents Included in the Compendium of Documents in Support of the Broad-Bussel Plaintiffs' Motion for Class Certification:</u>

| *Exhibit* | *Document* |
|---|---|
| A | Organizational Chart of Bayou Entities (excerpted from the document listed in Exhibit 14 below); |
| B | Bayou Personnel Organizational Chart (document produced by Citibank, N.A.); |
| C | Bayou Investor Letter dated February 6, 2003 (plaintiff document); |
| D | Self-titled "confession and suicide note" allegedly authored by defendant Daniel Marino (filed as Exhibit B to Declaration of Shari Claire Lewis, Document no. 45 in Case no. 06-Civ.-3026-CM); |
| E | Plea transcript in <u>United States of America v. Samuel Israel, III</u>, No. 05-Cr.-1039-SCR-GAY (S.D.N.Y.), dated September 29, 2005; |
| F | Plea transcript in <u>United States of America v. Daniel E. Marino</u>, No. 05-Cr.-1036-CM-GAY (S.D.N.Y.), dated September 29, 2005; |
| G | Plea transcript in <u>United States of America v. James Marquez</u>, No. 06-Cr.-1138 (S.D.N.Y.), dated January 16, 2007; |
| H | Excerpts of Bayou bankruptcy proofs of claim for plaintiffs Broad-Bussel Family L.P., Caroline B. Glass, Marie-Louise Michelsohn, Michelle Michelsohn and Herbert Blaine Lawson, Jr. (filed in <u>In re Bayou Group, LLC, et al.</u>, Case No. 06-22306-ASH, Bankr., S.D.N.Y., and downloaded from the Bayou bankruptcy claims administrator's website at <<http://www.trumbullgroup.com>>); |
| I | Bayou subscription documents for plaintiffs Broad-Bussel Family L.P., Marie-Louise and Michelle Michelsohn, and Herbert Blaine Lawson, Jr. (plaintiff documents, excerpted and redacted for certain personal and confidential information); |
| J | Amended and Restated Operating Agreement of Bayou Accredited Fund LLC (plaintiff document); |
| K | Amended and Restated Operating Agreement of Bayou Superfund LLC (plaintiff document); |

**Exhibit B**

## Documents and Sources Considered (cont.)

Documents Included in the Compendium of Documents in Support of the Broad-Bussel
Plaintiffs' Motion for Class Certification (cont.):

| Exhibit | Document |
|---------|----------|
| L | Amended and Restated Operating Agreement of Bayou Fund LLC (plaintiff document); |
| M | Hennessee investment advisory agreements for plaintiffs Broad-Bussel Family L.P. and Caroline B. Glass (plaintiff documents, excerpted and redacted for certain personal and confidential information); and |
| N | Disclosure Statement With Respect to Joint Chapter 11 Plan of Reorganization of Bayou Group, LLC, Bayou Management, LLC, Bayou SuperFund, LLC, Bayou No Leverage Fund, LLC, Bayou Affiliates Fund, LLC, Bayou Accredited Fund, LLC, Bayou Fund, LLC, Bayou Advisors, LLC and Bayou Equities, LLC (filed by the Bayou debtors in the In re Bayou Group, LLC, et al., Case No. 06-22306-ASH, Bankr., S.D.N.Y.). |

Additional Documents and Sources Considered:

- Amended Class Action Complaint, Broad-Bussel Family Limited Partnership et al. vs. Bayou Group, LLC, et al., No. 06 Civ. 3026 (CM), dated March 6, 2006

- Class Action Complaint, Broad-Bussel Family Limited Partnership et al. vs. Hennessee Group, LLC, et al., No. 07 Civ. 2026 (CM), dated March 1, 2007

- Decision and Order Granting in Part and Denying in Part the Hennessee Defendants' Motion to Dismiss the Complaint, Broad-Bussel Family Limited Partnership, et al. vs. Bayou Group, LLC, et al., No. 06 Civ. 3026 (CM), dated January 19, 2007

- Twenty-seven (27) additional Hennessee Group, LLC investment advisory agreements