# EXHIBIT  L

# AMENDED AND RESTATED OPERATING AGREEMENT OF

# BAYOU FUND, L.L.C.

## A NEW YORK LIMITED LIABILITY COMPANY

AMENDED AND RESTATED OPERATING AGREEMENT OF
BAYOU FUND, L.L.C.
A NEW YORK LIMITED LIABILITY COMPANY

Table of Contents

| Article | Description | Page |
|---------|-------------|------|
| 1.1 | Definitions | 1 |
| 2.1 | Name | |
| 2.2 | Principal Place of Business | 6 |
| 2.3 | Registered Office and Registration Agent | 6 |
| 2.4 | Term | 6 |
| | | 6 |
| 3.1 | Permitted Businesses | 6 |
| 4.1 | Names and Addresses of Members | 8 |
| 4.2 | Certificates | 8 |
| 5.1 | Management | |
| 5.2 | Number, Tenure, and Qualifications | 9 |
| 5.3 | Certain Powers of Manager | 9 |
| 5.4 | Liability for Certain Acts | 9 |
| 5.5 | Conflicts of Interest | 12 |
| 5.6 | Manager Has No Exclusive Duty to the Company | 12 |
| 5.7 | Bank Accounts | 12 |
| 5.8 | Indemnification of the Manager, Employees, and Other Agents | 14 |
| 5.9 | Resignation | 14 |
| 5.10 | Removal | 14 |
| 5.11 | Vacancies | 14 |
| 5.12 | Compensation and Expenses | 15 |
| | | 15 |
| 6.1 | Limitation of Liability | |
| 6.2 | Company Debt Liability | 16 |
| 6.3 | List of Members | 16 |
| 6.4 | Company Books | 16 |
| 6.5 | Priority and Return of Capital | 16 |
| 6.6 | Liability of a Member to the Company | 17 |

13.1    Dissolution . . . . . . . . . . . . . . . . . . . 34
13.2    Winding Up, Liquidation and
        Distribution of Assets . . . . . . . . . . . . . 35
13.3    Articles of Dissolution . . . . . . . . . . . . 37
13.4    Return of Contributions Nonrecourse to
        Other Members and Economic Interest Owners . . . 37

14.1    Notices . . . . . . . . . . . . . . . . . . . . 37
14.2    Books of Accounts and Records . . . . . . . . . 37
14.3    Application of New York Law . . . . . . . . . . 38
14.4    Waiver of Action for Partition . . . . . . . . 38
14.5    Amendments . . . . . . . . . . . . . . . . . . 38
14.6    Execution of Additional Instruments . . . . . . 38
14.7    Construction . . . . . . . . . . . . . . . . . 38
14.8    Headings . . . . . . . . . . . . . . . . . . . 38
14.9    Waivers . . . . . . . . . . . . . . . . . . . . 38
14.10   Rights and Remedies Cumulative . . . . . . . . 38
14.11   Severability . . . . . . . . . . . . . . . . . 39
14.12   Heirs, Successors, and Assigns . . . . . . . . 39
14.13   Creditors . . . . . . . . . . . . . . . . . . . 39
14.14   Counterparts . . . . . . . . . . . . . . . . . 39
14.15   Rule Against Perpetuities . . . . . . . . . . . 39
14.16   Investment Representations . . . . . . . . . . 40

(f)    "Capital Interest" shall mean the proportion that the positive Capital Account of a Member or Economic Interest Owner bears to the aggregate positive Capital Accounts of all Members and Economic Interest Owners whose Capital Accounts have positive balances, as may be adjusted from time to time, and as will be adjusted under the circumstances and in the manner described in Section 8.3(e).

(g)    "Company" shall refer to Bayou Fund, L.L.C.

(h)    "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amount which such Member is obligated to restore under Treas. Reg. §1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the next to last sentence of Treas. Reg. §§1.704-2(g)(1) and (i)(5), after taking into account thereunder any changes during such year in "partnership minimum gain" (as determined in accordance with Treas. Reg. §1.704-2(d)) and in the minimum gain attributable to any "partner nonrecourse debt" (as determined under Treas. Reg. §1.704-2(i)(3)); and

(ii)    Debit to such Capital Account the items described in Treas. Reg. §§1.704-1(b)(2)(ii)(d)(4), (5) and (6).

(iii)    This definition of Deficit Capital Account is intended to comply with the provision of Treas. Reg. §§1.704-1(b)(2)(ii)(d) and 1.704-2, and will be interpreted consistently with those provisions.

(i)    "Distributable Cash" means all cash, revenues, and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company:

(q)    "Majority Interest" shall mean one or more Membership Interests which taken together exceed eighty percent (80%) of the aggregate of all Membership Interests.

(r)    "Manager" shall mean one or more managers. Specifically, "Manager" shall mean Bayou Management, Inc., a New York limited liability company with its principal office located at 40 Signal Road, Stamford, Connecticut 06902, or any other person or persons that succeed it in that capacity. References to the Manager in the singular or as either or both of them or other like references shall also, when the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

(s)    "Member" shall mean each of the parties who executes a counterpart of this Operating Agreement as an Initial Member and each of the parties who may hereafter become Members. To the extent a Manager has purchased Membership Interests in the Company, he will have all the rights of a Member with respect to such Membership Interests, and the term "Member" as used in this Operating Agreement shall include a Manager if and to the extent that, he has purchased such Membership Interests in the Company. If a Person is a Member immediately before the purchase or other acquisition by such Person of an Economic Interest, that Person shall have all the rights of a Member with respect to the purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

(t)    "Membership Interest" shall mean a Member's entire interest in the Company including the Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Operating Agreement and the New York Act.

(u)    "Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions, and credits of the Company in the aggregate or separately stated, as appropriate, determined in accordance with Generally Accepted Accounting Principles applied on a consistent basis.

## ARTICLE 2
## Formation of Company

2.1    <u>Name</u>.    The name of the Company is Bayou Fund, L.L.C.

2.2    <u>Principal Place of Business</u>.    The principal place of business of the Company within the State of Connecticut shall be at 40 Signal Road, Stamford, Connecticut 06902.    The Company may locate its places of business and registered office at any other place or places as the Manager may from time to time deem advisable.

2.3    <u>Registered Office and Registration Agent</u>.    The Company's initial registered office shall be at the office of its registered agent at 488 Madison Avenue, New York, New York 10022, and the name of its initial registered agent at such address shall be Faust Rabbach & Oppenheim, LLP.    The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the New York Secretary of State pursuant to the New York Act.

2.4    <u>Term</u>.    The term of the Company shall be fifteen (15) years from the date of filing of Articles of Organization with the Secretary of State of the State of New York (the "Initial Term"), unless the Company is earlier dissolved in accordance with either the provisions of this Operating Agreement or the New York Act; provided, however, that the Initial Term may be extended by the Manager for up to three (3) additional one (1) year periods if the Manager deems such extension necessary for the orderly liquidation of the assets of the Company.

## ARTICLE 3
## Business of Company

3.1    <u>Permitted Businesses</u>.    The business of the Company shall be:

(a)    to purchase, invest, trade and sell, whether a long or short position, on margin or otherwise, in capital stock, subscriptions, warrants, bonds, notes, debentures, convertible securities, rights, options, puts and calls relating thereto and

(f)    to have and maintain one or more offices within or without the State of New York and incur such expenses as may be necessary or advisable in connection with the maintenance of such office or offices and the conduct of the business of the Company;

(g)    to open, conduct and close accounts, including margin and discretionary accounts, with brokers and/or dealers, and to pay the commissions, fees and other charges applicable to transactions in all such accounts, without regard to whether or not the Manager or its Principals are affiliated, related or employed by such brokerage firm and receive compensation from said firm as a registered representative, or otherwise, which compensation may be based, in whole or in part, on revenue received by such brokerage firm from transactions for or with the Company, with the understanding that such commissions payable to said firm and mark-ups charged by said firm are not independently negotiated;

(h)    to enter into, make and perform all contracts, agreements and undertakings, pay all costs and expenses and engage in all activities and transactions as may be necessary or advisable to the carrying out of the foregoing objects and purposes;

(i)    to engage in all activities necessary, customary, convenient, or incident to any of the foregoing;

(j)    to exercise all other powers reasonably connected with the Company's business that may be exercised by a limited liability company under the New York Act; and

(k)    to accomplish any lawful business for the protection or benefit of the Company or its assets.

## ARTICLE 4
## Initial Membership

4.1    <u>Names and Addresses of Members</u>.    The names and addresses of the Initial Members are set forth on Exhibit A attached hereto.    Exhibit A may be supplemented from time to time as Membership Interests in the Company are sold.

4.2    <u>Certificates</u>.    Membership Interests in the Company may be evidenced by certificates in a form approved by the Manager.

F:\1676-102\LLC'AGMT.007
mvk/08\01\01

(c) acquire and enter into any contract of insurance which the Manager deems necessary or appropriate for the protection of the Company and the Manager, for the conservation of the Company assets, or for any purpose convenient or beneficial to the Company;

(d) open, maintain and close bank accounts and draw checks or other orders for the payment of moneys;

(e) admit additional Members, subject to their meeting any and all standards imposed on Initial Members;

(f) require a Member to withdraw all or any portion of his or its Capital Account from the Company at any time for any reason deemed by the Manager in its sole discretion to be in the best interests of the Company;

(g) do any and all acts required of the Company and exercise all rights of the Company with respect to its interest in any corporation or other entity;

(h) Borrow money for the Company from banks, other lending institutions, the Manager, Members, or affiliates of the Manager or Members or others on such terms as the Manager deems appropriate, limited to the extent permitted by law or regulation, and, in connection therewith, to hypothecate, encumber and grant security interests in any of the assets of the Company to secure repayment of the borrowed sums. No debt shall be contracted or liability incurred by or on behalf of the Company except by the Manager or, to the extent permitted under the New York Act, by agents or employees of the Company expressly authorized to do so by the Manager;

(i) Pay all taxes, licenses, or assessments of whatever kind or nature imposed upon or against the Company, and for such purposes to make such returns and do all other such acts or things as may be deemed necessary and advisable by the Company;

(j) Establish, maintain, and supervise the deposit of any monies or securities of the Company with federally insured banking institutions or any institutions as may be selected by the Manager, in accounts in the name of the Company with such institutions;

authorized by the Manager to act as an agent of the Company in accordance with the previous sentence.

5.4    <u>Liability for Certain Acts</u>.  The Manager shall perform its managerial duties in good faith, in a manner it reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager who so performs the duties of Manager shall not have any liability by reason of being or having been a Manager of the Company.  A Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct, or a wrongful taking by the Manager.

5.5    <u>Conflicts of Interest</u>.  The Manager may employ or transact business with any person or entity for or on behalf of the Company, notwithstanding the fact that it or one of its affiliates may have an interest in or connection with such person or entity. Neither the Company nor the Members (other than said Manager who may also be a Member) shall have any rights in or to any income or profits derived therefrom.  However, subject to Section 3.1(c) hereof, except as specifically set forth herein, any such transactions with interested, related or affiliated parties shall be on terms reasonably competitive with those which may be obtained from unaffiliated persons.

5.6    <u>Manager Has No Exclusive Duty to the Company</u>.

(a)    The Manager hereby agrees to devote such of his time during normal business days and hours as in its discretion shall be deemed necessary and sufficient for the management of the affairs of the Company.  Nothing contained in this Section 5.6 shall preclude the Manager, or any affiliates or associates, or clients of either from engaging, presently or in the future, consistent with the foregoing, and without accountability to the Company, in any other business venture or ventures of any nature and description, including, without limitation, the management, financing, syndication or development of other ventures similar to

Company.  When effecting transactions for the Company, the Manager may, and most likely will, also be effecting similar or identical transactions for such other entities, customers and accounts (and may also be doing so for his own account and for the account of his family and other affiliates).  In each such case, the Manager will endeavor to treat the Company and all other entities and other customers and accounts on an essentially pro-rata basis in, among other things, effecting purchases and sales and allocating commissions and brokerage fees.  However, in some instances, parity will be difficult or impractical and the Company may pay more, or receive less or pay greater commission and fees when buying, selling or otherwise effecting transactions than such other entities, customers or accounts which are buying or selling in otherwise effecting similar or even identical transactions.  For all purposes hereof, none of the foregoing shall be deemed unlawful, wrongful or improper or in any way inconsistent with the Manager's obligations to the Company.

5.7    Bank Accounts.  The Manager may from time to time open bank accounts in the name of the Company, and the Manager shall be the sole signatory thereon, unless the Manager determines otherwise.

5.8    Indemnification of the Manager, Employees, and Other Agents.  To the maximum extent permitted under the New York Act, the Company shall indemnify the Manager and make advances for expenses.  The Company shall indemnify its employees and other agents who are not Managers to the fullest extent permitted by law.

5.9    Resignation.  Any Manager of the Company may resign at any time by giving written notice to the Members of the Company.  The resignation of any Manager shall take effect upon receipt of that notice or at such later time as shall be specified in the notice; and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.  The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.10    Removal.  At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed any time, with or without cause, by the affirmative vote of Members

equipment expenses (e.g., Trakdata machines, telephone lines, etc.), travel and entertainment expenses, supplies, premiums for liability insurance and other "general overhead expenses" associated with the operation of the Company. The Company is responsible for payment of all customary transaction expenses including, without limitation, interest, legal, accounting, brokerage, custody, transfer, registration, and similar fees and expenses and will reimburse the Manager for same if paid by the Manager, but it is intended that the Company will pay such expenses directly. Expenses up to $50,000 in connection with the offering of Membership Interests in the Company shall also be borne by the Company.

## ARTICLE 6
## Rights and Obligations of Members

6.1  <u>Limitation of Liability</u>. Each Member's liability shall be limited as set forth in this Operating Agreement, the New York Act, and other applicable law.

6.2  <u>Company Debt Liability</u>. A Member will not be personally liable for any debts or losses of the Company beyond the Member's respective Capital Contributions and any obligation of the Member under Section 8.1 or 8.2 below to make Capital Contributions, except as provided in Section 6.7 below or as otherwise required by law.

6.3  <u>List of Members</u>. Upon written request of any Member, the Manager shall provide a list showing the names, addresses, and Membership Interests and Economic Interests of all Members.

6.4  <u>Company Books</u>. In accordance with Section 9.9 below, the Manager shall maintain and preserve, during the term of the Company, and for five (5) years thereafter, all accounts, books, and other relevant Company documents. Upon reasonable request, each Member and Economic Interest Owner shall have the right, during ordinary business hours, to inspect and copy those Company documents at his or its own expense.

6.5  <u>Priority and Return of Capital</u>. Except as may be expressly provided in Article 9, no Member or Economic Interest Owner shall have priority over any other Member or Economic

from voting with respect to the matter being voted upon, shall be deemed to have voted in favor thereof.

## ARTICLE 8
## Contributions to the Company and Capital Accounts

8.1 <u>Members' Capital Contributions</u>. Each Member shall contribute such amount as is agreed-to in writing.

8.2 <u>Additional Contributions</u>. Except as set forth in Section 8.1 above, no Member shall be required to make any Capital Contributions. To the extent unanimously approved by the Managers, from time to time, the Members and Economic Interest Owners may be permitted to make additional Capital Contributions if and to the extent they so desire, and if the Managers determine that such additional Capital Contributions are necessary or appropriate for the conduct of the Company's business. In that event, the Members and Economic Interest Owners shall have the opportunity, but not the obligation, to participate in such additional Capital Contributions on a pro rata basis in accordance with their respective Capital Interests.

8.3 <u>Capital Accounts</u>. A separate Capital Account will be maintained for each Member and Economic Interest Owner.

(a) Each Capital Account will be increased by:

(i) The amount of money contributed by the Member or Economic Interest Owner to the Company;

(ii) The fair market value of property contributed by the Member or Economic Interest Owner to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under IRC §752);

(iii) Allocations to the Member or Economic Interest Owner of Net Profits and Net Losses; and

(iv) Allocations to the Member or Economic Interest Owner of income described in IRC §705(a)(1)(B).

(e)    Sums available for distribution upon liquidation of the Company (or any Member's Membership Interest or Economic Interest Owner's Economic Interest), will be made pro rata in accordance with the respective Capital Interests of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs. Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (or, if later, within one hundred twenty (120) days after the date of the liquidation). The Company may offset damages for breach of this Operating Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or Economic Interest Owner or the liquidation of the Company) against the amount otherwise distributable to the Member.

(f)    Except as otherwise required in the New York Act (and subject to Sections 8.1 and 8.2 above), no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in the Capital Account of a Member or Economic Interest Owner.

## ARTICLE 9
### Allocations, Income Tax, Distributions, Elections, and Reports

9.1    <u>Allocations of Profits and Losses from Operations</u>.

(a)    The Net Losses of the Company for each Fiscal Year will be allocated in accordance with the Capital Interests (expressed as a percentage) of each Member and Economic Interest Owner.

(b)    The Net Profits of the Company for each Fiscal Year will be tentatively allocated for purposes of computation only as provided for Net Losses in Section 9.1(a) above.

(c)    However, twenty percent (20%) of Eligible Net Profits tentatively allocated to each such Member or Economic Interest Owner pursuant to (b) above shall be allocated to the Manager. The remaining Net Profits after said allocation shall continue to be allocated to such Member of Economic Interest Owner.

year which is in excess of the sum of any amount that the Member or Economic Interest Owner is obligated to restore to the Company under Treas. Reg. §1.704-1(b)(2)(ii)(c) and the share of minimum gain of the Member or Economic Interest Owner as defined in Treas. Reg. §1.704-2(g)(1) (which is also treated as an obligation to restore in accordance with Treas. Reg. §1.704-1(b)(2)(ii)(d)), the Capital Account of the Member or Economic Interest Owner shall be specially credited with items of Membership or Economic Interest Owner income (including gross income) and gain in the amount of the excess as quickly as possible.

(d) Notwithstanding any other provision of this Section 9.2, if there is a net decrease in the Company's minimum gain as defined in Treas. Reg. §1.704-2(d) during a taxable year of the Company, the Capital Account of each Member and Economic Interest Owner shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to the share of the net decrease of that Member or Economic Interest Owner in Company minimum gain. This Section 9.2(d) is intended to comply with the minimum gain chargeback requirement of Treas. Reg. §1.704-2 and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the Company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members or Economic Interest Owners and it is not expected that the Company will have sufficient other income to correct that distortion, the Manager may in its discretion (and shall, if requested to do so by a Member or Economic Interest Owner) seek to have the IRS waive the minimum gain chargeback requirement in accordance with Treas. Reg. §1.704-2(f)(4).

(e) Items of Company loss, deduction, and expenditures described in IRC §705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as partner (Member or Economic Interest Owner) nonrecourse deductions under Treas. Reg. §1.7042(2)(i) shall be allocated to the Capital Accounts of the Members and Economic Interest Owners in accordance with said Treas. Reg. §1.704-2(i).

(f) Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Treas. Reg. §1.704-2(b)) those deductions shall be allocated to the

IRC §704(e)(1)(B) of all property which had been contributed to the Company within five years of the distribution, and is held by the Company immediately before the distribution, had been distributed by the Company to another Member or Economic Interest Owner. If any portion of the property distributed consists of property which had been contributed by the distributee Member or Economic Interest Owner to the Company, then the property shall not be taken into account under this Section 9.2(i) and shall not be taken into account in determining the amount of the Net Precontribution Gain. If the property distributed consists of an interest in an entity, the preceding sentence shall not apply to the extent that the value of the interest is attributable to the property contributed to the entity after such interest had been contributed to the Company.

(j)    In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Member or Economic Interest Owner as consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a de minimis amount) by the Company to a retiring Member or Economic Interest Owner as consideration for an Economic Interest or Membership Interest, the Capital Accounts of the Members and Economic Interest Owners shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treas. Reg. §1.704-1(b)(2)(iv)(f). If under Treas. Reg. §1.704-1(b)(2)(iv)(f), Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of the property, then depreciation, amortization and gain or loss with respect to such property shall be shared among the Members and Economic Interest Owners in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the shares of the Members and Economic Interest Owners of tax items under IRC §704(c).

of the Company are in excess of all liabilities of the Company, except liabilities to Members and Economic Interest Owners on account of their contributions.

9.5  <u>Accounting Principles</u>.  The profits and losses of the Company shall be determined in accordance with Generally Accepted Accounting Principles applied on a consistent basis using the mark-to-market method of accounting.

9.6  <u>Interest on and Return of Capital Contributions</u>.  No Member or Economic Interest Owner shall be entitled to interest on his or its Capital Contribution or to return of his or its Capital Contribution, except as otherwise specifically provided for in this Operating Agreement.

9.7  <u>Loans to Company</u>.  Nothing in this Operating Agreement shall prevent any Member or Economic Interest Owner from making secured or unsecured loans to the Company by agreement with the Company.

9.8  <u>Accounting Period</u>.  The Company's accounting period shall be its Fiscal Year.

9.9  <u>Records, Audits, and Reports</u>.  At the expense of the Company, the Manager shall maintain records and accounts of all operations and expenditures of the Company.  At a minimum the Company shall keep the following records:

(a)  A current list of the full name set forth in alphabetical order and last known business, residence, or mailing address of each Member, Economic Interest Owner, and Manager, both past and present;

(b)  A copy of the Articles of Organization of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)  Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

Manager in its sole discretion. No partial withdrawal request which is less than $50,000, or which would reduce a Member's Capital Account below the lesser of a Member's initial Capital Contribution or $250,000 (or such lesser amount as may be consented to by the Manager) will be accepted by the Manager. Upon receipt of any such partial withdrawal notice, the Manager may request the Member to change the amount of the requested withdrawal or withdraw all of his or its Capital Account. No withdrawal shall be made unless either: (i) all liabilities of the Company have been paid, or (ii) the Company has sufficient assets to pay such liabilities (including contingent or unliquidated liabilities). The Manager may, however, in its sole discretion, permit a withdrawal after deducting from the amount to be withdrawn any reserve or reserves which, in its sole discretion, would represent such withdrawing Member's share of such contingent or unliquidated liabilities and provided further that upon the definitive resolution of any such contingent or unliquidated liability so reserved against, the Manager shall distribute to the withdrawn Member any excess of such reserve over such ultimate liability, or, if such reserve is less than such ultimate liability, to require such Member to return to the Company that portion of the withdrawn amount equal to the excess of such Member's share of such liability over the amount of such reserve. Any Member electing a complete withdrawal pursuant to this Article 10 shall cease to be a Member as of the end of the Fiscal Year of the withdrawal. No provision of this Section shall affect the rights and limitations in connection with (i) an assignment or transfer by a Member of his or its interest pursuant to Article 11 of this Agreement, or (ii) the termination or dissolution of the Company pursuant to Article 12 of this Agreement.

10.2 <u>Withdrawals by the Manager</u>. As of the end of any Fiscal Year, commencing in 1996, the Manager may withdraw a portion of its Capital Account or Economic Interest. No such withdrawal shall be made unless all liabilities of the Company have been paid, or unless the Company would have sufficient assets to pay such liabilities (including contingent or unliquidated liabilities). The Manager shall give each Member at least sixty (60) days' prior written notice of any anticipated withdrawal, other than a distribution pursuant to Section 9.3 above.

within thirty-one (31) days after the Company has received its audited financial statements for the Fiscal Year. Furthermore, if in the opinion of the Manager it would be in the best interests of the Fund, any payment referred to above can be extended for up to ninety (90) days at the Manager's sole discretion.

## ARTICLE 11
## Transferability

11.1 <u>Assignment</u>. No Member shall assign or transfer, or offer to sell, assign, or transfer all or any part of his or its Membership Interest, except by operation of law as described in Section 11.5 following.

11.2 <u>Void Assignment</u>. Any sale, exchange or other transfer by any Member of any Membership Interest in contravention of Section 11.1 hereof shall be void and ineffective, and shall not bind, or be recognized by, the Company or any other party. No purported assignee shall have any right to any profits, losses or distributions of the Company.

11.3 <u>Substituted Member</u>.

(a) No Member shall have the right to substitute an assignee as a Member in his or its place. The Manager shall, however, have the right to permit such an assignee to become a Member. If granted, such permission by the Manager shall be binding and conclusive only upon receiving the consent or approval of a majority in interest of the Member.

(b) Upon the admission of a Substituted Member, the schedule of Members annexed hereto shall be amended to reflect the name and address of such Substituted Member and to eliminate the name and address of the assigning Member. Each Substituted Member, as a condition of becoming a Member, shall execute such instrument or instruments as shall be required by the Manager to signify such Substituted Member's agreement to be bound by all the provisions of this Agreement.

admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income, and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of IRC §706(d) and the Treasury Regulations promulgated thereunder.

## ARTICLE 13
### Dissolution and Termination

13.1  <u>Dissolution</u>.

(a)  The Company shall be dissolved upon the occurrence of any of the following events:

(i)  When the period fixed for the duration of the Company shall expire pursuant to Section 2.4 above;

(ii)  By the unanimous written agreement of all Members;

(iii)  The sale or other disposition of substantially all of the Company's assets (including the liquidation or reduction to cash of all consideration received); or

(iv)  Upon the death, incapacity, expulsion, bankruptcy, dissolution, or withdrawal of a Member or occurrence of any other event which terminates the continued membership of a Member in the Company (a "Withdrawal Event"); provided, however, that if there are at least two remaining Members the business of the Company shall be automatically continued unless the Manager elects not to continue the business of the Company within one hundred eighty (180) days after the Withdrawal Event.

(v)  Upon written notice from either (a) the Manager or (b) Principals of the Manager in their capacity as Members, in their sole and absolute discretion at any time and for any reason.

sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest Owners shall be adjusted pursuant to the provisions of Article 9 and Section 8.3 of this Operating Agreement to reflect such deemed sale.

(ii)    The positive balance (if any) of the Capital Account of each Member and Economic Interest Owner (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members and Economic Interest Owners, either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 12.3(b)(i). Any such distributions to the Members and Economic Interest Owners in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Treas. Reg. §1.704-1(b)(2)(ii)(b)(2).

(e)    Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Treas. Reg. §1.704-1(b)(2)(ii)(g), if any Member or Economic Interest Owner has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations, and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), the Member or Economic Interest Owner shall have no obligation to make any Capital Contribution, and the negative balance of the Capital Account of such Member or Economic Interest Owner shall not be considered a debt owed by the Member or Economic Interest Owner to the Company or to any other Person for any purpose whatsoever.

(f)    Upon completion of the winding up, liquidation, and distribution of its assets, the Company shall be deemed terminated.

(g)    The Manager shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

records shall be maintained as provided in Section 9.9 above. The books and records shall at all times be maintained at the principal executive office of the Company and shall be open to the reasonable inspection and examination of the Members, Economic Interest Owners, or their duly authorized representatives during reasonable business hours.

14.3 <u>Application of New York Law</u>. This Operating Agreement, and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of New York, and specifically the New York Act.

14.4 <u>Waiver of Action for Partition</u>. Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for partition with respect to the property of the Company.

14.5 <u>Amendments</u>. This Operating Agreement may not be amended except by the written agreement of a Majority Interest of the Members. Any Member who or which does not vote against, or abstain in writing from voting with respect to, any amendment proposed by the Manager (whether or not the Manager is then a Member), shall be deemed to have voted in favor of such amendment.

14.6 <u>Execution of Additional Instruments</u>. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney, and other instruments necessary to comply with any laws, rules, or regulations.

14.7 <u>Construction</u>. Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

14.8 <u>Headings</u>. The headings in this Operating Agreement are for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Operating Agreement or any of its provisions.

14.9 <u>Waivers</u>. The failure of any party to seek redress for violation of or to insist upon the strict performance of any

F:\1676-102\LLC'AGMT.007
mvk/08\01\01

- 38 -

the Rule against Perpetuities or any similar rule of law but for this Section 14.15, the parties to this Operating Agreement hereby agree that any future interest which is created pursuant to said provision shall cease if it is not vested within twenty-one (21) years after the death of the survivor of the group composed of all who are currently Members and their issue who are living on the date of this Operating Agreement.

14.16 <u>Investment Representations</u>.   The parties to this Operating Agreement agree as follows with respect to investment representations:

(a)   The undersigned Members and Economic Interest Owners, if any, understand:

(i)   That the Membership Interests and Economic Interests evidenced by this Operating Agreement have not been registered under the Securities Act of 1933, as amended, 15 U.S.C. §15b et seq., or any other state securities laws (the "Securities Acts") because the Company is issuing these Membership Interests and Economic Interests in reliance upon the exemptions from the registrations requirements of the Securities Acts providing for issuance of securities not involving a public offering;

(ii)   That the Company has relied upon the fact that the Membership Interests and Economic Interests are to be held by each Member and Economic Interest Owner for investment; and

(iii)   That exemption from registration under the Securities Acts would not be available if the Membership Interests and Economic Interests were acquired by a Member or Economic Interest Owner with a view to distribution.

(b)   Accordingly, each Member and Economic Interest Owner hereby confirms to the Company that the Member and Economic Interest Owner is acquiring the Membership Interests and Economic Interests for his or its own account, for investment and not with a view to the resale or distribution.

F:\1676-102\LLC'AGMT.007
mvk/08\01\01                        - 40 -

## CERTIFICATE

The undersigned hereby agree, acknowledge, and certify that the foregoing Operating Agreement, consisting of forty-one (41) pages, excluding the Table of Contents and attached Exhibits, constitutes the Amended and Restated Operating Agreement of Bayou Fund, L.L.C. adopted by the Members of the Company as of _____

_____.


MANAGER:

BAYOU MANAGEMENT, L.L.C.
a New York limited liability company


By:_____